**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Berkshire Investments LLC, | ) | Case No. 24-11552 |
| | ) | |
| Debtor. | ) | Honorable David D. Cleary |
| | ) | |

**DECLARATION OF RICHARD N. JENKINS IN SUPPORT OF CHAPTER 11
FILING AND FIRST DAY EMERGENCY MOTIONS**

I, Richard N. Jenkins, hereby declare under penalty of perjury the following is true to the best of my knowledge, information, and belief.

1. I am the Chief Financial Officer of Berkshire Investments, LLC ("Berkshire" or the "Debtor") d/b/a Chicago Extruded Metals Company, a limited liability company organized and existing under the laws of the State of Illinois. I have served as CFO of the Debtor since May 2022. Prior to that, I was a financial consultant to the Debtor since the Debtor's founding in 2003 through Lincoln Professional Group, LLC, an Illinois limited liability company formed in August 1999. I have also worked at several other companies in various stages of financial distress in the Chicago area, whether as Chief Financial Officer or in other consulting capacities.

2. As a result of my long tenure with the Debtor, I am intimately familiar with the Debtor's business, financial affairs, and operations.

**History and Background**

3. The Debtor is a fully integrated brass mill located in Cicero, Illinois. The Debtor's predecessor (Chicago Extruded Metals Company) was founded in 1922 at its current location and grew in size and volume over the years, shipping nearly 3,000,000 pounds of metal product per

month at its peak. The Debtor's predecessor filed for bankruptcy in 2003 when margins were small, competitors were many, and working capital was insufficient to sustain operations.

4. The Debtor currently produces standard and engineered brass and bronze alloys in extruded rod, bar, and other profiles, including a variety of low lead brass, leaded brass, naval brass, aluminum bronze, and silicon bronze alloys. Eighty percent of the Debtor's manufactured products use recycled materials. The Debtor's engineering capabilities and deep metallurgical experience enable it to manufacture these alloys to meet most customer requirements.

5. In 2022, the Debtor became one of the only domestic producers of nickel silver alloys. This extremely durable metal can be extruded by the Debtor into high quality elevator sills. The Debtor has perfected this process of manufacturing these sills after much trial and error over the past several years and is currently capable of producing this higher margin generic and custom designed product in either bronze or nickel silver and in standard 7, 8, 9 and 10-foot lengths or in any other custom length.

6. The Debtor was formed in September 2003 by IAT Reinsurance Company ("IAT") for purposes of bidding on the assets of Chicago Extruded Metals Company in a Section 363 sale under the United States Bankruptcy Code. The Debtor was the successful bidder at that sale. IAT retained sole ownership of the Debtor through December 18, 2020, when it sold 100% of its membership interests in the Debtor to CXM Investments LLC ("CXMI"), the current sole owner of the Debtor, for $5,000 cash plus an option to purchase 15% of the membership interests in CXMI within the next 10 years for $10,000. At the time of that transfer, IAT forgave $16 million in loan advances to the Debtor plus all interest accrued thereon. CXMI's initial capital contribution into the Debtor totaled $200,000. The purchase option in favor of IAT was never exercised.

7.     The Debtor is the only manufacturer of bronze products in the United States, with its competition being exclusively from imported products. The Debtor currently employs approximately 55 union workers and 25 salaried employees (collectively, the "Employees"). The union workers are members of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union Local 7-00717.

8.     The Debtor's Chief Executive Officer is Patrick Balson, who has served in that role since the Debtor's formation in 2003. Mr. Balson controls 79.5% of CXMI and is the sole manager of both the Debtor and CXMI.

**Historical Performance of the Debtor**

9.     From its acquisition by IAT in September 2003 through the sale of the Debtor in December 2020, the Debtor's financial results reflected the changing landscape of the brass industry. Revenues increased from $37 million in 2004 to $74 million in 2006. Market changes in the use of leaded brass in plumbing applications and the precipitous decline in the housing market, however, resulted in a 47% drop in sales revenues from $68 million in 2008 to $36 million in 2009.

