**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 24-11552 |
| | ) | |
| Berkshire Investments LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Honorable David D. Cleary |
| | ) | |
| Employer's Tax Identification No.: | ) | |
| 20-0200892 | ) | |
| | ) | |

_____

## NOTICE OF FILING STALKING HORSE ASSET PURCHASE AGREEMENT

To:  See attached service list

PLEASE TAKE NOTICE that on August 23, 2024 we filed the attached *Stalking Horse Asset Purchase Agreement* with the Clerk of the United States Bankruptcy Court, Northern District of Illinois, located at the United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, 60604, via the Court's CM/ECF system, a copy of which is hereby served upon you.

BERKSHIRE INVESTMENTS, LLC

By: /s/ Carolina Y. Sales_____

Steven R. Jakubowski (ARDC #6191960)
Carolina Y. Sales (ARDC #6287277)
ROBBINS DIMONTE, LTD.
180 N. LaSalle Street, Suite 3300
Chicago, Illinois 60601
Tel: 312-456-0191
Fax: 312-782-6690
sjakubowski@robbinsdimonte.com
csales@robbinsdimonte.com
*Proposed Counsel for Debtor*

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that he served a copy of this notice and the *Stalking Horse Asset Purchase Agreement* on each entity shown on the attached list at the address shown and by the method indicated on the list on August 23, 2024.

/s/ Carolina Y. Sales                                    

### **Service List**

**Via ECF**

Brian A. Audette on behalf of Interested Party X-Metal Acquisition, LLC
baudette@perkinscoie.com, docketchi@perkinscoie.com;brian-audette-perkins-coie-8180@ecf.pacerpro.com

William J Factor on behalf of Other Prof. NELI International Incorporated
wfactor@wfactorlaw.com,
wfactorlaw@gmail.com;bsass@wfactorlaw.com;wfactor@ecf.courtdrive.com;wfactormyecfmail@gmail.com;factorwr43923@notify.bestcase.com

Patrick S Layng
USTPRegion11.ES.ECF@usdoj.gov

Stephen A Yokich on behalf of Creditor United Steelworkers
efile@laboradvocates.com, syokich@laboradvocates.com

*Execution Version*

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of August 21, 2024 (the "**Agreement**"), by and between Berkshire Investments LLC (d/b/a Chicago Extruded Metals Company), an Illinois limited liability company ("**Seller**") and X-Metals Acquisition, LLC, a Delaware limited liability company (the "**Buyer**").

# RECITALS

WHEREAS, Seller is engaged in the business of manufacturing and selling metal alloys (collectively, the "**Business**");

WHEREAS, Seller has sought relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (as amended, the "**Bankruptcy Code**") by filing a case (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the Northern District of Illinois (the "**Bankruptcy Court**") on August 8, 2024 (the "**Petition Date**"); and

WHEREAS, Seller desires to sell, transfer, assign, convey and deliver to the Buyer, and the Buyer desires to purchase, acquire and accept from Seller, all of Seller's right, title, and interest in and to the Purchased Assets on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

ARTICLE 1
DEFINITIONS

SECTION 1.01 *Definitions*.

(a)      The following terms, as used herein, have the following meanings:

"**Affiliate**" shall have the meaning ascribed to it under Section 101(2) of the Bankruptcy Code.

"**Ancillary Agreements**" means the Bill of Sale Assignment and Assumption Agreement, IP Assignment Agreement and each other agreement, document, or instrument (other than this Agreement) executed and delivered by the parties hereto in connection with the consummation of the transactions contemplated by this Agreement.

"**Benefit Plan**" means any material plan, program, arrangement or agreement that is a compensation, pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change in control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life, Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance, or fringe benefit plan, program, arrangement or agreement, whether written or oral, including any (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA or (ii) other employee benefit plans, agreements, programs, policies, arrangements, or payroll practices, whether or not subject to ERISA, in each case, (x) which is sponsored, maintained, administered, or contributed to by Seller or any ERISA Affiliate and (y) under which any Business Employee or any dependent or beneficiary thereof has any

present or future right to benefits, but excluding those plans, programs, arrangements, or agreements that are maintained by a Governmental Unit.

"**Business Day**" means a day on which banks are open for business in the City of Chicago, Illinois but does not include a Saturday, Sunday or a statutory holiday in the State of Illinois.

"**Business Employees**" means those individuals primarily employed in providing services to the Seller in, or otherwise necessary for, the operation of the Business.

"**Closing Date**" means the date of the Closing.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Environmental Laws**" means all Laws and orders in effect and relating to: (a) pollution or the protection of natural resources, endangered or threatened species, human health, or the environment (including ambient air, surface water, ground water, land surface or subsurface strata);  (b) the presence of, or release or threatened release of, hazardous substances; (c) the generation, manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling, recycling, investigation, removal, cleanup, or remediation of hazardous substances, or documentation related to the foregoing; (d) community or worker right-to-know disclosures with respect to hazardous substances; (e) storage tanks, vessels, containers, abandoned or discarded barrels, or other closed receptacles containing hazardous substances; and (f) health and safety of employees or other persons.

"**Environmental Permit**" means any license, registration, governmental approval, and governmental authorization issued or granted pursuant to or under any Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**ERISA Affiliate**" means any trade or business that is, or was at any relevant time, treated as a single employer with Seller under Section 414 of the Code or Section 4001 of ERISA.

"**Governmental Unit**" shall have the meaning ascribed to it under Section 101(27) of the Bankruptcy Code.

"**Intellectual Property**" means, with respect to the Business or the Purchased Assets, all patents, trademarks, marks, copyrights, software, Intellectual Property Licenses, trade secrets, and confidential business information, and all rights, claims, benefits, and remedies under any Laws and throughout the world with respect to any of the foregoing and any other proprietary rights in intangible forms of property.

"**Knowledge of Seller**," "**Seller's Knowledge**," or any other similar knowledge qualification in this Agreement means the actual knowledge as of the Closing Date of Patrick Balson, Dick Jenkins, and Aaron Mercer after having conducted reasonable inquiries of all employees, consultants, and advisors of Seller who report to such individual.

"**Law**" means any law, statute, ordinance, regulation, rule, code, treaty, order, judgment, writ, injunction, act, decree, decision, ruling, award, or other requirement having the force of law of any Governmental Unit.

2

"**Liability**" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"**Liens**" means all options, proxies, voting trusts, voting agreements, judgments, pledges, charges, escrows, rights of first refusal or first offer, transfer restrictions, liens, claims, mortgages, security interests, indentures, equities and other encumbrances of every kind and nature whatsoever, including any arrangements or obligations to create any such encumbrance, whether arising by agreement, operation of Law or otherwise.

"**Material Adverse Effect**" means a material adverse effect on the Business, assets or financial condition of the Purchased Assets and Assumed Liabilities, taken as a whole, excluding any such effect to the extent resulting from or arising in connection with (i) the transactions contemplated hereby or the announcement thereof, (ii) changes or conditions affecting the industries generally in which Seller operates, (iii) changes in economic, regulatory or political conditions generally, or (iv) changes resulting from the Chapter 11 Case; *provided, however*, in the case of subsections (ii) and (iii), such changes or conditions may be taken into account in determining whether there has been or is a Material Adverse Effect to the extent such changes have a disproportionate effect on the Purchased Assets and Assumed Liabilities relative to other businesses operating in the industry in which the Business operates; *provided, further, however*, in the case of subsection (iv), such changes or conditions may be taken into account in determining whether there has been or is a Material Adverse Effect in the case it would be an expansion of the Assumed Liabilities or an increase in the Purchase Price beyond the Cap on the Purchase Price. Without any express or implied limitation of the generality of the foregoing, the following shall constitute a "Material Adverse Effect": (A) Seller's furnaces and extrusion lines have ceased operating consistent with normal pre-Petition operations, other than for routine or ordinary course maintenance, (B) a strike, work stoppage, or renegotiation of or dispute under the Union Contract, and (C) any adversary or other Proceeding that is initiated or threatened that could be reasonably likely to result in a material increase in or expand the scope of the Assumed Liabilities.

"**Permit**" means any license, permit, registration, government approval, and governmental authorization as well as industry certifications, registrations, and approvals, in each case of any kind or nature.

"**Permitted Liens**" means, with respect to the Purchased Assets, Liens for Taxes not yet due or delinquent or being contested in good faith by appropriate proceedings.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust, or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period ending on and including the Closing Date.

"**Proceeding**" means any litigation (in law or in equity), arbitration, mediation, action, lawsuit, proceeding, complaint, charge, claim, demand, hearing, inquiry, investigation or like matter, including those involving or before or by any Governmental Unit or other Person, and whether administrative, judicial, or arbitrational in nature.

167479169.20

"**Real Property Lease**" shall mean that certain lease dated as of March 8, 2023, between Seller and J2M-Cicero, LLC, an Illinois limited liability company, for the premises located at 1601 S. 54th Avenue, Cicero, Illinois.

"**Sale Hearing**" means the hearing conducted by the Bankruptcy Court to consider approval of the transactions contemplated by this Agreement.

"**Seller Intellectual Property**" means (i) all Intellectual Property owned or purported to be owned by Seller and (ii) to the extent transferable, any Intellectual Property that is licensed or purported to be licensed to Seller, in each case, used or held for use primarily in or otherwise necessary for the conduct of the Business, other than Intellectual Property that is an Excluded Asset.

"**Tax**" or "**Taxes**" means all federal, state, local, foreign, and other income, corporation, capital gains, excise, gross receipts, ad valorem, sales, goods and services, harmonized sales, use, employment, franchise, profits, gains, property, transfer, payroll, social security contributions, intangibles, and other taxes, fees, stamp taxes, duties, charges, levies, or assessments of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or additional amounts imposed by any Governmental Unit with respect thereto.

"**Tax Return**" means any and all returns, reports, declarations, elections, schedules, attachments, notices, forms, designations, filings, and statements (including estimated Tax Returns and reports, withholding Tax Returns and reports, information returns, and reports, and any amendments to any such documents) filed or required to be filed in respect of the determination, assessment, collection, or payment of any Taxes or in connection with the administration, implementation, or enforcement of any applicable Law relating to any Taxes.

"**Taxing Authority**" means any Governmental Unit responsible for the imposition of any Tax (domestic or foreign).

