**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 24-11552 |
| | ) | |
| Berkshire Investments LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Honorable David D. Cleary |
| | ) | |
| Employer's Tax Identification No.: | ) | |
| 20-0200892 | ) | |
| | ) | |

_____

## NOTICE OF MOTION

To:  See attached service list

PLEASE TAKE NOTICE that on **September 4, 2024, at 11:00 a.m.**, I will appear before the Honorable David D. Cleary, or any judge sitting in that judge's place, **either** in courtroom 644 of the Evertt McKinley Dirksen United States Courthouse, 219 S. Dearborn Street, Chicago, Illinois 60604 **or** electronically as described below, and present the **Motion Of Debtor For Entry Of (I) An Order: (A) Approving Sale Process And Stalking Horse Asset Purchase Agreement; (B) Approving Procedures For Assumption And Assignment Of Executory Contracts And Unexpired Leases; (C) Approving Form Of Notices; (D) Excusing Page Limit; And (E) Scheduling A Public Auction And Sale Approval Hearing; And (II) An Order: (A) Approving The Sale Of The Debtor's Assets Free And Clear Of Liens, Claims, Encumbrances, And Interests; (B) Approving The Assumption And Assignment Of Executory Contracts And Unexpired Leases; And (C) Granting Related Relief**, a copy of which is attached hereto.

**Important: Only parties and their counsel may appear for presentment of the motion electronically using Zoom for Government. All others must appear in person.**

**To appear by Zoom using the internet**, go to this link: https://www.zoomgov.com/. Then enter the meeting ID and passcode.

**To appear by Zoom using a telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666. Then enter the meeting ID and passcode.

**Meeting ID and passcode**. The meeting ID for this hearing is **161 122 6457**, and the passcode is **Cleary644**. The meeting ID and passcode can also be found on the judge's page on the court's web site.

**If you object to this motion** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of

Objection is timely filed, the motion will be called on the presentment date. If no Notice of Objection is timely filed, the court may grant the motion in advance without calling it.

Berkshire Investments, LLC

By: /s/ Steven R. Jakubowski

Steven R. Jakubowski, #6191960
Carolina Y. Sales, #6287277
Robbins DiMonte, Ltd.
180 North LaSalle Street, Suite 330
Chicago, Illinois 60601
Office: 312-456-0191
Fax: 312-782-6690
Emails: sjakubowski@robbinsdimonte.com
        csales@robbinsdimonte.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that he served a copy of this notice and the attached motion on each entity shown on the attached list at the address shown and by the method indicated on the list on August 23, 2024.

By: /s/ Steven R. Jakubowski

## Service List

### Via ECF

Brian A. Audette on behalf of Interested Party X-Metal Acquisition, LLC
baudette@perkinscoie.com, docketchi@perkinscoie.com;brian-audette-perkins-coie-8180@ecf.pacerpro.com

William J Factor on behalf of Other Prof. NELI International Incorporated
wfactor@wfactorlaw.com,
wfactorlaw@gmail.com;bsass@wfactorlaw.com;wfactor@ecf.courtdrive.com;wfactormyecfmail@gmail.com;factorwr43923@notify.bestcase.com

Patrick S Layng
USTPRegion11.ES.ECF@usdoj.gov

Stephen A Yokich on behalf of Creditor United Steelworkers
efile@laboradvocates.com, syokich@laboradvocates.com

**Via Email**
***20 Largest Creditors***

AM Industrial Group, LLC
Email: reg.wyman@amindustrialgroup.com

Capital Metals
Email:  bhorwitz@bhlfattorneys.com

Carolina Metals Group
Email: Joe.Cerda@carolinametalsgroup.com
        Mike.sordi@carolinametalsgroup.com

Cohen Brothers Inc.
Email: PDober@cohenusa.com
        tbenne@cohenusa.com

Combined Metal
Email: ndavy@combinedmetal.com

Constellation New Energy
Anthony.A.Wittrock@constellation.com

Dormakaba
Email: dkap.us.amer@dormakaba.com

Framingham Salvage Co.
Email: Scrapplebaum@gmail.com

Imperial Zinc Corp.
Email: jay@imperialzinc.com

Intrametco
Email: neil@intrmetco.com

JP Wire & Metals
dba Shapiro Recycle
Email:  Justin@shapirorecycling.com
        Janet@shapirorecycling.com
        bkasper@stark-stark.com
        Tonder@stark-stark.com

gsmarziani@davismcgrath.com

Metalsco Inc.
Email: linda@metalsco.com
        scott@metalsco.com

Premier Metal Services LLC
Email: meisner@permiermetalservices.com
dneumann@meyersroman.com
cmackow@premiermetalservices.com

Securitas Security Services USA-Inc
Email: Leonardo.Jimenez@securitasinc.com

Thalheimer
Email: aparks@thalbro.com

Total Metal Recycling (Wieland)
Email: Jessica.Jackson@Wieland.com

Resources Alloys
Email: richard@rmiint.com

WaterSaver Faucet Company
Email: hnguyen@wsflab.com

UB Greensfelder, Hemker, Gale PC
Email: wanaya@greensfelder.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 24-11552 |
| | ) | |
| Berkshire Investments LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Honorable David D. Cleary |
| | ) | |

**MOTION OF DEBTOR FOR ENTRY OF (I) AN ORDER: (A) APPROVING SALE
PROCESS; (B) APPROVING BID PROCEDURES; (C) APPROVING BREAK-UP FEE
AND OTHER BID PROTECTIONS FOR THE STALKING HORSE BIDDER; (D)
APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (E) APPROVING FORM OF
NOTICES; (F) EXCUSING PAGE LIMIT; AND (G) SCHEDULING A PUBLIC
AUCTION AND SALE APPROVAL HEARING AND (II) AN ORDER: (A) APPROVING
THE SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS; (B) APPROVING THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
AND (C) GRANTING RELATED RELIEF**