10.    In response, the Debtor began exploring other product lines that the Debtor could produce in an effort to replace lost sales volumes. When a bronze production facility closed in the Chicago area, the Debtor purchased and installed the required equipment and began selling bronze products in 2012. Bronze sales increased from 205,000 pounds in 2012 to 530,000 pounds in 2022, making the Debtor a viable supplier of that product. By 2023, however, the Debtor's working capital shortfalls and constraints caused bronze sales to drop to an annualized rate of only 259,000 pounds.

11.    In late 2021, the Debtor became aware of an opportunity arising from a company that produced architectural sills and was going out of business. In early 2022, the decision was

3

made to purchase the manufacturing equipment of that company related to the production of the architectural sills for $1.5 million, of which approximately $675,000 remains unpaid.

**Deterioration in the Debtor's Financial Condition**

12. As described in the Debtor's motion requesting authorization to obtain postpetition financing and use cash collateral, on February 17, 2021, the Company entered into a "Loan and Security Agreement" (the "NELI LSA") with NELI International Incorporated ("NELI"), secured by a perfected security interest in substantially all assets of the Debtor. The NELI LSA was amended seven times through November 16, 2023. The seventh amendment includes a forbearance agreement on account of the Debtor's material defaults under the NELI LSA. The forbearance agreement was further twice extended through March 31, 2024 and has expired by its terms.

13. By late 2021 and early 2022, the disruptive effects of the COVID-19 shutdowns resulted in a shortage of skilled workers and electricians, supply chain disruptions (which reduced the supply of critical replacement parts and electrical fixtures), and a slowdown in the demand for the Debtor's finished products. Simultaneously, installation costs for the new equipment relating to the production of architectural sills more than doubled, and the time to install and calibrate the equipment increased significantly. Further draining the Debtor's working capital reserves was the unexpected 80% drop in May 2022 of orders from one large customer, leaving the Debtor with over $2 million of raw material that had been designated for fulfillment of that customer's orders.

14. Installation of the architectural sill production equipment was scheduled to be completed between August 2022 and October 2022, but was delayed until February 2023. Training on the new equipment was also hampered because former employees of the company from which the equipment was purchased refused to assist the Debtor in starting up the equipment and training

the Debtor's employees based on a non-compete agreement they claimed they were required to sign as a condition of obtaining severance benefits from the seller of the equipment.

15. In 2023, the Debtor undertook to obtain additional financing to increase working capital availability for the Debtor's operations. On March 8, 2023, the Debtor entered into a sale-leaseback transaction in which it sold its rights to the approximately 10 acres of real property underlying the Debtor's facility to J2M-Cicero, LLC for $1.75 million. In exchange, the Debtor leased back the property for two years on a triple net lease, with the first year's annual rent of $262,500 prepaid at closing. Monthly rental payments to the landlord in this, the second year of the lease, total $26,250. The lease term expires on March 7, 2025.

16. The sale yielded the Debtor approximately $1.1 million in net working capital after payment of transaction fees and expenses, real property taxes due Cook County, and the first year's prepaid rent. The lease includes a purchase option that gives the Debtor the exclusive option to repurchase the property prior to lease termination for the same $1.75 million principal amount paid by the landlord to purchase the property at the inception of the transaction. That purchase option expires on the tenth business day before the March 7, 2025 expiration of the lease.

17. In September 2023, the Debtor sought to replace the NELI LSA with a new lending source. That replacement lender completed its due diligence and a closing was scheduled for October 17, but at the last moment the lender determined not to close on the refinancing. Other potential lenders were solicited in an effort to replace the NELI LSA, but none followed through with expressions of interest.

18. In addition to the $200,000 in capital contributions to the Debtor from CXMI in December 2020, Mr. Balson and I have personally collectively advanced over $2.2 million through unsecured loans to the Debtor and deferred compensation for services rendered.

19. NELI has been the sole lending source for the Debtor, but because of the borrowing base limitations, has only provided sufficient capital to keep the operations so that the Stalking Horse Bidder (as defined below) could complete its due diligence and finalize an asset purchase agreement that is contemplated to be filed with the bankruptcy court shortly after the filing and that calls for a sale of the Debtor's assets to the Stalking Horse Bidder free and clear of all liens, claims and encumbrances, subject to higher and better offers and bankruptcy court approval.