(b)      Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| Agreement | Preamble |
| Allocation Statement | 2.06(b) |
| Assumed Liabilities | 2.03 |
| Avoidance Actions | 2.02(f) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bid Procedures | 6.03(c) |
| Bid Procedures Order | 6.03(c) |
| Bill of Sale Assignment and Assumption Agreement | 2.09(a)(i) |
| Business | Recitals |
| Buyer | Preamble |
| Buyer Plan | 8.01(b) |
| Chapter 11 Case | Recitals |
| Chapter 11 Contracts | 2.01(d) |
| Closing | 2.08 |
| Cure Costs | 2.05(a) |
| Designation Deadline | 2.05(e) |
| Disclosure Schedules | Article 3 |

4

| | |
|---|---|
| Escrow Agent | 2.07 |
| Excluded Assets | 2.02 |
| Excluded Contracts | 2.02(c) |
| Excluded Liabilities | 2.04 |
| Good Faith Deposit | 2.07 |
| IP Assignment Agreement | 2.09(a)(iii) |
| Licenses | 2.01(e) |
| Outside Date | 11.01(b) |
| Petition Date | Recitals |
| Post-Petition Contracts | 2.01(d) |
| Purchased Assets | 2.01 |
| Purchased Contracts | 2.01(d) |
| Purchase Price | 2.06 |
| Sale Order | Section 2.09(a)(v) |
| Seller | Preamble |
| Straddle Period | 7.01(c) |
| Transferred Employee | 8.01(a) |
| Transfer Taxes | 7.01(b) |

ARTICLE 2
PURCHASE AND SALE

SECTION 2.01 *Purchase and Sale*.  Except as otherwise provided below, upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase from Seller and Seller agrees to sell, convey, transfer, assign, and deliver, or cause to be sold, conveyed, transferred, assigned, and delivered, to Buyer at the Closing, free and clear of all Liens and claims, other than Assumed Liabilities and Permitted Liens, all of Seller's right, title, and interest in, to, and under the assets, properties, and business, of every kind and description, owned, held, or used primarily in or otherwise necessary for the conduct of the Business by Seller as the same shall exist on the Closing Date (collectively, the "**Purchased Assets**"), including all right, title, and interest of Seller in, to, and under the following Purchased Assets to the extent owned, held, or used primarily in or otherwise necessary for the conduct of the Business:

(a)    the real property and leases of, and other interests in, real property, in each case together with all buildings, fixtures, and improvements erected thereon, listed on Schedule 2.01(a), including the Real Property Lease;

(b)    all machinery, equipment, vehicles, parts, furniture, and other tangible assets and personal property leased by or owned by Seller or that are, or may be, used in or related to the operation of the Business;

(c)    all inventory, raw materials, supplies, finished goods, component parts, returned goods, contemplated products, goods in transit, packaging materials, and other consumables of Seller relating to the Business including inventory in transit from suppliers of the Business or held by suppliers of the Business;

(d)    (i) all rights transferable under contracts, agreements, leases, licenses, commitments, sales, and orders, of Seller, in each case executed after the Petition Date (collectively, the "**Post-Petition Contracts**") and (ii) the transferable pre-Petition Date executory contracts that are listed on Schedule 2.01(d) (collectively, the "**Chapter 11 Contracts**", and together with Post-Petition Contracts, the "**Purchased Contracts**") to be assumed by the Seller and assigned to the Buyer pursuant to Section 365 of the Bankruptcy Code;

167479169.20

(e)   all transferable licenses, Permits, or other governmental authorizations of Seller relating primarily to the Purchased Assets or otherwise necessary for the conduct of the Business (the "**Licenses**");

(f)   all accounts, notes, and other receivables outstanding as of the Closing related to the Purchased Contracts that are for services to be performed on or after the Closing;

(g)   all Seller Intellectual Property, including the items listed on <u>Schedule 2.01(g)</u> and all of the Seller's rights therein, and all rights to sue for and recover and retain damages for present and past infringement thereof;

(h)   all hardware, software, completed products, products currently in development, and contemplated products, and all technology and Intellectual Property related thereto;

(i)   all operating records, data, and other materials maintained by the Business, including all sales and sales promotional data, advertising materials, customer lists and records, emails, passwords, credit information, cost and pricing information, supplier lists and records, business plans, catalogs, price lists, correspondence, mailing lists, distribution lists, photographs, production data, service and warranty records, engineering records, manufacturing and quality control records and procedures, drawings, blueprints, records, accounting records, plans, specifications, surveys, property records, manuals, and other materials related to any of the foregoing items;

(j)   all goodwill associated with the Business and the Purchased Assets;

(k)   all insurance proceeds, condemnation awards, or other compensation in respect of loss or damage to any of the Purchased Assets to the extent occurring between the date hereof and the Closing Date, and all rights and claims of Seller to any such insurance proceeds, condemnation awards or other compensation not paid by the Closing, but excluding any insurance proceeds used for repair or casualty;

(l)   all rights under non-disclosure or confidentiality agreements, inventions, and Intellectual Property assignment covenants executed for the benefit of Seller with current or former Business Employees, consultants, or contractors of Seller, or with third parties, in each case primarily related to the Purchased Assets or otherwise necessary for the conduct of the Business;

(m)   the Agreement by and between Seller and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, on behalf of its Local 7-0717 (the "**Union Contract**"); and

(n)   all security deposits, customer deposits and other deposits of any kind related to the Purchased Assets.

SECTION 2.02 *Excluded Assets*.  The Buyer expressly understands and agrees that the following assets and properties of Seller (the "**Excluded Assets**") shall be excluded from the Purchased Assets:

(a)   all of Seller's and its Affiliates' cash and cash equivalents on hand (including all undeposited checks) and in banks;

(b)   insurance policies of Seller and its Affiliates and claims, credits, causes of action, or rights thereunder;

6

(c)   all rights and obligations under the contracts, agreements, leases, licenses, commitments, sales and purchase orders, and other instruments of Seller and its Affiliates that are not Purchased Contracts (collectively, the "**Excluded Contracts**");

(d)   all rights of Seller arising under this Agreement, the Ancillary Agreements, or the transactions contemplated hereby or thereby;

(e)   any Purchased Asset sold or otherwise disposed of pursuant to Section 5.01(b) prior to the Closing Date;

(f)   (i) all avoidance claims or causes of action available to Seller under Chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law (collectively, "**Avoidance Actions**") against any Person, and (ii) any proceeds of any settlement from and after the date hereof through the Closing of any claims, counterclaims, rights of offset, or other causes of action of any of Seller against any Person;

(g)   all tax refunds related to any Pre-Closing Tax Period relating to the Business;

(h)   all receivables, claims or causes of action that relate to any of the Excluded Assets or Excluded Liabilities;

(i)   all Benefit Plans and any assets, trust agreements, insurance policies, administrative services agreements, and other contracts, files and records in respect thereof; and

(j)   any asset owned by Seller that is not a Purchased Asset, including, for the avoidance of doubt, any commercial tort claims that do not relate to Purchased Assets.

SECTION 2.03 *Assumed Liabilities*.   Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the time of the Closing, to assume the following Liabilities and obligations and agrees to pay, perform, and discharge, when due, in accordance with their respective terms, all of the Liabilities and obligations (of any nature or kind, and whether based in common Law or statute or arising under written contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential) of Seller with respect to, arising out of or relating to the following (the "**Assumed Liabilities**"):

(a)   all Liabilities and obligations of Seller arising under Purchased Contracts and Licenses to the extent first arising on or after the Closing and excluding any and all Liabilities or obligations relating to any pre-Closing period;

(b)   all authorizations of Governmental Units, including Permits, licenses, certificates, consents, variances, approvals, Environmental Permits, or authorizations of any Governmental Units relating primarily to or required in the operation of the Purchased Assets, to the extent transferable;

(c)   all Liabilities and obligations assumed by, or allocated to, Buyer pursuant to Article 7 hereof; and

(d)   the Assumed Liabilities listed on Schedule 2.03.

For the avoidance of doubt, nothing in this Section 2.03 or in Section 2.05 shall prevent the Buyer, after the date hereof and until the Closing, from negotiating or otherwise entering into a mutual agreement to reduce the amount of any Assumed Liability directly with the Person to which such Liability or obligation is owed;

167479169.20

*provided*, *however*, that Buyer shall provide Seller with reasonable advance notice of, and shall include representatives of Seller in, any such negotiation and any related communications with such Persons.

SECTION 2.04 *Excluded Liabilities*.  Buyer shall not assume and shall not be responsible to pay, perform, or discharge any Liabilities of Seller, other than the Assumed Liabilities (the "**Excluded Liabilities**").  Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement is intended to require Buyer to pay, perform, or otherwise discharge any Liability included in the Excluded Liabilities.  Without limiting the foregoing, the following Liabilities are Excluded Liabilities under this Agreement:

(a)    all Liabilities, including but not limited to all accounts payable, accrued payroll, payroll Tax, other employee benefit Liabilities, and income or business Tax Liabilities, and other accrued expenses incurred or arising prior to the Closing Date;

(b)    all Liabilities arising out of the Excluded Assets;

(c)    an amount equal to all Transfer Taxes, if any;

(d)    all environmental Liabilities and obligations and all other Liabilities relating to Laws or Environmental Permits in connection with any environmental, health, or safety matters based on facts arising or existing during Seller's operation of the Business prior to the Closing Date;

(e)    all Liabilities arising from or relating to Benefit Plans;

(f)    all Liabilities arising from or relating to any collective bargaining agreements, union contracts, including the Union Contract, and other similar agreements to the extent such Liabilities arose prior to Closing;

(g)    all Liabilities relating to any claims for infringement, dilution, misappropriation or any other violation of the Intellectual Property of a third party arising from Seller's operation of the Business prior to the Closing Date;

(h)    all Liabilities for any Taxes of Seller including, but not limited to, Liabilities of Seller for any Taxes arising in connection with the consummation of the transactions contemplated hereby, other than those assumed pursuant to Section 2.03;

(i)    all Liabilities of Seller for Taxes of any Person under Reg. § 1.1502-6 (or any similar provision of state, local, or non-U.S. Law), as a transferee or successor, by contract or otherwise;

(j)    all Liabilities for Taxes with respect to the Purchased Assets allocated under Section 7.01(c) hereof to any Pre-Closing Tax Period;

(k)    all Liabilities of Seller relating to claims under the WARN Act or other similar Laws, reclamation claims, or claims under Section 503(b)(9) of the Bankruptcy Code;

(l)    all Liabilities arising as a result of any action, suit, investigation, or proceeding initiated at any time, to the extent related to the Business or the Purchased Assets on or prior to the Closing Date, including, but not limited to, any equity holder suits, actions for breach of contract, or any tort actions;

(m)    all Liabilities of Seller relating to costs and expenses of professionals retained under Sections 327, 363, or 1103 of the Bankruptcy Code and all fees, if any, owed to the United States Trustee

8

under 28 U.S.C. § 1930 or otherwise, and all costs associated with the wind down of the Business and the Chapter 11 Case; and

(n)   all Liabilities incurred in the ordinary course of business existing prior to the Closing Date other than Assumed Liabilities.

SECTION 2.05 *Assignment of Contracts and Rights*.

(a)   Schedule 2.01(d) sets forth with respect to each Chapter 11 Contract, Seller's good-faith estimate of the amount required to be paid with respect to each Chapter 11 Contract to cure all monetary defaults under such contract to the extent required by Section 365(b) of the Bankruptcy Code and otherwise satisfy all requirements imposed by Section 365(d) of the Bankruptcy Code (the actual amount of such costs, the "**Cure Costs**"). The Buyer may identify any Purchased Contract that the Buyer no longer desires to have assigned to it in accordance with Section 2.05(e).  All contracts of Seller that are not listed on Schedule 2.01(d) shall not be considered a Purchased Contract or Purchased Asset.