Berkshire Investments LLC d/b/a Chicago Extruded Metals Company, debtor and debtor

in possession (the "Debtor") in its chapter 11 case (the "Chapter 11 Case"), by and through its

undersigned proposed counsel, and pursuant to Fed. R. Bankr. P. 2002, 6004, and 6006 and

sections 363 and 365 of the United States Bankruptcy Code (the "Bankruptcy Code"), in this

motion (the "Motion"), hereby moves the Court for entry of (I) an order (the "Sale Procedures

Order" a proposed form of which is filed herewith): (A) establishing procedures for the sale (the

"Asset Sale") of all, or substantially all, of the Debtor's assets (the "Sale Assets"), including a

stalking horse asset purchase agreement with a break-up fee, allowance for expense

reimbursement, and an initial overbid amount, together with a form asset purchase agreement for

non-stalking-horse bidders; (B) establishing procedures relating to the assumption and assignment

of executory contracts and unexpired leases; (C) approving the form notices for the sale and other

form notices; (D) excusing the 15-page limit under the Court's local rule; and (E) scheduling a

1

public auction and sale approval hearing; and (ii) an order (the "Sale Approval Order"): (a) approving the sale of the Debtor's assets free and clear of claims, liens, and encumbrances; (b) approving the assumption and assignment of executory contracts and unexpired leases; and (c) granting related relief. In support of the Motion, the Debtor respectfully states as follows:

## I.     PRELIMINARY STATEMENT

Exigent circumstances compel the Debtor to seek immediate approval of a competitive-bid sale process. The Debtor is only operating at six percent of its operating capacity. Its operations have generated aggregate losses of nearly $11 million since 2022. Its prepetition senior secured lender (since February 2021) has agreed to provide post-petition financing [ECF No. 22], but only on the condition that the Sale Assets be auctioned off pursuant to a sale process supported by a stalking horse bid that is subject to certain "milestones" (as set forth herein) regarding the timing for submission of other qualified bids, for the auction, for the hearing before this Court to approve the results of the auction, and for the closing of the sale. Failure to meet these milestones will result in the termination of the Debtor's access to post-petition financing and result in the immediate conversion of this chapter 11 case to a chapter 7 liquidation.

An auction of the Sale Assets on the proposed timeline set forth in this Motion, consistent with the milestones required by the Debtor's post-petition credit facility, will also benefit the estate by assuring continuity of the Debtor's operations into the future, thereby maintaining the employment of approximately 55 union and 25 non-union employees whom the stalking horse bidder has committed to employ if it is the prevailing bidder in the proposed sale process.

The Debtor, therefore, herein requests approval of a sale process that sets procedures related to the submission of bids for the Sale Assets, establishes the forms of notices to creditors and parties to executory contracts and unexpired leases, fixes the date and times for the auction,

the sale hearing, and the filing of objections relevant to the matters to be considered by the Court

at the sale hearing. The sale process contemplated by this Motion and the stalking horse bid upon

which the process is rooted envisions a qualified bid deadline of September 30, 2024; an auction

on October 15, 2024; a sale objection deadline of October 21, 2024; a sale hearing on October 31,

2024; and a sale closing on November 4, 2024. Given that the Debtor has actively marketed its

assets to likely strategic buyers for the Debtor's business since late summer of 2022, this timeline

is sufficient for these potential interested buyers—all of whom signed non-disclosure agreements

and conducted some due diligence in respect of the Debtor's operations and financial condition—

to determine whether they have an interest in participating in the sale process.

Based on the Debtor's cash flow budget through November 4, 2024 that is attached to the

interim order approving the post-petition credit facility [ECF No. 22] (the "Post-Petition Credit

Facility"), and based on the projected total "eligible inventory" and "eligible accounts receivable"

(as defined in the post-petition credit facility) as of the projected November 4, 2024 closing date,

the value of the stalking horse's bid for substantially all of the Debtor's assets is $7,442,782.95.

This bid includes a $100,000 cash component exclusively for the benefit of the Debtor's estate.

The Motion also seeks approval of the following bid protections negotiated with the stalking horse

bidder: (i) a break-up fee of $325,000 (which matches the amount of its good faith deposit) (the

"Break-Up Fee"); (ii) expense reimbursement of up to $100,000 for out-of-pocket costs actually

incurred by the stalking horse for its due diligence efforts, its negotiation of the stalking horse bid,

and its participation in the sale process generally (the "Expense Reimbursement"); and (iii) an

initial $200,000 overbid requirement by any qualified bidder (the "Initial Overbid Requirement",

and together with the Break-Up Fee and the Expense Reimbursement, the "Bid Protections").

These proposed Bid Protections, as applied to the estimated stalking horse bid of $7,442,782.95

as of November 4, 2024, would require an estimated all cash minimum overbid by another qualified bidder at the auction of $8,067,782.95, provided, however, that the components of the purchase price are described in more detail in paragraph 23 below and in the proposed Bid Procedures, which proposed Bid Procedures also provide further detail regarding how to calculate the purchase price and any competing bids.

In this Motion, the Debtor requests approval of (i) the proposed bid procedures and associated deadlines, (ii) the proposed bid protections for the stalking horse bidder, (iii) the proposed form of asset purchase agreement for other prospective bidders, and (iv) the form of notices to creditors and counterparties to executory contracts and unexpired leases. The relief requested is conventional for proposed asset sales under Bankruptcy Code section 363. The Debtor, therefore, believes the proposed "Sale Procedures Order" attached hereto as **Exhibit A** is in the best interests of the estate and urges entry of this order by the Court.

## II.    **FACTUAL BACKGROUND**

### A.    **The Debtor's Chapter 11 Case**

1.      On August 8, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor remains in possession of its assets and continues to maintain its operation and financial affairs as a debtor in possession in accordance with 11 U.S.C. §§ 1107 and 1108.

2.      As of the date of this Motion, an official unsecured creditors' committee has been appointed in the Debtor's chapter 11 case, but no trustee or examiner has been appointed. On August 15, 2024, the Debtor attended the initial debtor interview. The first meeting of creditors under section 341(a) of the Bankruptcy Code is currently scheduled for September 9, 2024, at 1:30 p.m. (local time).

3.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

4.      The statutory predicates for the relief requested herein are sections 363 and 365 of the Bankruptcy Code and Fed. R. Bankr. P. 2002, 6004, and 6006.