20. The Debtor's gross revenues were approximately $32 million and $30 million in 2021 and 2022, respectively. The Debtor's deteriorating financial condition and severe working capital constraints under the Neli LSA resulted in gross revenues declining to approximately $17 million in 2023 and only $6 million during the first six months of 2024.

21. As a result of the confluence of events described above, the Debtor incurred a net income loss of approximately $869,000 in 2021, $3.5 million in 2022, $5 million in 2023, and $2.7 million for the six months ended June 30, 2024.

22. The Debtor's primary tangible assets as of the filing date are approximately $550,000 of accounts receivable and $2.2 million of raw material inventory. The net book value of the Debtor's machinery and equipment is approximately $3.6 million.

23. In addition to the approximately $2.1 million due under the NELI LSA, the Debtor owes $1,752,339.50 to Tramec, LLC ("Tramec") on account of unfulfilled purchase orders that were paid in advance by Tramec since December 2023. These advances are secured by a perfected security interest in favor of Tramec. The Debtor also owes approximately $11.1 million to holders of unsecured claims.

24. The Debtor's shortage of working capital and significant past due balances to vendors has resulted in vendor product being supplied to the Debtor only if paid with cash in

advance of shipment. Currently, the Debtor lacks sufficient working capital to purchase the necessary raw materials needed to reach a breakeven sales level of approximately $3 million per month.

### Marketing of the Debtor's Operations for Acquisition by Third Parties

25. High demand exists for the brass, bronze, and architectural sill products that the Debtor produces, but the Debtor simply has lacked adequate working capital to meet this demand. As a result, starting in the late summer of 2022, the Debtor's management contacted the four other specialty niche manufacturers who, like the Debtor, convert brass scrap and other virgin scrap materials into niche brass and bronze product as a specialty jobber rather than as a commodity high volume processer to see if any would be interested in acquiring the Debtor's operations.

26. Each of these manufacturers either visited the Debtor's facility or were visited by the Debtor's Chief Executive Officer, Mr. Balson, at their European headquarters in Italy and France, respectively. Three of the firms refused to make an offer for the company, and the other required an amendment to the Debtor's collective bargaining agreement as a condition to making an offer that was unacceptable to the union because of the lack of certainty regarding health, welfare, and other employee benefit plans that would be offered in a new contract with that entity.

### Negotiations with the Stalking Horse Bidder and Finalization of APA

27. The greatest interest in potentially acquiring the Debtor's operations came from Tramec, which had acquired a division of a former customer of the Debtor who had purchased significant quantities of raw material from the Debtor for its parts manufacturing business prior to being acquired by Tramec. The Debtor perceived that its operations would be a good fit for Tramec's portfolio of companies, as they generate significant quantities of scrap metal that could

be processed through the Debtor's facility at reduced cost to these companies and thereby fit well into Tramec's overall corporate platform.

28. In December 2023, Tramec and the Debtor signed a non-binding letter of intent for the acquisition of the Debtor's operations, subject to due diligence and other conditions. Following the signing of that letter of intent, and continuing through May 2024, as noted above, Tramec advanced $1,752,339,50 cash to the Debtor under prepaid product purchase orders, none of which were fulfilled by the Debtor. These advances, however, were a critical lifeline that enabled the Debtor to survive until an asset purchase agreement (the "APA") could be finalized, with Tramec's wholly-owned subsidiary, X-Metals Acquisition, LLC, the contemplated "Stalking Horse Bidder" in a motion soon to be filed with the bankruptcy court seeking entry of an order approving bidding procedures and a public auction of substantially all the Debtor's assets, free and clear of all liens, claims, and encumbrances.

29. I believe the contemplated sale process, supported by NELI through its proposed debtor in possession financing facility (described below), will preserve the Debtor's ongoing operations and going concern value, enable the Debtor's union and non-union employees to retain their high-skilled positions, and avoid a catastrophic shutdown of a metal processing facility that has been in operation for over 100 years.