(b)   Prior to the Sale Hearing, Seller shall take all actions reasonably required to assume and assign the Purchased Contracts to the Buyer and otherwise take all reasonably necessary actions in order to determine the Cure Costs with respect to any Chapter 11 Contract, including the right (subject to Section 5.01) to negotiate in good faith and litigate, if necessary, with any contract counterparty the Cure Costs needed to cure all monetary defaults under such Chapter 11 Contract.  If Seller, the Buyer, and the counterparty to a Chapter 11 Contract are unable to reach mutual agreement regarding any dispute with respect to Cure Costs, Seller shall seek a hearing before the Bankruptcy Court, which hearing may be the Sale Hearing, to determine Cure Costs.  Notwithstanding the foregoing, if the Bankruptcy Court allows a Cure Cost in excess of the amount listed on Schedule 2.01(d), then Buyer shall be entitled, in its sole discretion, to re-designate the contract as an Excluded Contract (including, notwithstanding Section 2.05(e), if the Designation Deadline shall have passed).

(c)   To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 2.05, on the Closing Date, Seller shall assume and assign to the Buyer the Chapter 11 Contracts pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to the provision of adequate assurance by the Buyer as may be required under Section 365 of the Bankruptcy Code and payment by the Buyer of the Cure Costs solely in respect of the Chapter 11 Contracts.

(d)   To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 2.05, Seller shall transfer and assign all of the Purchased Contracts to the Buyer and the Buyer shall assume all of the Purchased Contracts from Seller, as of the Closing Date, pursuant to Sections 363 and 365 of the Bankruptcy Code, as applicable.  Notwithstanding any other provision of this Agreement or in any Ancillary Agreement to the contrary, this Agreement shall not constitute an agreement to assign any contract or any right thereunder if an attempted assignment without the consent of a third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), would constitute a breach or in any way adversely affect the rights of the Buyer or Seller thereunder.

(e)   Notwithstanding anything in this Agreement to the contrary, the Buyer may, in its sole and absolute discretion, amend or revise Schedule 2.01(d) setting forth the Purchased Contracts in order to add any contract to, or eliminate any contract from, such Schedule in each case at any time during the period commencing from the date hereof and ending on the date that is five (5) Business Days before the commencement of the Sale Hearing (the "**Designation Deadline**").  Automatically upon the addition of any contract to Schedule 2.01(d), on or prior to the Designation Deadline, such contract shall be a Purchased Contract for all purposes of this Agreement.  Automatically upon the removal of any contract

9

from Schedule 2.01(d), on or prior to the Designation Deadline, such contract shall be an Excluded Contract for all purposes of this Agreement, and no Liabilities arising thereunder shall be assumed or borne by the Buyer unless such Liability is otherwise specifically assumed pursuant to Section 2.03. After entry of the Sale Order by the Bankruptcy Court, Seller may file one or more motions with the Bankruptcy Court seeking approval under Section 365 of the Bankruptcy Code to reject any or all Excluded Contracts.

SECTION 2.06 *Purchase Price; Allocation of Purchase Price.*

(a)     In consideration of the sale of the Purchased Assets to Buyer, and upon the terms and subject to the conditions hereinafter set forth, the purchase price for the Purchased Assets (the "**Purchase Price**") shall be equal to the sum of the following amounts and payable as follows:

(i) the amount of the credit bid for outstanding indebtedness as referenced in that certain Security Agreement and UCC Filing Authorization, dated February 28, 2024, by and among Seller, Tramec, L.L.C. and Tramec Sloan LLC, and NELI International Incorporated ("**NELI**") which is equal to $1,752,339.50 as of the Petition Date; *plus*

(ii) an amount equal to the sum of (x) the obligations owed to NELI under that certain Secured Super-Priority Post-Petition Credit Agreement (as the same may be amended and modified, the "**Post-Petition Credit Agreement**") dated August 12, 2024 by and between Seller and NELI, *plus* (y) the Pre-Petition Obligations (as defined in the Post-Petition Credit Agreement) (collectively, the "**NELI Portion of the Purchase Price**"); *plus*

(iii)     the amount of Cure Costs for the Real Property Lease and any other Chapter 11 Contracts assumed by Buyer within the Buyer's sole discretion (the "**Cure Portion of the Purchase Price**"); *plus*

(iv)     the amount of up to $100,000.00 cash for the benefit of the bankruptcy estate of Seller (the "**Estate Portion of the Purchase Price**" and together with the NELI Portion of the Purchase Price and the Cure Portion of the Purchase Price, the "**Cash Portion of the Purchase Price**").

(b)     The parties agree that a good faith estimate of the Purchase Price as of the date hereof and the method of calculation thereof is set forth on Schedule 2.06 (the "**Form Estimated Purchase Price Worksheet**"). The Form Estimated Purchase Price Worksheet sets forth, in each case as of the date hereof, (i) a good faith estimate of the NELI Portion of the Purchase Price, (ii) a good faith estimate of the Cure Portion of the Purchase Price, (iii) a good faith estimate of the Estate Portion of the Purchase Price, and (iv) a good faith estimate of the Cash Portion of the Purchase Price.

(c)     No later than five (5) Business Days prior to the Closing Date, Seller shall deliver to Buyer, in the form of Schedule 2.06, a good faith estimate of the Purchase Price as of the Closing Date and the method of calculation thereof (the "**Closing Purchase Price Worksheet**"). The Closing Purchase Price Worksheet shall set forth, in each case as of the Closing Date, (i) a good faith estimate of the NELI Portion of the Purchase Price, (ii) a good faith estimate of the Cure Portion of the Purchase Price, (iii) a good faith estimate of the Estate Portion of the Purchase Price, and (iv) a good faith estimate of the Cash Portion of the Purchase Price.

(d)     No later than ten (10) days prior to the Closing Date, the Buyer shall deliver to Seller a proposed allocation of the Purchase Price (and other amounts treated as additional consideration for U.S. federal income Tax purposes) as of the Closing Date among the Purchased Assets determined in a manner consistent with Section 1060 of the Code and the Treasury Regulations promulgated thereunder

10

("**Allocation Statement**"). If Seller disagrees with the Allocation Statement, Seller may, within five (5) days after delivery of the Allocation Statement, deliver a notice (the "**Seller's Allocation Notice**") to the Buyer to such effect, specifying those items as to which Seller disagrees, the basis for such disagreement, and setting forth Seller's proposed allocation of the Purchase Price (and other amounts treated as additional consideration for U.S. federal income Tax purposes) and file its Tax Returns (and Tax Returns of its Affiliates) using alternative allocations of its choosing. If Seller's Allocation Notice is duly and timely delivered, Seller and the Buyer shall cooperate in good faith to reach a mutually agreeable allocation of the Purchase Price, which allocation shall be binding on all parties. In the event the parties are unable to resolve any such dispute prior to the Closing Date, neither the Buyer nor Seller will be bound by the Allocation Statement, and each of the parties may independently determine its own allocation of the Purchase Price for income Tax purposes and file its Tax Returns (and Tax Returns of its Affiliates) using alternative allocations of its choosing.

(e)    The Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that the Buyer may be required to deduct and withhold under any provision of Tax Law on account of the transactions contemplated herein. To the extent any such amount is to be so deducted and withheld by the Buyer, such amounts shall be timely paid over to, or deposited with, the relevant Governmental Unit in accordance with the applicable provisions of Tax Law. All such amounts, to the extent deducted and withheld, shall be treated for all purposes of this Agreement as having been paid to the Person from whom such amount was deducted and withheld.

SECTION 2.07 *Good Faith Deposit*. The Buyer shall deposit into escrow with an escrow agent agreed upon by the parties (the "**Escrow Agent**") an aggregate amount equal to $325,000 (such amount that has been deposited at any given time, the "**Good Faith Deposit**") by wire transfer of immediately available funds. The Good Faith Deposit shall be deposited by Buyer on the later of the date of this Agreement or the date the escrow account with the Escrow Agent is established; *provided*, that, if the foregoing occurs after 4 p.m. Eastern Time on the applicable date, Buyer shall deposit such amount on the immediately succeeding Business Day. On the date of the termination of this Agreement or the Closing Date, as applicable, and except as provided in Section 11.01(j)(ii), Buyer and Seller shall provide joint written instructions to the Escrow Agent instructing the Escrow Agent to release the Good Faith Deposit and deliver it promptly to either (x) the Buyer or (y) Seller:

(a)    if the Closing shall occur, the Good Faith Deposit shall be applied toward the Purchase Price payable by the Buyer to Seller;

(b)    if this Agreement is terminated by Seller pursuant to Section 11.01(f) or Section 11.01(j), the Good Faith Deposit shall be delivered to Seller; or

(c)    if this Agreement is terminated by Buyer pursuant to Section 6.04(c), Section 11.01, any other provision of this Agreement that gives Buyer the express right to terminate this Agreement, or except as expressly set forth in Section 2.07(b), the Good Faith Deposit shall be returned to the Buyer.

SECTION 2.08 *Closing*. The closing (the "**Closing**") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place remotely via the exchange of documents and signatures as soon as possible after entry of the Sale Order authorizing the transactions contemplated herein, but in no event later than two (2) Business Days, after satisfaction or waiver (except for such conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver thereof at the Closing) of the conditions set forth in Article 9, or at such other time, date or place (which may be virtual) as the Buyer and Seller may mutually agree.

SECTION 2.09 *Deliveries at the Closing.*

(a)    At the Closing, Seller shall deliver to the Buyer:

(i) the bill of sale, assignment, and assumption agreement transferring the Purchased Assets to the Buyer substantially in the form of Exhibit A attached hereto (the "**Bill of Sale Assignment and Assumption Agreement**"), duly executed by Seller;

(ii) an intellectual property assignment agreement transferring the Seller Intellectual Property to Buyer substantially in the form of Exhibit B attached hereto (the "**IP Assignment Agreement**"), duly executed by Seller;

(iii)    an IRS Form W-9, duly executed by Seller;

(iv)    copies of all of the Seller's books and records related to the Business, the Purchased Assets, and/or the Assumed Liabilities;

(v)    a certified copy of the Sale Order (the "**Sale Order**") that must include, inter alia, the following:

(A)    approval of the sale, transfer and assignment of the Purchased Assets to Buyer free and clear of any and all Liens, including, but not limited to, all successor liability obligations under applicable law;

(B)    provision that any and all valid Liens, including Interests (as defined in the Bankruptcy Code) which includes but is not limited to liens, claims, and encumbrances, shall attach to the Cash Portion of the Purchase Price at Closing;

(C)    approval of Seller's assumption and assignment to Buyer of the Chapter 11 Contracts, including the Real Property Lease, in accordance with Section 365 of the Bankruptcy Code, in which case the Sale Order shall be deemed to be the order approving the assumption and assignment of the Chapter 11 Contracts, including the Real Property Lease; and

(D)    a finding that the Buyer is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code.

(vi)    originals of all Purchased Contracts, and if unavailable, true and correct copies thereof;

(vii)    a certified resolution of the Seller's board of directors or managers, as the case may be, authorizing the execution, delivery and performance of this Agreement;

(viii)    if requested by the Buyer, notices in a form reasonably satisfactory to the Buyer executed by Seller's duly authorized representative to each customer or account debtor of the Seller advising them of the sale of the Purchased Assets and the Buyer's right to collect the applicable receivables; and

(ix)    such other instruments and documents as the Buyer shall reasonably request to consummate the transactions contemplated in this Agreement or to otherwise effectuate the transfer of any and all Purchased Assets to Buyer.