**B.      Chapter 11 Objectives**

5.      After analyzing the ramifications of not filing the Chapter 11 Case and pursuing an out-of-court sale or assignment for the benefit of creditors, the Debtor has determined that a bankruptcy sale process will afford the Debtor the best means of preserving its enterprise value and maximizing recoveries to the Debtor's estate. The Debtor's ability to obtain the long-term funding necessary to support a plan of reorganization is an impossibility given the Debtor's lack of available working capital, its significant and continuing operational losses, and the unavailability of credit except through the Post-Petition Credit Facility (which itself is conditioned upon entry of the Sale Procedures Order—including the attendant milestones set forth therein—by no later than September 4, 2024).

6.      As such, it is imperative that the proposed Sale Procedures Order be entered in order to launch a structured sale process, which contemplates that a sale closing approximately 11 to 14 weeks after the filing of this Motion.

**C.      The Debtor's Business**

7.      The Debtor is a fully integrated brass mill located in Cicero, Illinois. The Debtor was formed in September 2003 for purposes of bidding on the assets of the Debtor's predecessor, Chicago Extruded Metals Company ("CXM") in a section 363 sale under the United States Bankruptcy Code.

5

8.      CXM was founded in 1922 at the Debtor's current facility. The Debtor currently mills brass and bronze alloys in extruded rod, bar, and other profiles, from the Debtor's facility located at 1601 S. 54th Avenue, Cicero, Illinois 60804. The nature and operations of the Debtor's business, as well as the factual background relating to the Debtor's commencement of this Chapter 11 Case, is described in more detail in the *Declaration of Richard M. Jenkins in Support of Chapter 11 Filing and Motion to Approve Postpetition Credit Facility* (the "Declaration") [ECF No. 14], which is expressly incorporated herein by reference.

### D.      **Prepetition Secured Indebtedness**

9.      As of the Petition Date, the Debtor is primarily indebted to the following secured lenders: (a) NELI International Incorporated ("**NELI**"), and (b) Tramec, L.L.C. and Tramec Sloan LLC (collectively, "**Tramec**").

10.      As of the Petition Date, the Debtor believes it owes (a) approximately the amount of $2.1 million on account of prepetition senior secured obligations due NELI and (b) approximately the amount of $1.752 million on account of prepetition junior secured obligations due Tramec.

### E.      **Cash Collateral and DIP Financing**

11.      Shortly after the Petition Date, the Debtor filed a motion (the "DIP/Cash Collateral Motion") under which the Debtor sought, among other things: (a) approval of the Post-Petition Credit Facility with NELI and (b) use of cash collateral that secured NELI's prepetition senior secured claims ("Cash Collateral"). The Post-Petition Credit Facility provides the Debtor with access to up to $3.5 million in the aggregate maximum principal amount. On August 14, 2024, the Court granted the DIP/Cash Collateral Motion on an interim basis and scheduled a final hearing thereon for September 4, 2024 at 11:00 a.m. [ECF No. 22].

F.      **Pre-Petition Sale Efforts**

12.      In the late summer of 2022, the Debtor's management contacted the top four other specialty niche manufacturers to see if any would be interested in acquiring the Debtor's operations. These niche manufacturers were selected because they, like the Debtor, convert brass scrap and other virgin scrap materials into niche brass and bronze product as a specialty jobber rather than as a commodity high volume processer.

13.      Each of these manufacturers either visited the Debtor's facility or—in respects of the foreign manufacturers—were visited by the Debtor's Chief Executive Officer, Mr. Patrick Balson, at their European headquarters. Three of the firms refused to make an offer of any kind for the company. The other required an amendment to the Debtor's collective bargaining agreement as a condition to making such an offer. The union, however, was understandably unwilling to accept an open-ended amendment that left the terms of health, welfare, and other benefits for union employees entirely within the potential buyer's discretion.

14.      The greatest interest in potentially acquiring the Debtor's operations came from Tramec, which had acquired a division of a former customer of the Debtor who had purchased significant quantities of raw material from the Debtor for its parts manufacturing business prior to being acquired by Tramec. The Debtor perceived that its operations would be a good fit for Tramec's portfolio of companies, as these companies generate significant quantities of scrap metal that could be processed through the Debtor's facility at reduced cost to these companies and thereby fit well into Tramec's overall corporate platform.

15.      In December 2023, Tramec and the Debtor signed a non-binding letter of intent ("LOI") for the acquisition of the Debtor's operations, subject to due diligence and other conditions. After the LOI was executed, Tramec undertook significant due diligence and a

thorough assessment of the Debtor's financial condition, operating history, operating permits, and environmental issues.

16.     Following the signing of that letter of intent, and continuing through May 2024, Tramec also advanced $1,752,339.50 cash to the Debtor under prepaid product purchase orders, none of which were fulfilled by the Debtor. These advances were a critical lifeline that enabled the Debtor to maintain its going concern operations and keep its workers employed until an asset purchase agreement could be finalized with Tramec's affiliate, X-Metals Acquisition, LLC (the "Stalking Horse").

17.     On August 20, 2024, the Debtor and the Stalking Horse executed that certain "Asset Purchase Agreement" (the "Stalking Horse APA"), which provides for the acquisition by the Stalking Horse of substantially all of the Debtor's business, subject to higher and better offers and Court approval. The Stalking Horse APA was filed contemporaneously with this Motion under the pleading captioned *Notice of Filing of Stalking Horse APA*.

## III.     THE CONTEMPLATED SALE PROCESS.

### A.     The Sale Procedures Order and the Sale Approval Order

18.     By this Motion, the Debtor requests the entry of two orders.

19.     The first order requested by the Debtor contemplates entry of the proposed Sale Procedures Order attached hereto as **Exhibit A**, which: (a) establishes procedures for the Asset Sale, including approval of the Break-Up Fee, Expense Reimbursement, and Initial Overbid Requirement, as well as approval of the proposed form asset purchase agreement for other qualified bidders to submit with their bids; (b) establishes procedures relating to the assumption and assignment of executory contracts and unexpired leases in connection with the Asset Sale; (c) approves the form notices to creditors and other interested parties of the Asset Sale and to

counterparties to executory contracts and unexpired leases; (d) excuses the Local Rule's page limit in connection with the Motion; and (e) schedules a public auction for the Sale Assets (the "Auction") and a hearing to consider the outcome of the Auction and approval of the Asset Sale to the Prevailing Bidder (as defined below) at the Auction (the "Sale Hearing").