**Motion to Approve Postpetition Credit Facility**

30. In order to continue operating in the Chapter 11 Case, the Debtor requires immediate access to post-petition financing and use of the cash collateral. Absent such relief, the Debtor does not have sufficient unrestricted cash or other financing available to operate its business, maintain the estate's property, and administer the Chapter 11 Case with a view toward a going-concern sale of substantially all of its assets.

31. The Debtor is therefore filing a motion (the "DIP Financing/Cash Collateral Motion") seeking authority for it to obtain post-petition asset-based financing from NELI with a maximum borrowing limit in the principal amount of $3,500,000 (as limited by the borrowing base formulas contained in the DIP Credit Agreement). This post-petition financing would bear interest an annual rate equal to the Prime Rate in effect from time to time plus 1.75% per annum, accruing daily and payable monthly, *provided* that during the existence of any default under the Post-Petition Financing that such interest shall be increased by an additional four percent (4%) and will be secured by liens on substantially all assets of the Debtor. In addition, the DIP Financing/Cash Collateral Motion seeks authority to allow the Debtor to use cash collateral, and to provide adequate protection to NELI.

32. The Debtor, with the assistance of its professionals, conducted an analysis and determined, in its business judgment, that financing under section 364(c) and (d) of the Bankruptcy Code was the only realistic means of obtaining the capital it needed to operate during the Chapter 11 Case. Following this determination, the Debtor and its professionals engaged in good-faith negotiations with NELI, resulting in what I believe to be the most favorable terms upon which the Debtor could reasonably obtain the needed financing. The Debtor contacted four other prospective lenders to no avail. Due to the Debtor's overall precarious financial position, the Debtor is unable to obtain (1) adequate unsecured credit allowable under Sections 503(b)(1) or 364(c)(1) of the Bankruptcy Code as an ordinary administrative expense, (2) unsecured credit allowable under Section 364(a) or (b) of the Bankruptcy Code, (3) unsecured credit entitled to priority under Section 364(c)(1) of the Bankruptcy Code, or (4) adequate secured credit under Section 364(c)(2), (c)(3) or (d)(1), from any source other than the Lender that would be sufficient to enable the Debtor to continue its business operations.

33. If granted, the DIP Financing/Cash Collateral Motion would provide significant, critically needed, additional liquidity to the Debtor, and thus enable it, among other things, to (a) maintain the continuity of its operations, and (b) maximize the value of the Debtor's business as a going concern.

34. For the foregoing reasons and those set forth in the DIP Financing/Cash Collateral Motion, I believe the relief requested in that motion is in the Debtor's best interests and will enable it to preserve and maximize the value of its estate.

### Prepetition Wages and Benefits

35. The Debtor requests authority to (A) pay certain prepetition employee wages, salaries, and other compensation; (B) pay and honor employee medical and other benefits; (C) continue employee benefit programs; (D) reimburse employees for advancing costs on personal credit cards; (E) to obtain related relief; and (F) for shortened and limited notice thereof.

36. The skills, training, and institutional knowledge of the Employees are essential to the Debtor's ability to administer its business effectively during the chapter 11 case and to maximize the value of its assets. As of the Petition Date, there are amounts accrued and owing under or related to the Debtor's compensation and benefit programs. A large number of the Employees are dependent on receiving their earned compensation and benefits to pay their daily living expenses and provide for their families.

37. The Debtor estimates Prepetition Wage Claims owed Union Employees and Salaried Employees for the period from August 5 through and including August 7, 2024 at approximately $59,030.06. The Debtor estimates Prepetition Wage Claims owed Union Employees for the period August 5 through and including August 7, 2024 at approximately $36,399.46. The Debtor estimates Prepetition Wage Claims owed Salaried Employees for the

period August 5 through and including August 7, 2024 at approximately $22,630.60. Significantly, no single Employee is owed prepetition wages in excess of the $15,150 priority limit provided under section 507(a)(4) of the Bankruptcy Code.

38. The Debtor offers Employees access to health, dental, vision, disability, life, and worker's compensation insurance, along with other benefits. Certain of these benefits are on account of periods preceding the Petition Date, in whole or in part. None of the proposed payments would result in any covered Employee receiving aggregate wages and benefits for prepetition periods that could exceed the $15,150 priority limit under Bankruptcy Code sections 507(a)(4) and (a)(5) for such claims.