12

(b)     At the Closing, the Buyer shall deliver to Seller:

(i)     an amount equal to the Cash Portion of the Purchase Price as calculated in accordance with Section 2.06(c) (including pursuant to release by the Escrow Agent of any portion of the Purchase Price from the Good Faith Deposit), by wire transfer of immediately available funds to an account or accounts designated no later than three (3) Business Days prior to Closing by Seller;

(ii)     the Bill of Sale, Assignment and Assumption Agreement, duly executed by the Buyer; and

(iii)     the IP Assignment Agreement, duly executed by Buyer.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES OF SELLER

Except as disclosed on the disclosure schedules delivered by Seller to the Buyer immediately prior to the execution of this Agreement (the "**Disclosure Schedules**"), it being understood that the scope of the representations in this Article 3 and/or any matters described in the Disclosure Schedules shall not be deemed to expand the scope of the Assumed Liabilities, Seller represents and warrants to the Buyer solely with respect to the Business and the Purchased Assets as follows:

SECTION 3.01 *Good and Marketable Title*.  Seller has good and marketable title to the Purchased Assets and, upon the entry of the Sale Order, the Buyer will acquire all right, title, and interest in the Purchased Assets, free and clear of all Liens, other than any Permitted Liens.

SECTION 3.02 *Corporate Existence and Power*.  Seller is duly formed, validly existing and in good standing under the Laws of its jurisdiction of formation and has all powers and all material governmental licenses, authorizations, Permits, consents, and approvals required to carry on the Business as now conducted.

SECTION 3.03 *Corporate Authorization*.  Subject to the applicable provisions of the Bankruptcy Code and the Bankruptcy Court's entry of the Sale Order, the execution, delivery, and performance by Seller of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby are within Seller's powers and authorities and have been duly authorized by all necessary action on the part of Seller.  On the date which the Sale Order is entered, this Agreement and the Ancillary Agreements will constitute valid and binding agreements of Seller (assuming the due authorization, execution and delivery of this Agreement and the Ancillary Agreements by the Buyer).

SECTION 3.04 *Governmental Authorization*.  Except as disclosed in Schedule 3.04 of the Disclosure Schedules, the execution, delivery, and performance by Seller of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby require no action by or in respect of, or filing with, any Governmental Unit, agency or official other than (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a Material Adverse Effect.

SECTION 3.05 *Compliance with Laws and Court Orders*.  To the Knowledge of Seller, Seller is not in material violation of any Law, rule, regulation, judgment, injunction, order or decree applicable to the Purchased Assets or the conduct of the Business.

13

SECTION 3.06 *Properties*.  Schedule 3.06 of the Disclosure Schedules includes a description of all real property used or held for use primarily in or otherwise necessary for the conduct of the Business which Seller leases, operates, or subleases. Seller has good title to, or in the case of any leased personal property, have valid leasehold interests in, all Purchased Assets, subject to the entry of an order of the Bankruptcy Court authorizing the assignment and assumption of such leasehold interests to the extent they are being conveyed to Buyer under this Agreement.

SECTION 3.07 *Labor Matters*.  Except for the Union Contract, Seller is not a party to or bound by any collective bargaining agreement or other labor union contract applicable to their employees, no collective bargaining agreement is currently being negotiated with respect to any of Seller's employees, and no Seller employees are represented by a labor union.  To the Seller's Knowledge, there is no pending or threatened strike, work stoppage, or material labor dispute concerning the Seller's employees. Seller has made available to the Buyer the Union Contract and summaries of all material Benefit Plans covering employees, directors or consultants or former employees, directors or consultants in, or related to, the Business.

ARTICLE 4
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that:

SECTION 4.01 *Corporate Existence and Power*.  Buyer is a limited liability company duly incorporated, validly existing, and in good standing under the Laws of the State of Delaware and has all corporate powers and all material governmental licenses, authorizations, Permits, consents, and approvals required to carry on its business as now conducted.

SECTION 4.02 *Corporate Authorization*.  The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby are within the powers of Buyer and have been duly authorized by all necessary corporate action on the part of Buyer.  Subject to Bankruptcy Court approval, this Agreement and the Ancillary Agreements constitute valid and binding agreements of Buyer (assuming the due authorization, execution, and delivery of this Agreement and the Ancillary Agreements by Seller).

SECTION 4.03 *Governmental Authorization*.  The execution, delivery, and performance by Buyer of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby require no material action by or in respect of, or material filing with, any Governmental Unit, agency or official.

SECTION 4.04 *Noncontravention*.  The execution, delivery, and performance by Buyer of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate the organizational documents of the Buyer, (ii) assuming compliance with the matters referred to in Section 4.03, materially violate any applicable Law, rule, regulation, judgment, injunction, order, or decree, (iii) require any consent or other action by any Person under, constitute a default under or give rise to any right of termination, cancellation, or acceleration of any right or obligation or to a loss of any benefit to which Buyer is entitled under any provision of any agreement or other instrument binding upon Buyer, or (iv) result in the creation or imposition of any material Lien on any asset of Buyer.

SECTION 4.05 *Financing*.  Buyer has, or will have prior to the Closing, sufficient funds available to deliver the Purchase Price, including the timely satisfaction of the Assumed Liabilities and payment of

14

the Cash Portion of the Purchase Price, if any, to the Seller, and to otherwise consummate the transactions contemplated by this Agreement.

SECTION 4.06 *Litigation*.  There is no action, suit, investigation or proceeding pending against, or to the knowledge of Buyer threatened against or affecting, Buyer before any court or arbitrator or any Governmental Unit, agency, or official which in any manner challenges or seeks to prevent, enjoin, alter, or materially delay the transactions contemplated by this Agreement or the Ancillary Agreements.

SECTION 4.07 *Finders' Fees*.  There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Buyer who might be entitled to any fee or commission from Seller or any of their Affiliates upon consummation of the transactions contemplated by this Agreement or the Ancillary Agreements.

SECTION 4.08 *Not Foreign Person*.  Buyer is not a "Foreign Person" as such term is defined at 31 C.F.R § 800.224 and/or 31 C.F.R. § 802.221.

ARTICLE 5
COVENANTS OF SELLER

SECTION 5.01 *Conduct of the Business*.  Except as may be required by the Bankruptcy Code and by the Bankruptcy Court in the Chapter 11 Case, from the date hereof until the Closing Date, Seller shall use commercially reasonable efforts to (a) conduct the Business in the ordinary course consistent with past practice over the last six months' time, (b) preserve intact the business organizations and material relationships with third parties, and (c) keep available the services of the present employees of the Business in the ordinary course consistent with past practice over the last six months' time.  Without limiting the generality of the foregoing, from the date hereof until the Closing Date, except as disclosed on Schedule 5.01, Seller will not, with respect to the Business:

(a)     acquire a material amount of assets from any other Person;

(b)     sell, lease, license, or otherwise dispose of any Purchased Assets except (i) otherwise in the ordinary course of business consistent with past practices or (ii) pursuant to Sections 363 or 365 of the Bankruptcy Code;

(c)     agree or commit to do any of the foregoing; or

(d)     take any action that would reasonably be expected to cause the failure of the conditions contained in Section 9.02(b).

SECTION 5.02 *Access to Information*.  From the date hereof until the Closing Date, Seller will, and will cause its Affiliates, as applicable, to (i) give Buyer, its counsel, financial advisors, auditors, and other authorized representatives reasonable access to the offices, properties, employees, books and records of Seller or its Affiliates relating to the Business, and (ii) furnish to Buyer, its counsel, financial advisors, auditors, and other authorized representatives such financial and operating data and other information relating to the Business as such Persons may reasonably request; *provided*, *however*, that such access shall be coordinated through persons as may be designated in writing by Seller for such purpose.  Any investigation pursuant to this Section shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Seller.  Notwithstanding the foregoing, Buyer shall not have the right to conduct any invasive testing (including digging, installing wells, pumping groundwater, or removing soil) with respect to the Purchased Assets, nor shall Buyer have access to personnel records of Seller relating to individual performance or evaluation records, medical histories, or other information which, in the good

15

faith determination of Seller, the disclosure of which would subject Seller to material risk of Liability or would violate applicable Law.

SECTION 5.03 *Notices of Certain Events*.  Seller shall promptly notify Buyer of:

(a)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b)    any notice or other communication from any governmental or regulatory agency or authority in connection with the transactions contemplated by this Agreement; and

(c)    any action, event, facts or circumstances that would reasonably be expected to cause the failure of the conditions contained in Section 9.02(b).

ARTICLE 6

COVENANTS OF BUYER AND SELLER

SECTION 6.01 *Reasonable Efforts; Further Assurances*.  Subject to the terms and conditions of this Agreement, Buyer and Seller will use their commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Laws and regulations to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.  Seller and Buyer agree to execute and deliver such other documents, certificates, agreements, and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement and the Ancillary Agreements and to vest in Buyer good title to the Purchased Assets, *provided*, *however*, that, except as otherwise provided in Section 6.04 of this Agreement, neither Seller nor the Buyer are obligated to incur any material cost or expense or initiate or join in any litigation in order to meet the obligations under this Section 6.01.

SECTION 6.02 *Certain Filings*.  Seller and Buyer shall cooperate with one another (a) in determining whether any action by or in respect of, or filing with, any Governmental Unit is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (b) in taking such actions, making any such filings, furnishing information required in connection therewith, and seeking timely to obtain any such actions, consents, approvals, or waivers.

SECTION 6.03 *Public Announcements*.  Except for filings effectuated by the Seller in connection with the Chapter 11 Case, the parties agree to consult with each other before issuing any press release or making any public statement with respect to this Agreement or the transactions contemplated hereby and, except for any press releases and public statements the making of which may be required by applicable Law (including the Bankruptcy Code) or any listing agreement with any national securities exchange, will not issue any such press release or make any such public statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed).

SECTION 6.04 *Method of Sale; Bankruptcy Court Approval*.

(a)    As promptly as practicable after the Petition Date, Seller shall file a motion in the Chapter 11 Case seeking the entry of an order: (i) approving the sale process for the sale of all or substantially all of the Purchased Assets and the Bid Procedures; (ii) approving the Bid Procedures, including the Break-Up Fee and Expense Reimbursement in favor of Buyer, as defined in, and pursuant to, Section 6.04(c) (collectively, the "**Bid Procedures**"); (iii) scheduling an initial bid deadline, a qualifying

16

offer deadline, an auction, and a Sale Hearing, as those terms and deadlines are defined and/or described below; (iv) approving the form of the notice of the Sale Hearing and the recipients of that notice; (v) authorizing the sale of the Purchased Assets free and clear of Liens other than any Permitted Liens; and (vi) obtaining such other relief as is necessary, reasonable, and customary in connection therewith.

(b)    Seller and the Buyer shall each use their commercially reasonable efforts, and shall cooperate, assist, and consult with each other, to secure the entry of the Sale Order, consistent with the terms of this Agreement and in substantially the form of Exhibit C, approving this Agreement and authorizing the transactions contemplated hereby. Seller and the Buyer shall consult with one another regarding pleadings that any of them intend to file or positions any of them intend to take with the Bankruptcy Court in connection with the Bankruptcy Court's entry of the Sale Order. Seller shall use commercially reasonable efforts to provide Buyer and its counsel with drafts of all notices and filings to be submitted by Seller to the Bankruptcy Court pertaining to this Agreement and the proposed Sale Order.