20.     The second order requested by this Motion, to be entered following the Sale Hearing (the "Sale Approval Order"), would: (a) authorize the Sale Assets to be sold free and clear of claims, liens, and encumbrances to the Prevailing Bidder (or the Back-Up Bidder if the Prevailing Bidder fails to close); (b) approve the assumption and assignment of certain executory contracts and unexpired leases; and (c) grant related relief.

21.     The Debtor intends to be in regular communication and consultation with NELI and any official unsecured creditors' committee appointed in the case (the "Committee") (collectively, the "Constituent Parties") regarding the sale mechanics and the ultimate proposed Prevailing Bidder and Back-Up Bidder (if any) for the Sale Assets.

**B.      The Stalking Horse APA[1]**

22.     The Stalking Horse APA is a proposal to acquire substantially all of the assets of the Debtor. These assets are described in detail in Section 2.01 of the Stalking Horse APA and are described or defined therein as follows:

> (a)      the real property and leases of, and other interests in, real property, in each case together with all buildings, fixtures, and improvements erected thereon, listed on Schedule 1.01(a) of the Stalking Horse APA, including the Real Property Lease;

> (b)      all machinery, equipment, vehicles, parts, furniture, and other tangible assets and personal property leased by or owned by the

---

[1]     The summary of the Stalking Horse APA set forth herein is not intended to be a comprehensive restatement of all material terms of the Stalking Horse APA. Capitalized terms used in Paragraphs 22 and 23 hereof shall have the meanings set forth in the Stalking Horse APA. To the extent there is any inconsistency between the terms summarized in this Motion and the Stalking Horse APA, the Stalking Horse APA shall govern.

Debtor or that are, or may be, used in or related to the operation of the Business;

(c)      all inventory, raw materials, supplies, finished goods, component parts, returned goods, contemplated products, goods in transit, packaging materials, and other consumables of the Debtor relating to the Business including inventory in transit from suppliers of the Business or held by suppliers of the Business;

(d)      (i) all rights transferable under contracts, agreements, leases, licenses, commitments, sales, and orders, of the Debtor, in each case executed after the Petition Date (collectively, the "Post-Petition Contracts") and (ii) the transferable pre-Petition Date executory contracts [and unexpired leases] that are listed on Schedule **Error! Reference source not found.**(d) of the Stalking Horse APA (collectively, the "Chapter 11 Contracts", and together with Post-Petition Contracts, the "Purchased Contracts") to be assumed by the Debtor and assigned to the Buyer pursuant to Section 365 of the Bankruptcy Code;

(e)      all transferable licenses, Permits, or other governmental authorizations of the Debtor relating primarily to the Purchased Assets or otherwise necessary for the conduct of the Business (the "Licenses");

(f)      all accounts, notes, and other receivables outstanding as of the Closing related to the Purchased Contracts that are for services to be performed on or after the Closing;

(g)      all of the Debtor's Intellectual Property, including the items listed on Schedule **Error! Reference source not found.**(g) of the Stalking Horse APA and all of the Debtor's rights therein, and all rights to sue for and recover and retain damages for present and past infringement thereof;

(h)      all hardware, software, completed products, products currently in development, and contemplated products, and all technology and Intellectual Property related thereto;

(i)      all operating records, data, and other materials maintained by the Business, including all sales and sales promotional data, advertising materials, customer lists and records, emails, passwords, credit information, cost and pricing information, supplier lists and records, business plans, catalogs, price lists, correspondence, mailing lists, distribution lists, photographs, production data, service and warranty records, engineering records, manufacturing and quality control records and procedures, drawings, blueprints, records, accounting records, plans, specifications, surveys, property records, manuals, and other materials related to any of the foregoing items;

(j)      all goodwill associated with the Business and the Purchased Assets;

10

(k)     all insurance proceeds, condemnation awards, or other compensation in respect of loss or damage to any of the Purchased Assets to the extent occurring between the date hereof and the Closing Date, and all rights and claims of the Debtor to any such insurance proceeds, condemnation awards or other compensation not paid by the Closing, but excluding any insurance proceeds used for repair or casualty;

(l)     all rights under non-disclosure or confidentiality agreements, inventions, and Intellectual Property assignment covenants executed for the benefit of the Debtor with current or former Business Employees, consultants, or contractors of the Debtor, or with third parties, in each case primarily related to the Purchased Assets or otherwise necessary for the conduct of the Business;

(m)     the Agreement by and between the Debtor and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, on behalf of its Local 7-0717 (the "Union Contract"); and

(n)     all security deposits, customer deposits and other deposits of any kind related to the Purchased Assets.

23.     The purchase price set forth in Section 2.06 of the Stalking Horse APA (the "Purchase Price") shall be equal to the sum of the following amounts and payable as follows:

(i)     the amount of the credit bid for outstanding indebtedness as referenced in that certain Security Agreement and UCC Filing Authorization, dated February 28, 2024, by and among the Debtor, Tramec, L.L.C. and Tramec Sloan LLC, and NELI International Incorporated ("NELI") which is equal to $1,752,339.50 as of the Petition Date; *plus*

(ii)     an amount equal to the sum of (x) the obligations owed to NELI under that certain Secured Super-Priority Post-Petition Credit Agreement (as the same may be amended and modified, the "Post-Petition Credit Agreement") dated August 12, 2024 by and between the Debtor and NELI, *plus* (y) the Pre-Petition Obligations (as defined in the Post-Petition Credit Agreement) (collectively, the "NELI Portion of the Purchase Price"); *plus*

(iii)     the amount of Cure Costs for the Real Property Lease and any other Chapter 11 Contracts assumed by Buyer within the Buyer's sole discretion (the "Cure Portion of the Purchase Price"); *plus*

(iv)     the amount of up to $100,000.00 cash for the benefit of the bankruptcy estate of the Debtor (the "Estate Portion of the Purchase Price" and together with the NELI Portion of the Purchase

Price and the Cure Portion of the Purchase Price, the "Cash Portion of the Purchase Price").