39. In addition to wages and salaries, the Debtor provides regular full-time Employees with paid time off ("PTO") for holidays, vacations, and other personal days off. As of the Petition Date, the Debtor's Employees have accrued an aggregate unpaid PTO in the approximate amount of $98,517.19. The Debtor seeks authority to honor all accrued PTO in the ordinary course as requested by the Debtor's Employees.

40. The Debtor is obligated under its collective bargaining agreement with the Union to deduct monthly dues owed by Union Employees to the Union. Amounts deducted from the prepetition wages of Union Employees but not remitted to the Union total $19,450.22. This payment is accounted for and authorized in the Debtor's "DIP Budget" that is attached to the Debtor's motion seeking authority to obtain credit from the Proposed Postpetition Lender.

41. The Debtor reimburses certain Employees for reasonable business expenses incurred in the performance of their respective duties, such as mileage, parking and tolls, airfare, lodging, and meal expenses while performing company business. The Debtor requests authority to

reimburse all unpaid business expenses incurred by its Employees prior to the Petition Date, which is a nominal amount as of the Petition Date.

42. In addition, I have personally guaranteed an aggregate of $42,293.12 for business expenses paid through one of the Debtor's American Express Business Cards. These purchases were for office supplies, breakroom supplies, parts for equipment, gas, parking, and business meals.

43. Similarly, Patrick Balson, the Debtor's Chief Executive Officer, has paid an aggregate of approximately $21,500 for business expenses paid through one of his personal credit cards.

44. The payments to American Express for these prepetition business expenses incurred are accounted for and authorized in the Debtor's "DIP Budget" that is attached to the Debtor's motion seeking authority to obtain credit from the Proposed Postpetition Lender.

45. Employees are entitled to contribute to a 401(k) plan sponsored by the Debtor, a safe harbor plan into which such Employees may contribute pretax earnings for retirement savings. The Debtor does also contribute to Employees' 401(k) accounts. The Debtor has deducted $32,415.73 from the Employees' pay for approximately six weeks prepetition that had not yet been forwarded to the 401(k) plan. The Debtor's matching contribution for this period is $21,901.22.

46. I believe the relief requested in the Wages/Benefits Motion is in the Debtor's best interests and will enable it to preserve and maximize the value of its estate.

### Page Limit

47. The Court's Local Rules provide for a 15-page limit on motions and other filings, which may be extended by the Court. The Debtor will file a motion to excuse this limit with respect to the DIP Financing/Cash Collateral Motion (the "Page Limit Motion"). Given the

complexity of both the Debtor's business and the relief requested, adhering to the 15-page limit would not give the Debtor an adequate opportunity to set forth the factual and legal bases for the relief it requests. Because the DIP Financing/Cash Collateral Motion is so important to the continued operations and ultimate sale of the Debtor's business, I believe that extending the 15-page limit as requested in the Page Limit Motion is in the best interests of the Debtor, its estate, and parties in interest.

## Conclusion

48.     In order to minimize any loss to the value of the Debtor's assets and to maximize the benefit to the Debtor's creditors and estate, the Debtor's objective is to continue operating in the short term, with a view toward selling the business as a going concern on an expedited timeframe. I believe that if the Court grants the relief requested in the aforementioned motions and other motions to follow, the prospect of achieving such objectives, and thus maximizing the recovery for the Debtor's estate and creditors, will be significantly enhanced.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 12, 2024.

*Richard N. Jenkins* (signature)
Richard N. Jenkins

Dated: August 12, 2024          Respectfully Submitted,

BERKSHIRE INVESTMENTS, LLC

By: /s/ Carolina Y. Sales     .
Proposed Counsel for the Debtor

Steven R. Jakubowski (ARDC #6191960)
Carolina Y. Sales (ARDC #6287277)
ROBBINS DIMONTE, LTD.
180 N. LaSalle Street, Suite 3300
Chicago, Illinois 60601
Tel: 312-782-9000
sjakubowski@robbinsdimonte.com
csales@robbinsdimonte.com

15