(c)    Seller shall use its best efforts to obtain entry of the Sale Order by the Bankruptcy Court to approve this Agreement and authorize the transactions contemplated hereby, consistent with the Bid Procedures approved by order of the Bankruptcy Court (the "**Bid Procedures Order**"). The Bid Procedures Order must approve Bid Procedures that contain, among other customary protections and procedures relating to process, the following: if Buyer is not in material default under the terms of this Agreement and Buyer is not the successful buyer of the Purchased Assets, then Buyer shall be entitled to (i) payment of a "break-up fee" in an amount equal to $325,000.00 (the "**Break-Up Fee**"), (ii) a reimbursement of reasonable out-of-pocket expenses in an amount not to exceed $100,000.00 (the "**Expense Reimbursement**") and (iii) the return of the Good Faith Deposit.

(d)    If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing, re-argument, reversal, or leave to appeal shall be filed with respect to the Sale Order or other such order), Seller and Buyer will, at the sole cost and expense of Buyer, cooperate in taking such steps to diligently defend such appeal, petition, or motion and shall seek an expedited resolution of any such appeal, petition, or motion.

SECTION 6.05 *Notices*. If at any time (a) Buyer becomes aware of any material breach by Seller of any representation, warranty, covenant, or agreement contained herein and such breach is capable of being cured by Seller, or (b) Seller becomes aware of any breach by Buyer of any representation, warranty, covenant, or agreement contained herein and such breach is capable of being cured by Buyer, the party becoming aware of such breach shall promptly notify the other parties, in accordance with Section 12.01, of such breach.

SECTION 6.06 *Communications with Customers and Suppliers*. Prior to the Closing, the Buyer shall not, and shall cause its Affiliates and representatives not to, contact, or engage in any discussions or otherwise communicate with, Seller's customers, suppliers, licensors, licensees, and other Persons with which Seller have commercial dealings without obtaining the prior written consent of Seller. Seller agrees that, subsequent to the Closing, it will refer all customer inquiries or other communications with business relationships relating to the Business to Buyer.

SECTION 6.07 *Winding Up; Dissolution; Liquidation*. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall prohibit Seller from ceasing its operations, converting the Chapter 11 Case to one under chapter 7 of the Bankruptcy Code, or seeking dismissal of the Chapter 11 Case to wind down its affairs outside of bankruptcy at any time after the Closing Date.

SECTION 6.08 *Post-Closing Payments; No Wrong Pockets*.

(a)    If, for a period of nine (9) months after the Closing, Seller or any of its Affiliates receive any notices, monies, or amounts that are properly due, deliverable, or owing to the Buyer or attributable to the Purchased Assets (including funds relating to any Purchased Contracts for any post-Closing period) or Assumed Liabilities in accordance with the terms of this Agreement, Seller shall, or shall cause its applicable Affiliates to, promptly, but in any event within twenty (20) Business Days of receipt, remit, pay or deliver, or cause to be remitted, paid, or delivered, to Buyer (or its designated Affiliates) any monies or checks to the extent related to the Business that have been sent to Seller or its Affiliates after the Closing Date by customers, suppliers, or other contracting parties primarily related to or otherwise necessary for the conduct of the Business or to the extent they are or are in respect of a Purchased Asset for any period or an Assumed Liability.

(b)    If, for a period of nine (9) months after the Closing, the Buyer or any of its Affiliates receives notices, monies, or amounts that are properly due, deliverable, or owing to the Seller or attributable to the Excluded Assets or Excluded Liabilities in accordance with the terms of this Agreement (or the purposes and intent of this Agreement), Buyer shall, or shall cause its applicable Affiliates to, promptly remit, pay, or deliver, or shall cause to be remitted, paid, or delivered, to Seller (or its designated Affiliates) any monies or checks that have been sent to Buyer or its Affiliates after the Closing Date solely to the extent they are in respect of an Excluded Asset or Excluded Liability.

ARTICLE 7
TAX MATTERS

SECTION 7.01 *Tax Cooperation; Allocation of Taxes*.

(a)    The Buyer and Seller agree to use commercially reasonable efforts to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including, without limitation, access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the claim of any tax benefit under applicable Law, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit, or proceeding relating to any Tax, in each case with respect to Taxes or Tax Returns in respect of the Business or the Purchased Assets. For a period of three (3) years following the Closing Date, each party shall use commercially reasonable efforts to provide the other with at least ten (10) days' prior written notice before destroying any such books and records with respect to Taxes pertaining to the Purchased Assets with respect to any Tax period (or portion thereof) ending on or prior to the Closing Date, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records.  Seller and Buyer shall use commercially reasonable efforts to cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

(b)    To the extent not exempt under Section 1146(a) of the Bankruptcy Code in connection with the Chapter 11 Case, all sales, use, value added, registration stamp, recording, documentary, conveyancing, transfer, and similar Taxes, levies, charges, and fees (collectively, "**Transfer Taxes**") incurred in connection with the transactions contemplated by this Agreement shall be borne 50% by Buyer, on the one hand, and 50% by Seller, on the other.  Buyer and Seller shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation; *provided*, that the parties shall reasonably cooperate in availing themselves of any available exemptions from any collection of (or otherwise reduce) any such Transfer Taxes, including any exemptions available under the Bankruptcy Code.

(c)     For purposes of this Agreement, the Taxes imposed on a periodic basis with respect to the assets in respect of the Purchased Assets for any taxable period that begins on or prior to the Closing Date and ends after the Closing Date (each, a "**Straddle Period**") deemed allocable to the Pre-Closing Tax Period shall be the amount of such Taxes for the entire Straddle Period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period), multiplied by a fraction the numerator of which is the number of calendar days in the portion of such Straddle Period ending on the Closing Date and the denominator of which is the number of calendar days in the entire Straddle Period.  The amount of all other Taxes for the Pre-Closing Tax Period shall be deemed allocable to the Pre-Closing Tax Period deemed equal to the amount which would be payable if the taxable year ended on the Closing Date, as determined by means of a closing of the books and records of Seller as of the end of the day on the Closing Date.

ARTICLE 8
EMPLOYEE MATTERS

SECTION 8.01 *Employee Matters*.

(a)     Transferred Employees.  The employment or engagement of each of the Business Employees and independent contractors, consultants, and service providers whom Buyer has determined are necessary for operation of the Business and the Purchased Assets after Closing, including sales personnel that maintain the customer relationships of the Business and the Purchased Assets, shall be transferred to the Buyer, and the Buyer shall accept the transfer of all such employees and independent contractors, consultants, and other service providers automatically effective as of the Closing (collectively, the "**Transferred Employees**").  For a period of one year following the Closing Date, the Buyer shall or shall cause one of its Affiliates to provide each Transferred Employee employed by Buyer or one of its Affiliates with terms and conditions of employment that are substantially similar, in the aggregate, to such Transferred Employee's terms and conditions of employment as of immediately prior to the Closing, including with respect to (i) base salary or hourly wage rate, as applicable, (ii) cash bonus opportunities and incentive opportunities (excluding equity incentive arrangements), and (iii) employee benefits (including vacation accruals, severance payments and benefits).  With respect to each Transferred Employee that is an independent contractor, consultant, or other service provider, the Buyer shall assume each such individual's respective contract.  Notwithstanding the foregoing, nothing herein will, after the Closing Date, impose on the Buyer any obligation to retain any Transferred Employees in its employment or engagement for any amount of time.

(b)     Cooperation.  In connection with the Buyer's obligations under this Article 8, prior to the Closing, and provided Buyer is the successful bidder at the auction, Seller shall reasonably cooperate with and assist the Buyer, including: (i) providing such information, to the extent not prohibited by applicable Law, reasonably requested by the Buyer of the Business Employees; and (ii) making the Business Employees available to the Buyer, without interference with the Business, with reasonable advance notice and during normal business hours, for purposes of interviewing and onboarding.  Seller shall not take, cause or allow to be taken any action intended to impede, hinder, interfere, or otherwise compete with the Buyer's or its Affiliate's effort to hire any Business Employee.  The Buyer shall not be responsible for any Liability, obligation, or commitment arising out of any Business Employee's employment or termination of employment with Seller or non-acceptance of the Buyer's offer of employment or failure to commence employment with the Buyer, which Liabilities, obligations and commitments shall remain those of Seller, subject in each case to Buyer's compliance with its obligations pursuant to this Article 8.

(c)     Service Credit.  The Buyer and its Affiliates shall treat, and shall cause each plan, program, policy, practice, and arrangement sponsored or maintained by Buyer or any of its Affiliates on or

19

after the Closing Date and made available to any Transferred Employee (or the spouse, domestic partner or dependent of any Transferred Employee) on or after the Closing Date (each, a "**Buyer Plan**") to treat, for all purposes (including for purposes of determining eligibility to participate, vesting, benefit accrual, and level of benefits (including vacation accruals and severance but not otherwise for purposes of benefit accruals under a defined benefit plan) and including for the purpose of calculating all service-based entitlements under applicable Law), all service with Seller and its Affiliates (and any predecessor employers to the extent Seller and its Affiliates or any corresponding Benefit Plan provides for past service credit) as service with Buyer and its subsidiaries and Affiliates; *provided, however*, that such service need not be counted to the extent it would result in duplication of benefits and such service need only be credited to the same extent and for the same purpose as such service was credited under the corresponding Benefit Plan; *provided, further*, that with respect to any Buyer Plan for which third party consent would be required to provide such service credit, Buyer and its Affiliates shall use their respective commercially reasonable efforts to cause the foregoing to be implemented.

(d)    <u>Welfare Benefits</u>.    The Buyer and its subsidiaries and Affiliates shall use commercially reasonable efforts to cause each Buyer Plan that is a welfare benefit plan, within the meaning of Section 3(l) of ERISA, and in which any Transferred Employee commences participation in: (i) to waive any and all eligibility waiting periods, actively-at-work requirements, evidence of insurability requirements, pre-existing conditions limitations, and other exclusions and limitations, regarding the Transferred Employees and their spouses, domestic partners, and dependents to the extent such exclusions, requirements or limitations were waived or satisfied by (or were not applicable) a Transferred Employee under the corresponding Benefit Plan, and (ii) to recognize for each Transferred Employee any deductible, copayment, and out-of-pocket expenses paid by such Transferred Employee and his or her spouse, domestic partner, and dependents under any Benefit Plan that provides welfare benefits during the plan year in which occurs the later of the Closing Date and the date on which such Transferred Employee begins participating in such Buyer Plan for purposes of satisfying the corresponding deductible, co-payment, and out-of-pocket provisions under such Buyer Plan.  Except as required by applicable Law, effective as of the Closing Date, each Transferred Employee who is a participant in any Benefit Plan shall cease to accrue benefits under and be an active participant in any such Benefit Plan.