24.     The Stalking Horse APA requires a $325,000 deposit, to be deposited into escrow with an escrow agent agreed upon by the parties.

25.     The Stalking Horse APA provides for an initial topping bid in the amount of no less than the Purchase Price, in addition to Bid Protections in the form of (a) the $325,000 Break-Up Fee, *plus* (b) the Expense Reimbursement of reasonable out-of-pocket expenses in an amount not to exceed $100,000.00, *plus* (c) the Initial Overbid Requirement of $200,000.

### C.     The Form APA

26.     In order to expedite the consideration of competing bids, the Debtor proposes that any parties seeking to bid for the Sale Assets at the Auction (each a "Qualified Bidder") other than the Stalking Horse be required to submit their bid substantially in the form of the Asset Purchase Agreement attached to the *Notice of Filing Form APA* filed contemporaneously with this Motion (the "Form APA"). The Form APA is substantially similar to the Stalking Horse APA in all material respects.

27.     At the Auction, the Debtor, along with the Constituent Parties, will consider whether a combination of bids meets or exceeds the offer set forth in the Stalking Horse APA after accounting for the Bid Protections and other considerations, including execution risk.

### D.     The Bid Procedures[2]

28.     The Debtor proposes a sale process to be completed in accordance with the proposed form of *Approved Bid Procedures* attached to the proposed Sale Procedures Order as **Exhibit A** (the "Bid Procedures"). The central features of the proposed Bid Procedures are follows:

---

[2]     The summary of the Bidding Procedures that follows is not intended to be a comprehensive restatement of all material terms to the Bidding Procedures set forth in Exhibit A to the proposed Sale Procedures Order. To the extent there is any inconsistency between the terms summarized in this motion and the Bid Procedures, the Bid Procedures shall govern.

a.      <u>Confidentiality Agreement and Due Diligence</u>.   Upon execution of a standard confidentiality agreement, Qualified Bidders will be granted access to non-public information pertaining to the Sale Assets (including executory contracts and unexpired leases), the Debtor's historical financial performance, and the Debtor's operations, operating permits, and environmental issues.

b.      <u>Criteria for Consideration to be Deemed a Qualified Bid</u>. The proposed Bid Procedures set forth a number of criteria to be used in determining whether a bid is qualified as a bid at the auction (a "<u>Qualified Bid</u>"), including submission of an asset purchase agreement that tracks the Form APA. The proposed Bid Procedures contemplate that Qualified Bids (i) be submitted prior to **5:00 p.m. (Central time) on September 30, 2024** (the "<u>Bid Deadline</u>"), (ii) be accompanied by an earnest money deposit in the amount of $325,000 (the "<u>Deposit</u>"), and (iii) contain sufficient information regarding the Bidder's creditworthiness and ability to consummate the sale in a timely manner.

c.      <u>Auction and Selection of Prevailing Bid and Back-Up Bid</u>. The Bid Procedures specify the date and location of the Auction, which the Debtor proposes be held at the offices of proposed counsel for the Debtor **at 10:00 a.m. (Central time) on October 15, 2024**. The proposed Bid Procedures further provide that the prevailing bid at the Auction (the "<u>Prevailing Bid</u>") will be the highest and best bid, as determined by the Debtor (in consultation with the Constituent Parties). The proposed Bid Procedures also authorize the Debtor (in consultation with the Constituent Parties) to choose the second highest-and-best bid to serve as a back-up bid (the "<u>Back-Up Bid</u>").

d.      <u>Sale Hearing and Return of Deposits.</u> The proposed Bid Procedures propose the Sale Hearing be held at **1:00 p.m. (Central time) on October 30, 2024**, at which time the Court

13

will consider whether to approve the proposed sale of the Sale Assets to the Prevailing Bidder (or the Back-Up Bidder (if any) should the Prevailing Bidder fail to close) pursuant to a proposed form of Sale Approval Order. After the Sale Hearing, all Deposits will be returned to all Bidders other than those of the Prevailing Bidder and the Back-Up Bidder (if any).

e.      Closing and Failure to Close. Following entry of the Sale Approval Order, the Prevailing Bidder must use commercially reasonable efforts to close the sale on the latest of (i) November 4, 2024, (ii) five (5) calendar days after entry on the docket of the Sale Approval Order, and (iii) such other date as agreed between Purchaser and Debtor (but in no event beyond November 22, 2024) (the "Prevailing Bid Closing").

f.      In the event of a Prevailing Bidder's failure to close, the Bidder submitting the Back-Up Bid (the "Back-Up Bidder") shall be required to consummate the transactions contemplated in the Back-Up Bid at the purchase price so offered without further act, deed, or order of the Bankruptcy Court within five (5) business days following receipt of a notice from the Debtor of a Prevailing Bidder's Failure to Close, unless the Debtor has previously provided written notice to the Back-Up Bidder of its intent not to accept the Back-Up Bid. Deposits submitted in connection with either the Prevailing Bid or the Back-Up Bid may be forfeited irrevocably if their respective bidders fail to close as required under the proposed Approved Bid Procedures.

g.      Reservation of Rights and Miscellaneous. The Bid Procedures contain a broad reservation of rights to allow the Debtor, in consultation with the Constituent Parties, to determine which bids are Qualified Bids and to take other actions regarding the Asset Sale (all without prejudice to the rights of the Stalking Horse Bidder to object to any such action by the Debtor that does not strictly follow process and deadlines set forth in the approved Bid Procedures). In assessing Qualified Bids, the Debtor will compare the value of bids so as to achieve the greatest