(e)    <u>Claims Incurred</u>.  Seller shall remain liable and retain responsibility for, and continue to pay in accordance with, the terms of the applicable Benefit Plan, all medical, dental, life insurance, and other welfare plan expenses and benefits for each Transferred Employee with respect to claims incurred by such Transferred Employee (or his or her spouse, domestic partner and/or dependents) which are covered by such Benefit Plan, whether incurred prior to, on or after the Closing Date, and shall remain liable for workers compensation claims (including medical, disability, permanency, and expense claims) incurred by any Transferred Employee prior to the Closing Date.  The Buyer or one of its Affiliates shall be responsible for all expenses and benefits with respect to claims incurred by any Transferred Employee (or his or her spouse, domestic partner and/or dependents) on or after the Closing Date and which are covered by any Buyer Plan and shall be liable and responsible for workers compensation claims (including medical, disability, permanency and expense claims) incurred by any Transferred Employee on or after the Closing Date.  For purposes of this <u>Section 8.01(e)</u>, a claim is deemed incurred: in the case of medical or dental benefits, when the services that are subject to the claim are performed; in the case of life insurance, when the death occurs; in the case of accidental death and dismemberment or workers compensation claims, when the event giving rise to the claim occurs; and in the case of a claim that results in a hospital admission, on the date of admission.

(f)    <u>Wage Reporting</u>.    Buyer and Seller agree to utilize, or cause their respective Affiliates to utilize, the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320, with respect to wage reporting for the Transferred Employees. Notwithstanding anything to the contrary in this Agreement, Seller shall (or shall cause its Affiliates to) provide copies to Buyer of any

records relating to withholding and payment of income and unemployment Taxes (federal, state and local) and FICA and FUTA Taxes and any and all state unemployment payment reserves and/or charge history with respect to wages paid to the Transferred Employees for the calendar year in which the Closing occurs (including without limitation, Forms W-4 and Employee's Withholding Allowance Certificates).

(g)      No Third-Party Beneficiaries.  Nothing in this Agreement, express or implied, shall confer upon any employee, independent contractor, any beneficiary, or any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement, including any right to employment or continued employment for any specified period or continued participation in any Benefit Plan or other benefit plan, or any nature or kind whatsoever under or by reason of this Agreement.  Nothing contained herein, express or implied, (i) shall be construed to establish, amend, modify, or terminate any benefit or compensation plan, program, agreement or arrangement, policy, or scheme, including any Benefit Plan, or restrict or otherwise limit the right of any party hereto to amend, terminate, or otherwise modify any such plans or arrangements, or (ii) shall be construed as a guarantee of employment for any period, or a restriction or other limitation on the right of any party hereto to terminate the employment of any individual at any time.  The parties hereto agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any current or former employee or other service provider.

## ARTICLE 9
## CONDITIONS TO CLOSING

SECTION 9.01 *Conditions to Obligations of Buyer and Seller*.  The obligations of Buyer and Seller to consummate the Closing are subject to the satisfaction of the following conditions:

(a)      *No Orders*.  No Governmental Unit shall have enacted, enforced, or entered any Law and no order shall be in effect on the Closing Date that prohibits the consummation of the Closing and no action or Proceeding shall have been initiated or threatened by a Governmental Unit that could reasonably be likely to delay or prohibit the consummation of the Closing.

(b)      *Sale Order*.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect and shall not be subject to a stay pending appeal.

SECTION 9.02 *Conditions to Obligation of Buyer*.  The obligation of Buyer to consummate the Closing is subject to the satisfaction of the following further conditions:

(a)      *Covenants*. Seller shall have performed in all material respects all of its material obligations hereunder required to be performed by Seller on or prior to the Closing Date.

(b)      *Representations and Warranties*. The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (except to the extent such representations and warranties speak as of another date, in which case such representations and warranties shall be true and correct as of such other date).

(c)      *Certificate.*  Seller shall have delivered to the Buyer a certificate duly executed by an executive officer of Seller certifying to the effect that the conditions set forth in Section 9.02(a) and Section 9.02(b) have been satisfied.

(d)      *Deliveries*.  Seller shall make or cause to be made the deliveries described in Section 2.09(a).

167479169.20

(e)    *Material Adverse Effect*.  There shall have been no Material Adverse Effect.

SECTION 9.03 *Conditions to Obligation of Seller*.  The obligation of Seller to consummate the Closing is subject to the satisfaction of the following further conditions:

(a)    *Covenants*.  The Buyer shall have performed in all material respects all of its material obligations hereunder required to be performed by it at or prior to the Closing Date.

(b)    *Representations and Warranties*.  The representations and warranties of the Buyer contained in this Agreement shall be true and correct at and as of the Closing Date, as if made at and as of such date (except to the extent such representations and warranties speak as of another date, in which case such representations and warranties shall be true and correct as of such other date).

(c)    *Certificate*.  The Buyer shall have delivered to Seller a certificate duly executed by an executive officer of the Buyer certifying to the effect that the conditions set forth in Section 9.03(a) and Section 9.03(b) have been satisfied.

(d)    *Deliveries*. The Buyer shall make or cause to be made the deliveries described in Section 2.09(b), including payment of the Purchase Price.

SECTION 9.04 *Waiver of Conditions Precedent*.  Upon the occurrence of the Closing, any condition set forth in this Article 9, other than as provided in Section 9.01(b), that was not satisfied as of the Closing shall be deemed to have been waived as of and after the Closing.

ARTICLE 10
SURVIVAL

SECTION 10.01 *Survival*.  The representations and warranties of each of Seller and the Buyer contained in this Agreement, in any Ancillary Agreement, or in any certificate or other writing delivered in connection herewith shall not survive the Closing. The covenants and agreements of each of Seller and the Buyer that by their terms are to be performed before Closing shall not survive the Closing, The covenants and agreements contained herein and in any Ancillary Agreement that by their terms are to be performed after Closing shall survive the Closing (a) for such period expressly set forth in this Agreement or (b) if a period is not expressly set forth, then for the applicable statute of limitations.

ARTICLE 11
TERMINATION

SECTION 11.01 *Grounds for Termination*.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of Seller and Buyer;

(b)    by Buyer if: (i) by September 4, 2024, the Bankruptcy Court shall have not entered the Bid Procedures Order consistent with the milestones set forth herein; (ii) the deadline for competing, qualified bids ("**Qualified Bids**") under the Bid Procedures Order is established later than September 30, 2024; (iii) by no later than October 16, 2024, Seller shall not have completed the auction pursuant to the approved Bid Procedures; (iv) Buyer is the successful bidder at the auction and the Bankruptcy Court shall not have conducted the Sale Hearing and entered a final order approving the Section 363 sale of the Purchased Assets contemplated herein to Buyer on or before October 30, 2024; or (v) Buyer is the successful bidder at the auction and Buyer's acquisition of the Purchased Assets shall have not closed on

22

or before November 4, 2024 (the "**Outside Date**"); *provided*, *however*, that if Buyer is determined to be the successful backup bidder at the auction, then pursuant to the Bid Procedures Order, Buyer's acquisition of the Purchased Assets shall have not closed on or before November 29, 2024.

(i)   In addition to the foregoing deadlines in this Section 11.01(b), for purposes of this Agreement and the Bid Procedures, Seller shall obtain authority from the Bankruptcy Court in the Bid Procedures Order to define the Qualified Bids that shall have the right to participate in the auction as being bona fide, binding, and duly executed written offers to purchase the Purchased Assets with no financing contingency, and which: (A) must be no less than the Purchase Price, plus the Break-Up Fee, plus the Expense Reimbursement, plus an initial overbid of $200,000; (B) is in a form substantially similar to the form of this Agreement; (C) is irrevocable until the conclusion of the Sale Hearing or such later time as provided in the Bid Procedures Order; (D) is an all cash bid that shall be accompanied by a cashier's check or wire transfer in the amount of $325,000 as a good faith deposit to be held by the Escrow Agent; and (E) is accompanied by such evidence reasonably acceptable to the Seller demonstrating the proposed bidder's ability to close the proposed transaction.

(c)   by Buyer if the Sale Order does not expressly approve Seller's assumption and assignment of the Real Property Lease to the Buyer pursuant to Section 365 of the Bankruptcy Code;

(d)   by Buyer if the Purchase Price exceeds $7,470,000 (the "**Cap on the Purchase Price**");

(e)   by either Seller or Buyer, if any condition set forth in Section 9.01 is not satisfied, and such condition is incapable of being satisfied by the Outside Date;

(f)   by Seller, if failure to perform any covenant or agreement on the part of the Buyer set forth in this Agreement shall have occurred that would cause the conditions set forth in Section 9.03 not to be satisfied;

(g)   by Buyer, if failure to perform any covenant or agreement on the part of the Seller set forth in this Agreement shall have occurred that would cause the conditions set forth in Section 9.02 not to be satisfied;

(h)   by the Buyer if the Disclosure Schedules fail to be finalized in accordance with Section 12.11;

(i)   upon the closing of a bid submitted by a Person other than Buyer, and provided that Buyer is not in default hereunder, then subject to the terms and conditions of the Bid Procedures Order concerning back-up bids, this Agreement shall be null and void and of no legal effect whatsoever upon Seller's return of the Good Faith Deposit to Buyer, and, other than with respect to payment of the Break-Up Fee and Expense Reimbursement to Buyer, each party hereto shall otherwise suffer their own losses, costs, expenses, or damages arising out of, or related to this Agreement; or

(j)   by either of the parties hereto if the other party materially defaults under this Agreement or if the Closing shall not have occurred at or before 5:00 p.m. on the Outside Date; *provided*, *however*, that the right to terminate this Agreement under this subparagraph shall not be available to any party whose failure to fulfill any of its obligations under this Agreement has been the cause of or resulted in the failure of the Closing to occur on or prior to the aforesaid date, *provided further*, *however*, that: (i) if Buyer is not in default hereunder and Seller fails to make the required deliveries at the Closing or materially defaults under this Agreement with no fault of Buyer, then Buyer shall have the right to: (A) terminate this

Agreement and thereupon this Agreement shall be null and void and of no legal effect whatsoever upon Seller's return of the Good Faith Deposit to Buyer or (B) pursue the remedy of specific performance of this Agreement in the Bankruptcy Court, in which case, if successful, Buyer shall be entitled to offset from the Purchase Price at Closing all of its reasonable costs and expenses incurred in connection therewith (including, without limitation, reasonable attorneys' fees); and (ii) if Seller is not in default hereunder, and Buyer fails to make the required deliveries at the Closing or materially defaults under this Agreement (including the failure of conditions in <u>Section 9.03</u> hereof) with no fault of Seller, including if Buyer fails to pay the balance of the Purchase Price at the Closing as set forth above, or refuses to close for any reason, then Seller, as its sole remedy, shall be entitled to retain the Good Faith Deposit as liquidated damages for Buyer's default.

(k)     The party desiring to terminate this Agreement pursuant to this <u>Section 11.01</u> (other than pursuant to <u>Section 11.01(a)</u>) shall give notice of such termination to the other party in accordance with <u>Section 12.01</u>.

SECTION 11.02  *Effect of Termination*.

(a)     If this Agreement is terminated as permitted by <u>Section 11.01</u>, such termination shall be without Liability of either party (or any stockholder, director, officer, employee, agent, consultant, or representative of such party) to the other party to this Agreement except as provided in <u>Section 2.07</u> and this <u>Section 11.02</u>.