14

possible value for the Sale Assets as a whole. The Debtor further reserves all rights to modify or impose, at or prior to the Auction, additional terms and conditions on the sale of the Sale Assets, to extend to adjourn any deadlines set forth herein, and to take any other actions with respect to the Auction, the Sale Hearing, or the sale of the Sale Assets that, in its business judgment and after consultation with the Constituent Parties, are reasonably necessary to preserve the bankruptcy estate or maximize the value thereof (all without prejudice to the rights of the Stalking Horse Bidder to object to any such action that does not strictly follow process and deadlines set forth in the approved Bid Procedures).

h.    <u>Notice of the Proposed Approved Bid Procedures.</u> Once authorized by the court, the Debtor proposes to serve copies of the Bid Procedures upon (i) counsel for each of the Constituent Parties; (ii) all known counterparties to the Debtor's executory contracts and unexpired leases; (iii) the United States Trustee's Office for Region 11; (iv) all entities reasonably known by the Debtor (or their representatives or retained professionals) to have a lien or other property interest in the Sale Assets; (v) the District Director of the Internal Revenue Service for the Northern District of Illinois; (vi) the Office of the Attorney General of Illinois; (vii) all parties entitled to notice with the Court's ECF noticing system; and (viii) all other entities that have filed requests for notices pursuant to Fed. R. Bankr. P. 2002. Additionally, the Debtor will serve the *Summary Notice of Sale of All or Substantially All Assets of Debtor* attached to the proposed Sale Procedures Order as **<u>Exhibit B</u>** (the "<u>Summary Notice of Sale</u>"), via first-class U.S. mail (unless mail to such person or entity has previously been returned as undeliverable), upon all entities (a) who are listed on the Schedules D, E, and F of the Debtor's filed schedules, (b) who have filed proofs of claim in the case, or (c) who are otherwise listed on the Debtor's matrix of interested parties filed with the Debtor's chapter 11 petition.

## IV.    ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

29.    As part of the Motion, the Debtor seeks authority to assume and assign the executory contracts and unexpired leases (the "Executory Contracts / Unexpired Leases") identified in the Prevailing Bidder's Asset Purchase Agreement. The counterparties to Executory Contracts / Unexpired Leases will receive, in addition to the Sale Approval Order, the proposed *Notice of Potential Assumption and Assignment of Executory Contracts and Unexpired Leases*, a copy of which is attached hereto as **Exhibit C** (the "Assumption Notice").

30.    The Assumption Notice will specify the "cure amounts" that the Debtor's books and records reflect are necessary to assume and assign such Executory Contracts / Unexpired Leases pursuant to section 365 of the Bankruptcy Code (each a "Cure Amount"). The Debtor believes that the payment of each Cure Amount will cure any and all defaults and pecuniary losses under the corresponding Executory Contract / Unexpired Lease.

31.    Further, if the Debtor identifies additional executory contracts or unexpired leases that might be assumed by the Debtor and assigned to the Prevailing Bidder or Back-Up Bidder not set forth in the Assumption Notice, the Debtor will send a supplemental notice (a "Supplemental Assumption Notice") on or before October 4, 2024, to the non-Debtor parties to such additional Executory Contracts / Unexpired leases by facsimile, overnight delivery, or such other form of notice authorized by the recipient (including CM/ECF and/or email). The Supplemental Assumption Notice shall set forth for such applicable counterparties the same information as is required by the Assumption Notice. The Supplemental Assumption Notice shall also be sent to any applicable counterparties to Executory Contracts / Unexpired Leases identified in any Qualified Bid received by the Debtor as of September 30, 2024, where the Cure Amount in that Qualifying Bid (which amount shall be specifically quantified in the Supplemental Assumption Notice) is less than the Cure Amount set forth in the Assumption Notice.

16

32.     The Debtor proposes the following additional procedures for addressing the assumption and assignment of Executory Contracts and Unexpired Leases:

a.      The deadline for a non-Debtor party to an Executory Contract / Unexpired Lease (a "Contract/Lease Counterparty") to file and serve an objection (a "Cure Amount/Assignment Objection") to the Cure Amount or proposed assumption and assignment will be **5:00 p.m. (Central time) on October 11, 2024** (the "Cure Amount/Assignment Objection Deadline").

c.      Cure Amount/Assignment Objections must be both (i) filed with the clerk of the Bankruptcy Court, and (ii) served in the matter provided in the Assumption Notice upon respective counsel to the Debtor, the U.S. Trustee's Office for Region 11, and each Constituent Party on or before the Cure Amount/Assignment Objection Deadline.

d.      Unless a Contract/Lease Counterparty timely files and serves a Cure Amount/Assignment Objection as provided herein, then such Contract/Lease Counterparty:

i.      Will be forever barred from objecting to its Cure Amount and from asserting any additional cure or other amounts with respect to its Executory Contract / Unexpired Lease, and the Debtor, the Prevailing Bidder, and the Back-Up Bidder shall be entitled to rely solely upon the Cure Amount; and

ii.     Will be deemed to have consented to the assumption, assignment, and/or transfer of such Executory Contract / Unexpired Lease and will be forever barred and estopped from asserting or claiming against the Debtor, the Prevailing Bidder, the Back-Up Bidder, or any other assignee thereof,

17

that any additional amounts are due or defaults exist, or that other conditions to assumption, assignment and/or transfer must be satisfied in respect of such Executory Contract / Unexpired Lease as a precondition to such assumption and assignment (including relating to the adequacy of assurance of future performance by the Prevailing Bidder and/or the Back-Up Bidder in respect of such Executory Contract / Unexpired Lease).

e.   If an objection challenges a Cure Amount, the objection must set forth the cure amount being claimed by the objecting party (the "Claimed Cure Amount") with the appropriate documentation in support thereof. Upon receipt of a Cure Amount/Assignment Objection, the Debtor is authorized, but not directed, in consultation with the Constituent Parties, to resolve any Cure Amount/Assignment Objection by mutual agreement with the objecting party to any Executory Contract / Unexpired Lease without further order of the Court (all without prejudice to the rights of the Stalking Horse Bidder to object to any such action by the Debtor). In the event that the Debtor and any objecting party are unable to consensually resolve any Cure Amount/Assignment Objection prior to the Sale Hearing, the Court will resolve any such Cure Amount/Assignment Objection at the Sale Hearing.