(b)     The provisions of Sections 2.07, Section 11.02, 11.03, 12.04, 12.05 and 12.06 shall survive any termination hereof pursuant to Section 11.01.

SECTION 11.03  *Expenses*.  Except as otherwise expressly provided herein, whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated thereby shall be paid by the party hereto incurring such expenses.

SECTION 11.04  *Exclusive Remedies*.  Except as otherwise provided in <u>Section 11.01</u>, in the event of any breach prior to the Closing by either party of any of such party's agreements, covenants, representations, or warranties contained herein or in the Bid Procedures, the Sale Order, including any breach that is material or willful, except as set forth in <u>Section 12.12</u>, the parties' sole and exclusive remedy shall be to exercise such party's rights to terminate this Agreement pursuant to <u>Section 11.01</u>, and, as applicable, to receive the Good Faith Deposit pursuant to <u>Section 2.07</u>, and such party shall not have any further cause of action for damages, specific performance or any other legal or equitable relief against the other parties hereto or any of their respective former, current or future holders of equity interests, directors, officers, Affiliates, agents or representatives with respect thereto.

ARTICLE 12
MISCELLANEOUS

SECTION 12.01  *Notices*.  All notices, requests, claims, demands or other communications hereunder shall be deemed to have been duly given and made if in writing and (a) at the time personally delivered if served by personal delivery upon the party hereto for whom it is intended, (b) at the time received if delivered by registered or certified mail (postage prepaid, return receipt requested) or by a national courier service (delivery of which is confirmed), or (c) upon confirmation if sent by facsimile or email; in each case to the Person at the address set forth below, or such other address as may be designated in writing hereafter, in the same manner, by such Person:

24

if to Buyer, to:

X-Metals Acquisition, LLC
Attn: Mark Holm and Jim Kozlowski
E mail: jkozlowski@x-metals.com and mholm@x-metals.com

with a copy to (which shall not constitute notice):

Perkins Coie LLP
110 North Wacker Drive, Suite 3400
Chicago, IL 60606
Attn: Ted Wern and Brian Audette
E-mail: twern@perkinscoie.com and baudette@perkinscoie.com

if to Seller, to:

before Closing:

Berkshire Investments, LLC
1601 South 54th Avenue
Cicero, Illinois 60804
Attn: Patrick J. Balson
Email: pbalson@cxmetals.com
Attn: Dick Jenkins
Email; jenkinsrn@aol.com

after Closing:

Berkshire Investments, LLC
c/o RD Company Agents Chicago, Inc.
180 North LaSalle Street, Suite 3300
Chicago, Illinois 60601
Attn: Patrick J. Balson
Email: patrickbalson22@gmail.com
Attn: Richard N. Jenkins
Email; jenkinsrn@aol.com
Attn: Steve Jakubowski
Email: sjakubowski@robbinsdimonte.com

with a copy to:

Robbins DiMonte, Ltd.
180 North LaSalle Street, Suite 3300
Chicago, Illinois 60601
Attn: Steve Jakubowski and Robert E. Harig
Email: sjakubowski@robbinsdimonte.com and rharig@robbinsdimonte.com

SECTION 12.02  *Amendments and Waivers*.

(a)     Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)     No failure or delay by any party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  Subject to <u>Section 11.04</u>, the rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

SECTION 12.03  *Successors and Assigns*.  No party shall be entitled to assign this Agreement or any rights or obligations hereunder without the prior written consent of, with respect to any assignment by Buyer, Seller, and, with respect to any assignment by Seller, Buyer, which consent may be withheld by the applicable party in its sole and absolute discretion, and any such attempted assignment without such prior written consent shall be void and of no force and effect, *provided*, *however*, that Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Affiliates or wholly-owned subsidiaries without the prior written consent of Seller so long as prior to such assignment such assignee(s) of Buyer agrees in writing in favor of Seller to be bound by the provisions of this Agreement, it being agreed that no such assignment shall relieve Buyer of any of its obligations hereunder.

SECTION 12.04  *Governing Law*.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by and construed in accordance with the Law of the State of Illinois, without regard to the conflicts of Law rules of such state.

SECTION 12.05  *Jurisdiction*.  The parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court, and each of the parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in the Bankruptcy Court or that any such suit, action, or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.  Process in any such suit, action, or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.  Without limiting the foregoing, each party agrees that service of process on such party as provided in <u>Section 12.01</u> shall be deemed effective service of process on such party.

SECTION 12.06  *WAIVER OF JURY TRIAL*.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 12.07  *Counterparts; Third Party Beneficiaries*.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.  No provision of this Agreement is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

SECTION 12.08  *Entire Agreement*.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written.

167479169.20

SECTION 12.09  *Bulk Sales Laws*.  Buyer hereby waives compliance by Seller and Seller hereby waive compliance by Buyer, with the provisions of the "bulk sales", "bulk transfer" or similar Laws other than any Laws which would exempt any of the transactions contemplated by this Agreement from any Tax Liability which would be imposed but for such compliance.

SECTION 12.10  *Captions, Headings, Interpretation*.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disbarring any party by virtue of authorship of any provisions of this Agreement.

SECTION 12.11  *Disclosure Schedules*.  The parties acknowledge and agree that (i) the Disclosure Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Buyer and (ii) the disclosure by Seller of any matter in the Disclosure Schedules shall not be deemed to constitute an acknowledgment by Seller that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.  If any Disclosure Schedule discloses an item or information in such a way as to make its relevance to the disclosure required by another Disclosure Schedule reasonably apparent, the matter shall be deemed to have been disclosed in such other Disclosure Schedule, notwithstanding the omission of an appropriate cross-reference to such other Disclosure Schedule.  The parties acknowledge that the Disclosure Schedules may not be complete as of the execution of this Agreement, and the parties hereby covenant they each will use commercially reasonable efforts to complete and deliver the Disclosure Schedules as soon as practical following the execution of this Agreement.  Disclosure Schedules not included as attachments to this Agreement upon the execution and delivery hereof shall be delivered by the party responsible therefor no later than the deadline in the Bid Procedures Order for submitting Qualified Bids, and shall thereupon, if mutually acceptable to the parties, be deemed included in this Agreement as if such Disclosure Schedule was attached to this Agreement as of the execution of this Agreement.

SECTION 12.12  *Specific Performance*.  The parties recognize that if the Buyer breaches this Agreement or refuses to perform under the provisions of this Agreement, monetary damages alone would not be adequate to compensate Seller for its injuries.  Seller shall therefore be entitled, in addition to any other remedies that may be available, to equitable relief, including an injunction or injunctions or orders for specific performance, to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement (including, for the avoidance of doubt, the obligation of the Buyer to consummate the transactions contemplated by this Agreement), without proof of actual damages or the posting of a bond or other undertaking.  If any action is brought by Seller to enforce this Agreement, the Buyer shall waive the defense that there is an adequate remedy at Law.

SECTION 12.13  *Time of the Essence*.  Time shall be of the essence of this Agreement.

SECTION 12.14  **"As Is", "Where Is", and "With all Faults" Transaction**. BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN ARTICLE 3, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS. BUYER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF ALL PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS BUYER DEEMS NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION

167479169.20

OF THE ACQUIRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE 3, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, BUYER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS." WITH RESPECT TO ALL MATTERS AND WITHOUT RELIANCE UPON ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES OF ANY NATURE MADE BY OR ON BEHALF OF OR IMPUTED TO SELLER, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER ACKNOWLEDGES THAT SELLER DOES NOT MAKE ANY REPRESENTATION OR WARRANTY WITH RESPECT TO (I) ANY PROJECTIONS (INCLUDING WITH RESPECT TO ANY BALANCE SHEET), ESTIMATES OR BUDGETS DELIVERED TO OR MADE AVAILABLE TO BUYER OF FUTURE REVENUES, FUTURE RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), FUTURE CASH FLOWS OR FUTURE FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) OF THE BUSINESS OR THE FUTURE BUSINESS AND OPERATIONS OF THE BUSINESS OR (II) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS COUNSEL, ACCOUNTANTS OR ADVISORS WITH RESPECT TO THE BUSINESS, EXCEPT, IN EACH CASE, AS EXPRESSLY SET FORTH IN THIS AGREEMENT (AS QUALIFIED BY THE DISCLOSURE SCHEDULES) OR IN ANY ANCILLARY AGREEMENT.

[*Signature Pages Follow*]

28

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BUYER**:

X-METALS ACQUISITION, LLC

By: _____

Name:       Gary E Sullo

Its:       Chief Executive Officer

**SELLER**:

BERKSHIRE INVESTMENTS, LLC

By: _____

Name:   Patrick J. Balson

Its:       Chief Executive Officer

167479169.13

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BUYER**:

X-METALS ACQUISITION, LLC

By: _____

Name
:     _____

Its:    Chief Executive Officer
_____

**SELLER**:

BERKSHIRE INVESTMENTS, LLC

**By:** _____

Name    Patrick J. Balson
:       _____

Its:    Chief Executive Officer
_____

**EXHIBIT A**

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

*Final Form*

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT ("**Bill of Sale**"), dated as [•], 2024, is made and entered into by and between Berkshire Investments LLC (d/b/a Chicago Extruded Metals Company), an Illinois limited liability company ("**Seller**"), and X-Metals Acquisition, LLC, a Delaware limited liability company ("**Buyer**").

### RECITALS

WHEREAS, this Bill of Sale is executed and delivered pursuant to that certain Asset Purchase Agreement, dated as of August 14, 2024 (the "**Purchase Agreement**"), by and between Buyer and Seller.

WHEREAS, all capitalized terms used without definition herein shall have the meanings specified in the Purchase Agreement.

NOW THEREFORE, pursuant to the Purchase Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller hereby agree as follows:

1.      Seller hereby sells, assigns, transfers and conveys to Buyer, and Buyer hereby purchases from Seller, free and clear of all Liens and claims, other than Assumed Liabilities and Permitted Liens, all of Seller's right, title and interest in, to and under the Purchased Assets.

2.      Seller hereby transfers to Buyer the Assumed Liabilities.  Buyer hereby agrees to assume, pay, perform and discharge in full all of the duties, obligations, terms, provisions and covenants of the Assumed Liabilities as provided in, and in accordance with, the Purchase Agreement. Notwithstanding anything to the contrary contained in this Bill of Sale or the Purchase Agreement, Buyer shall not assume, and shall not be responsible to pay, perform, or discharge, any Excluded Liabilities, and the parties hereto agree that all such Excluded Liabilities shall remain the sole responsibility of Seller.

3.      This Bill of Sale is made, executed and delivered in accordance with and is subject to the representations, warranties, covenants, terms and conditions of the Purchase Agreement and is not intended in any way to supersede, expand upon or limit any provision of the Purchase Agreement.  In the event of any conflict between the terms of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall control.  The terms and conditions of the Purchase Agreement, including but not limited to the parties' representations, warranties, waivers, disclaimers, covenants, and agreements relating to the Purchased Assets, are incorporated herein by this reference and will remain in full force and effect to the full extent provided therein.