## V.   RELIEF REQUESTED AND AUTHORITY THEREFOR

### A.   The Asset Sale Satisfies the Business Judgment Rule.

33.   Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). To approve the use, sale or lease of property outside the ordinary course of business, there must be some "articulated business justification." *Fulton State Bank v.*

*Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Efoora, Inc.*, 472 B.R. 481, 488 (Bankr. N.D. Ill. 2012); *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

34.    Once a valid business justification made in the ordinary course of business is established, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Johns-Manville Corp.*, 60 B.R. 612, 615-616 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions"). Similarly, a court will defer the debtor's judgment to make a sale outside the ordinary course of business pursuant to section 363, when the debtor has "sound business reasons for making the sale." *Schipper*, 933 F.2d at 515.

35.    A debtor-in-possession "has considerable discretion when it comes to the sale of estate assets, and that discretion is entitled to great judicial deference as long as a sound business reason is given." *Efoora*, 472 B.R. at 481. Therefore, the relief requested in this Motion should be granted if the Debtor demonstrates a sound business justification therefor. *Schipper*, 933 F.2d at 515; *Lionel Corp.*, 722 F.2d at 1071.

36.    The Debtor has sound business justifications for selling the Sale Assets at this time. The Debtor does not have the financial resources or access to capital necessary to maintain its operations without the assistance of NELI, its senior secured lender. NELI has agreed to provide post-petition financing through the Post-Petition Credit Facility, but only if the milestone deadlines in the proposed Sale Procedures Order are approved by September 4, 2024.

19

37.     Absent acceptance of the milestones set forth in the proposed Sale Procedures Order, therefore, the funding would terminate, the Debtor would be forced into a chapter 7 liquidation, its operations would shut down, its melters and furnaces would be turned off, and its entire workforce of approximately 55 union employees and 25 salaried employees would be laid off, all making the prospect of resuscitating the business and selling it as a going concern in an orderly liquidation impossible.

38.     As such, the Debtor therefore has determined in the exercise of its business judgment that the best option for maximizing the value of its estate is through the contemplated sale of the Sale Assets in accordance with the proposed form of Approved Bid Procedures attached to the proposed Sale Procedures Order as **Exhibit A**.

### B.     **The Proposed Bid Protections Are Fair and Reasonable.**

39.     The Debtor believes that a compelling need exists to authorize the granting of the proposed Bid Protections in order to induce the Stalking Horse to submit its bid for the Sale Assets as early as possible in the sale process. Moreover, the Debtor believes that the proposed Bid Protections are fair and reasonable in relation to any Qualifying Bid received and will maximize the benefit to the Debtor's estate by providing an incentive to potential purchasers to expend the resources necessary to formulate offers for the Sale Assets in excess of the Stalking Horse Bid. *See, e.g., In re Oberweis Dairy, Inc.*, Case No. 24-B-05385 (Bankr N.D. Ill. June 7, 2024) (approving a break-up fee equal to 5% of the stalking horse's bid plus an overbid amount of $250,000); *In re Kmart Corp.*, Case No. 02-B-02474 (Bankr. N.D. Ill. Aug. 29, 2002) (approving proposed termination fee and authorizing a termination fee and overbid protections for potential bidders).

20

40.     The purpose of the Break-Up Fee and Expense Reimbursement is to provide "an incentive payment to a prospective purchaser with which a company fails to consummate a transaction." *S.N.A. Nut*, 186 B.R. at 101. Such agreements are designed "to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers.'" *Id.*; *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentive may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking").

41.     In the bankruptcy context, the test for determining whether a proposed break-up fee or expense reimbursement should be approved is whether it is in the best interests of the estate because it will maximize the consideration to be brought into the debtor's estate. *S.N.A. Nut*, 186 B.R. at 104; *In re Tiara Motorcoach Corp.*, 212 B.R. 133, 137 (Bankr. N.D. Ind. 1997) (adopting the standard set forth in *S.N.A. Nut*).

42.     The Debtor believes that the proposed Bid Protections satisfy this standard. Given the exigent circumstances facing the Debtor, the milestone conditions set by NELI in the Post-Petition Credit Facility, and continuing and accelerating losses sustained by the Debtor since 2021, it is imperative that the sale process led by a Stalking Horse Bid be commenced as quickly as possible. Further, the Break-Up Fee and Expense Reimbursement in the Stalking Horse Bid will be awarded only if the Debtor actually closes on a competing bid. *S.N.A. Nut*, 186 B.R. at 103 n.5, 106 (denying break-up fee in the absence of any consummated sale).

43.     The Initial Overbid Requirement is also reasonable. It represents a premium of only approximately three percent (3%) of the estimated minimum bid contemplated by the Stalking Horse Bid and thus is "a fair and reasonable percentage of the proposed purchase price [and not] so substantial that it provides a 'chilling effect' on other potential bidders." *Id.* at 103 n.5.

44.     The proposed Bid Protections, therefore, should be approved. Only through them will the Debtor retain the commitment of the Stalking Horse Bidder and thereby enable the Debtor to market the Sale Assets (including to those whom the Debtor approached prepetition) for purposes of soliciting higher or better offers.

**C.      The Asset Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear of Liens, Claims, Encumbrances, and Interests.**

45.     Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim, or interest in such property if, among other things:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

46.     Because section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will be sufficient to permit the sale of the Sale Assets free and clear of any and all interests. *See In re Terrace Chalet Apartments, Ltd.*, 159 B.R. 821, 827 (N.D. Ill. 1993).

47.     Here, all holders of interests in the Sale Assets, including NELI and Tramec, can be compelled to accept a money satisfaction of such interests in legal or equitable proceedings in accordance with section 363(f)(5) of the Bankruptcy Code. Such legal or equitable proceedings include proceedings to confirm a plan of reorganization, under which the holder of a lien may be compelled to accept payment in satisfaction of its lien pursuant to section 1129(b)(2)(A) of the

Bankruptcy Code, which authorizes a debtor to sell property free and clear of liens so long as the lien attaches to the net proceeds of the sale, subject to any claims and defenses of the Debtor or other interested parties. Here, the Debtor proposes that any interests in the Sale Assets attach to the net proceeds from the sale. The requirements of Bankruptcy Code section 363(f), therefore, are satisfied and the sale may be approved free and clear of all liens, claims, encumbrances and interests, including claims for successor liability.