4.      This Bill of Sale may be executed in one or more counterparts, each of which shall be regarded as an original and all of which shall constitute one and the same instrument.  In the event that any signature is delivered by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

*[Signature Pages Follow]*

167893515.4

IN WITNESS WHEREOF, each of the parties hereto has caused this Bill of Sale to be executed by an authorized representative as of the date first above written.

**BUYER:**

X-METALS ACQUISITION, LLC

By: _____
Name: _____
Title: _____

**SELLER:**

BERKSHIRE INVESTMENTS LLC (d/b/a CHICAGO
EXTRUDED METALS COMPANY)


By: _____
Name: _____
Title: _____

**EXHIBIT B**

**INTELLECTUAL PROPERTY ASSIGNMENT**

*Final Form*

## INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

THIS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (this "**Assignment**"), dated as of [•], 2024 (the "**Effective Date**"), is made by and between Berkshire Investments LLC (d/b/a Chicago Extruded Metals Company), an Illinois limited liability company ("**Assignor**"), and X-Metals Acquisition, LLC, a Delaware limited liability company ("**Assignee**").

**WHEREAS**, Assignor and Assignee are parties to that certain Asset Purchase Agreement, dated as of August 15, 2024 (the "**Asset Purchase Agreement**"), pursuant to which Assignor is selling, transferring, assigning, conveying and delivering to Assignee certain assets and properties of Assignor used or held for use in the Business, and Assignee is assuming certain specified liabilities of Assignor (the "**Transaction**").

**NOW, THEREFORE**, in exchange for the consideration set forth in the Asset Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Definitions**.  Capitalized terms used herein and not otherwise defined herein will have the respective meanings assigned to such terms in the Asset Purchase Agreement.  As used herein, the following terms have the following meanings:

"**Assignor IP**" means all Intellectual Property that has been or is created by, practiced by, held for practice by, owned (in whole or in part), purported to be owned (in whole or in part) by, or is licensed to the Assignor (including in connection with the Business).

"**Domain Names**" means domain names and uniform resource locators, including Domain Names listed or described on **Exhibit A**.

"**Intellectual Property**" means, collectively, all: (a) all rights (anywhere in the world, whether statutory, common law or otherwise)  in or affecting intellectual or industrial property or other proprietary rights, including with respect to the following: (i) patents and applications therefor, and patents issuing thereon, including continuations, divisionals, continuations-in-part, reissues, reexaminations, renewals and extensions; (ii) copyrights and registrations and applications therefor, works of authorship, "moral" rights and mask work rights; (iii) domain names, uniform resource locators and other names and locators associated with the internet, including applications and registrations thereof; (iv) telephone numbers; (v) trademarks, trade dress, trade names, logos and service marks, together with the goodwill symbolized by or associated with any of the foregoing and any applications, registrations and renewals therefore; (vi) all technology, ideas, research and development, inventions, manufacturing and operating specifications and processes, schematics, know-how, formulae, customer and supplier lists, shop rights, designs, drawings, patterns, Trade Secrets, confidential information, technical data, databases, data compilations and collections, web addresses and sites, software, computer architecture, and documentation; and (vii) all other intangible assets, properties or rights and, (viii) the right to file applications and obtain registrations for any of the foregoing and claim priority thereto; (b) all claims, causes of action and rights to sue for past, present and future infringement or misappropriation of the foregoing, and all proceeds, rights of recovery and revenues arising from or pertaining to the foregoing; and, (c) all copies and tangible embodiments of any of the foregoing (in whatever form or medium).

2.    **Assignment**.  Assignor hereby irrevocably sells, assigns, transfers and conveys to Assignee, its successors, assigns, and legal representatives, all right, title and interest in and to any Assignor IP in perpetuity, including all rights and interests in the Intellectual Property listed on **Exhibit A** (collectively, the "**Assigned IP**"), and Assignor acknowledges that Assignee owns and will own all such

168568528.3

existing and future right, title and interest in and to the Assigned IP, including the right to claim priority rights deriving from any of the foregoing and the right to sue for, settle and release past, present and future infringement of any of the foregoing. Without limiting the foregoing, Assignor acknowledges that Assignee may use, sell, license, translate, copy, duplicate, record, broadcast, distribute, perform, display, add to, subtract from, arrange, rearrange, revise, modify, change, adapt and otherwise exploit the Assigned IP and any derivative works thereof in Assignee's sole and absolute discretion.

3.    **Further Assurances**.  Assignor will, at its own cost and expense, promptly execute, acknowledge and deliver to Assignee all additional instruments or documents that Assignee determines at any time to be necessary to complete the timely transfer of the Assigned IP to Assignee.  Furthermore, Assignor will, at Assignee's cost and expense (except to the extent that such cost and expense are related to or arise from any claim for which Assignee is entitled to indemnification from Assignor pursuant to the Asset Purchase Agreement), testify in any legal proceedings, sign all lawful papers, execute all divisional, continuing, reissue, reexamination and other applications, make all assignments and rightful oaths, and generally do everything possible to aid Assignee, its successors, assigns and nominees to perfect, obtain, prosecute, maintain, validate and enforce proper protection for the Assigned IP in all countries.  Assignor will not execute any agreements inconsistent with the foregoing.  Without limiting the foregoing, Assignor hereby irrevocably designates and appoints Assignee and its duly authorized officers and agents, as Assignor's agent and attorney-in-fact to act for and on its behalf and instead of Assignor, to execute and file any documents, applications or related filings and to do all other lawfully permitted acts in furtherance of the purposes set forth above in this paragraph, including the perfection of assignment and the prosecution and issuance of patents, patent applications, copyright applications and registrations, trademark applications and registrations, or other rights in connection with such Assigned IP and improvements thereto with the same legal force and effect as if executed by Assignor.

4.    **Domain Names**.  At its own expense, Assignor will promptly and properly complete and submit, to the registrar for each of the Domain Names, any and all instructions necessary to transfer ownership as registrant of the Domain Names to Assignee.

5.    **Assignor's Transfer and Cessation of Use of the Assigned IP**.  Commencing on the Effective Date, Assignor will: (a) provide to Assignee all existing documentation in Assignor's possession necessary to fully produce and exploit all trade secrets and other confidential information that relates to the Assigned IP; (b) destroy all remaining copies of all printed or electronic media in Assignor's possession relating to such documentation, trade secrets and confidential information; and (c) cease all use and development of, and forever refrain from using in any manner, the trade secrets and any confidential information that relates to the Assigned IP.  Commencing on the Effective Date, Assignor will immediately cease all use, and will forever refrain from using, any words, names, slogans, symbols, or logos (or anything confusingly similar thereto) as they appear in the Assigned IP, including to use for any entity name, slogan, product name, on any website, as a service mark, trademark, domain name, URL, meta tag, directory search term, or a component of any of the foregoing.

6.    **Waiver of Moral Rights**.  Assignor hereby irrevocably and perpetually waives (and to the fullest extent permitted by law, causes all employees and contractors to waive) all rights under all laws now existing or hereafter permitted, with respect to any and all purposes for which the Assigned IP and any derivative works thereof may be used, including without limitation: (a) all rights under the United States Copyright Act, or any other country's copyright law, including any rights provided in 17 U.S.C. §§ 106 and 106A; and (b) any rights of attribution and integrity or any other "moral rights of authors" existing under applicable law.

7.    **Irrevocable and Binding Assignment**.  Assignor acknowledges that this Assignment is irrevocable and binding on Assignor's successors and assigns.  Assignor does not have the right to: (a)

rescind any of the rights or waivers granted herein; (b) enjoin, restrain or otherwise hinder Assignee's exercise of any of the rights granted herein; or (c) enjoin, restrain or otherwise hinder, by court order or otherwise, the manufacture, use, sale, offer for sale, importation, marketing, license, translation, copying, duplication, recording, broadcasting, distribution, performance, display, addition to, subtraction from, arrangement, rearrangement, revision, modification, change, adaptation or other exploitation of the Assigned IP or any derivative works thereof.

8. **Entire Agreement; Amendments**. This Assignment and the Asset Purchase Agreement constitute the entire agreement between Assignor and Assignee with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, between Assignor and Assignee with respect to the subject matter hereof. In the event of a conflict between the terms of the Asset Purchase Agreement and this Assignment, the Asset Purchase Agreement will control. This Assignment may be modified only by a written agreement signed by both parties.

9. **Severability**. Each provision contained in this Assignment constitutes a separate and distinct provision severable from all other provisions. If any provision (or any part thereof) is unenforceable under or prohibited by any present or future law, then such provision (or part thereof) will be amended, and is hereby amended, so as to be in compliance with such law, while preserving to the maximum extent possible the intent of the original provision. Any provision (or part thereof) that cannot be so amended will be severed from this Assignment, and all the remaining provisions of this Assignment will remain unimpaired.

10. **Governing Law**. This Assignment and all Proceedings arising hereunder will be governed by and construed in accordance with the Laws of the State of Illinois without reference to such state's principles of conflicts of Law. Each of the parties irrevocably consents to the exclusive jurisdiction and venue in any state or federal court located in the State of Illinois (and of and in any court to which an appeal of the decisions of any such court may be taken), in connection with any matter based upon or arising out of this Assignment or the matters contemplated herein, agrees that process may be served upon them in any manner authorized by the Laws of the State of Illinois for such persons, and waives and covenants not to assert or plead any objection which it might otherwise have to such jurisdiction and such process; provided, however, that any party will be entitled to seek injunctive or other equitable relief in connection with any matter based upon or arising out of this Assignment or the matters contemplated herein in any forum having proper legal jurisdiction over such matter.

11. **Waiver of Jury Trial**. TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH PARTY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, AMONG THE PARTIES ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED HEREUNDER. ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS ASSIGNMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

12. **Counterparts, Facsimile Signature**. This Assignment may be executed and delivered by each party in separate counterparts (including electronic portable document format (.PDF) or similar format), each of which when so executed and delivered will be deemed an original and all of which taken together will constitute one and the same agreement. This Assignment will become effective when, and only when, each party delivers a counterpart hereof to each other party. This Assignment may be executed by .PDF signature, and a .PDF signature will constitute an original signature for all purposes.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the undersigned have executed this Assignment as of the date first above written.

**ASSIGNOR:**

BERKSHIRE INVESTMENTS LLC
(D/B/A CHICAGO EXTRUDED METALS COMPANY)


By: _____
Name: _____
Title: _____



**ASSIGNEE:**

X-METALS ACQUISITION, LLC


By: _____
Name: _____
Title: _____

## Exhibit A

### Assigned IP[1]

**Trademarks**

| Jurisdiction | Mark | Application Number | Application Date | Registration Number | Registration Date |
|---|---|---|---|---|---|
| U.S. | Biobrass | [•] | [•] | 4,017,616 | 8/30/2011 |
| Czech Republic | Biobrass | [•] | [•] | 4,017,616 | 08/03/2011 |

**Domain Names**

| Domain Name | Domain Name Registrar | Expiration Date |
|---|---|---|
| http://www.CXMetals.com | GoDaddy.com | March 6, 2025 |

**Assumed Name**

Chicago Extruded Metals Company

---

[1] **Note to Seller**: Please provide all missing information.

**EXHIBIT C**

**SALE ORDER**

To be inserted.