       **D.**    <u>**The Sale Satisfies the Requirements of Bankruptcy Code Section 363(m).**</u>

     48.    Bankruptcy Code section 363(m) favors finality of orders approving asset sales under Bankruptcy Code section 363 and maximizes the value of the assets for sale, which benefits both debtors and creditors. *See Hower v. Molding Sys. Eng'g Corp.,* 445 F.3d 935, 938 (7th Cir. 2006).

     49.    As noted by the Seventh Circuit Court of Appeals, "[t]he requirement that a purchaser act in good faith, of course, speaks to the integrity of his conduct in the course of the sale proceedings." *In re Andy Frain Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1995, 1198 (7th Cir. 1978)) ("Typically the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.").

     50.    In the present case, the Bid Procedures have been developed in consultation with NELI and Tramec and at full arm's length. The Debtor believes the proposed Bid Procedures properly balance the interest of NELI, the Stalking Horse Bidder, and the Debtor to enable a fair sales process, consistent with the requirements of the Bankruptcy Code and customary practices in larger corporate bankruptcy cases both in this district and nationwide.

### E.    The Assumption and Assignment of Executory Contracts / Unexpired Leases Should Be Authorized.

51.    Section 365(f)(2) of the Bankruptcy Code provides:

The trustee may assign an executory contract or unexpired lease of the debtor only if–

(A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

52.    Under section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor. This subsection provides as follows:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee–

(A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;

(B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

53.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *In re Resource Tech. Corp.*, 624 F.3d 376, 383 (7th Cir. 2010) (internal citation omitted). The required

assurance "will fall considerably short of an absolute guarantee of performance." *Id.* (quoting *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988)); *see also In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803-04 (Bankr. N.D. Ill. 1985).

54.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and reputation. *Resource Tech.*, 624 F.3d at 383; *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance where prospective assignee of lease from debtor had financial resources and expressed its willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

55.     To the extent that any defaults exist under any of the Executory Contracts / Unexpired Leases that are to be assumed and assigned in the proposed sale, they will be cured at closing as a condition of such assumption and assignment (unless consent to the assumption and assignment on other terms are agreed to by the counterparty to such Executory Contracts / Unexpired Leases). Further, if necessary, the Debtor will demonstrate at the Sale Hearing that the Prevailing Bidder and the Back-Up Bidder (if any) have the requisite experience in the industry and financial capability to perform under the proposed Executory Contracts / Leases to be assumed and assigned.

56.     The Sale Hearing, therefore, will provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Prevailing Bidder and Back-up Bidder (if any) to provide adequate assurance of future performance under the contracts to be assumed and assigned. As such, the Court can expect to have a sufficient basis upon which to authorize the Debtor to assume and assign those Executory Contracts / Unexpired Leases designated for assumption and assignment in the sale.

## VI.   WAIVER OF STAYS UNDER FED. R. BANKR. P. 6004(h) and 6006(d)

57.     Bankruptcy Rule 6004(h) provides that an order authorizing the use, sale, or lease of estate property other than cash collateral is stayed until 14 days from its entry, unless the bankruptcy court orders otherwise. Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) imposes a similar stay upon an order authorizing the assignment of executory contracts or unexpired leases under section 365 of the Code, also subject to waiver on the Court's order. Fed. R. Bankr. P. 6006(d).

58.     Given the urgency of closing within the milestones set by NELI in the Post-Petition Credit Facility, the Debtor requests that the stays under Fed. R. Bankr. P. 6004(h) and 6006(d) be waived by the Court, as they will impede consummation of the Asset Sale to the detriment of all interested parties.

## VII.   REQUEST TO EXCUSE FIFTEEN-PAGE LIMIT

59.     Local Rule 5005-3(D) provides, "No motion, response to a motion, brief, or memorandum in excess of fifteen pages may be filed without prior approval of the Court." Bankr. N.D. Ill. L.R. 5005-3(D). Since this Motion requests two separate orders granting multiple forms of relief, adhering to the fifteen-page limit would not adequately convey the relief requested and the factual background thereto. The Debtor, therefore, requests that the Court excuse the fifteen-page limit otherwise applicable to the Motion.

## VIII.   NOTICE REQUIREMENTS

60.     The Debtor has provided a copy of this Motion via ECF filing, U.S. mail, e-mail, and/or overnight delivery to the following persons, in the manner specified in the Notice of Motion: (a) counsel for NELI; (b) counsel for Tramec and the Stalking Horse; (c) counsel for the United States Trustee's Office for Region 11; (d) the 20 largest unsecured creditors; (e) any Committee formed in this Chapter 11 Case; and (e) all other entities that have filed requests for

26

notices pursuant to Fed. R. Bankr. P. 2002. Coupled with the notices to be sent by the Debtor pursuant to the proposed Approved Bid Procedures, the Debtor requests that such notice of the Motion be deemed adequate and reasonable under the circumstances.

WHEREFORE, the Debtor respectfully requests entry of (i) an order approving the proposed Sale Procedures Order and exhibits thereto, (ii) an order approving the Asset Sale to the Prevailing Bidder or Back-Up Bidder (if any) following the completion of the Auction and Sale Hearing, and (iii) the grant of such other and further relief as is just.

Dated:  August 23, 2024

Respectfully Submitted,

BERKSHIRE INVESTMENTS, LLC

By: /s/ Steven R. Jakubowski
      One of Its Proposed Attorneys

Steven R. Jakubowski (ARDC #6191960)
Carolina Y. Sales (ARDC #6287277)
Dominic G. Erbacci (ARDC# 6329651)
ROBBINS DIMONTE, LTD.
180 N. LaSalle Street, Suite 3300
Chicago, Illinois 60601
Tel: (312) 456-0191
Fax (312) 782-6690
sjakubowski@robbinsdimonte.com
csales@robbinsdimonte.com
derbacci@robbinsdimonte.com

*Proposed Counsel for Debtor*