**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 24-11552 |
| | ) | |
| Berkshire Investments LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Honorable David D. Cleary |
| | ) | |

**ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR FREE AND CLEAR OF INTERESTS INCLUDING LIENS, CLAIMS, AND ENCUMBRANCES; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion") dated August 23, 2024 of the above-captioned debtor and debtor in possession (the "Debtor"), for, *inter alia,* entry of an order (the "Sale Approval Order") (A) approving the sale (the "Sale") of substantially all of the Debtor's assets free and clear of all interests, including "Liens" (as defined in 11 U.S.C. § 101(37), "Claims" (as defined in 11 U.S.C. § 101(5)), and encumbrances (collectively with all Liens and Claims, the "Interests"), pursuant to sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (as amended, the "Bankruptcy Code"), and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); (B) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "Assumed Executory Contracts/Leases") identified by the Purchaser (hereafter defined) and more fully described in that certain Asset Purchase Agreement dated August 21, 2024 by and between the Debtor as Seller and X-Metals Acquisition, LLC, a Delaware limited liability company, as buyer (the "Purchaser") for the purchase of the Sale Property (hereafter defined); and (C) granting related relief; and the Bankruptcy Court (the "Court") having entered on September 11, 2024 that certain order [Dkt. No. 62] (the "Sale Procedures Order") setting forth the underlying sales process (the "Sale Process")

for the marketing of the Sale Property, the solicitation of bids and the approval and consummation of the ultimate Sale; and the Sale Procedures Order having incorporated the accompanying bidding procedures (the "Approved Bidding Procedures"), the "Summary Sale Notice," and the "Assumption Notice" attached as Exhibits A-C thereto; and the Court having conducted a hearing (the "Sale and Injunction Hearing") on the Debtor's *Emergency Motion for: (I) Immediate Preliminary Injunctive Relief to Enjoin X-Metals Acquisition, LLC from Terminating its Stalking Horse Bid; (II) Immediate Consolidation of the Hearing for Preliminary Injunctive Relief with the Trial on the Merits* [Dkt. No. 89] (the "Emergency Motion") to consider the approval of the Sale Property to the Purchaser under the Asset Purchase Agreement dated August 21, 2024 (as amended by the Purchaser on the record at the Auction and as reflected in the "First Amended and Restated Asset Purchase Agreement" attached to this Order as Exhibit 1, defined herein as the "Asset Purchase Agreement") and entry of an order requiring the Purchaser to immediately close on its obligations under the Asset Purchase Agreement; and the Debtor having determined and declared at the auction proceeding conducted on October 22, 2024 (the "Auction") that the Purchaser made the highest and best offer for the Sale Property under the Asset Purchase Agreement; and the Bankruptcy Court having reviewed: (a) the Motion, (b) the objections of the Committee and the Purchaser to the relief sought in the Motion and the Emergency Motion (the "Sale Objections"); (c) the manner of resolution of certain of the Sale Objections as announced on the record at the Sale and Injunction Hearing; (d) the arguments of counsel made; (e) the evidence proffered or adduced at the Sale and Injunction Hearing, including the testimony of witnesses and exhibits introduced into evidence; and it appearing that the relief requested in the Motion and Emergency Motion is in the best interests of the Debtor, its estate, its creditors, and other parties in interest; and upon the record of the Sale and Injunction Hearing and this Chapter 11 Case; and after due

deliberation thereon and for the reasons set forth in the record; and for good cause appearing therefor.

**IT IS HEREBY FOUND AND DETERMINED THAT:**

**A.** **Fed. R. Bankr. P. 7052 and 7065**. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, and Bankruptcy Rule 7065 and Fed. R. Civ. P. 65. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. The Court's findings and conclusions shall also include any oral findings of fact and conclusions of law made by the Court on the record during or at the conclusion of the Sale and Injunction Hearing, which findings and conclusions are incorporated herein by reference.

**B.** **Jurisdiction and Venue**. The Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 157 and 1334, and this matter is a core proceeding pursuant to, *inter alia*, 28 U.S.C. § 157(b)(2)(A) and § 157(b)(2)(N). Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

**C.** **Statutory Predicates**. The statutory predicates for the relief sought in the Motion are sections 105(a), 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 7065 and 9014 of the Bankruptcy Rules, and Rule 65 of the Federal Rules of Civil Procedure.

**D.** **Final Sale Approval Order**. This Sale Approval Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rules 54(b) and 65 of the Federal Rule of Civil Procedure, as made applicable by Bankruptcy Rules 7054 and 7065,

respectively, the Court finds that there is no just reason for delay in the implementation of this Sale Approval Order, and directs entry of judgment as set forth herein. No appeal, motion to reconsider, or similar pleading has been filed with respect to the Sale Procedures Order, and the Sale Procedures Order is a final order of the Court, has not been vacated, withdrawn, rescinded, or amended, and remains in full force and effect.

**E.** **Petition Date**. On August 8, 2024 (the "Petition Date"), the Debtor commenced these proceedings by filing a petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

**F.** **Sale Property**. The Sale Property consists of the assets and property of the estate of the Debtor as specifically described in the Asset Purchase Agreement, but not the Excluded Assets as defined therein.

**G.** **Entry of Sale Procedures Order**. The Sale Procedures Order: (i) authorized and approved the Approved Bidding Procedures; (ii) determined the stalking horse bid to constitute the Stalking Horse Bid under the Approved Bidding Procedures; (iii) approved the form asset purchase agreement; (iv) scheduled the Auction; (v) established procedures for the assumption and assignment of the Assumed Executory Contracts/Leases, and for noticing and determining the cure amount necessary to enable the Debtor to consummate the proposed assumption and assignment of the Assumed Executory Contract/Leases (the "Cure Costs"); (vi) approved the form and matter of notice of all procedures, protections, schedules, agreements and relating hearings (the "Notices"); (vii) established deadlines for submitting bids ("Bid Deadline"); (viii) stated the parameters of acceptable bids ("Qualified Bids"); (ix) delineated the requirements to participate as a bidder at the Auction ("Qualified Bidders"); (x) set forth the criteria for determining the

successful bid ("Prevailing Bid") and the back-up bid ("Back-Up Bid"); (xi) and granted certain related relief.

**H. Compliance with Sale Procedures Order**. The Approved Bidding Procedures were substantively and procedurally fair to all parties. As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale and Injunction Hearing, and (ii) the representations of counsel made on the record at the Sale and Injunction Hearing, the Debtor conducted the Sale Process in compliance with the Sale Procedures Order and the Approved Bidding Procedures, and the Auction was duly noticed and conducted in a non-collusive, fair, and good faith manner. The Debtor and its professionals, together with members of the Committee, adequately marketed the Sale Property including the initiation of teaser letters to over 16,000 industry participants and prospective suitors; published notice of the sale hearing and auction in the Sunday edition of the Chicago Tribune; obtained non-disclosure agreements from several prospective suitors; created and made available a comprehensive due diligence folder, including comprehensive information regarding the Debtor's assets; conducted management meetings with certain prospective suitors; and otherwise enabled prospective suitors to conduct due diligence. Accordingly, the Sale Process was conducted in compliance with the Sale Procedures Order, and has afforded prospective suitors a full and fair opportunity to participate in the sale process and make higher and better offers.

**I. Notice**. As evidenced by the certificates of service attached to the Motion and the Emergency Motion or otherwise filed separately with the Court [Dkt. Nos. 66, 67, 79]: (i) proper, timely, adequate and sufficient notice of the Motion, the Emergency Motion, the Sale and Injunction Hearing, the Sale, the assumption and assignment procedures for the Assumed Executory Contracts/Leases (including the objection deadline and the outstanding amounts with respect to any Cure Costs), has been provided in accordance with sections 102(1), 363 and 365 of

the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 7065 and in compliance with the Sale Procedures Order, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Emergency Motion, the Sale and Injunction Hearing, the Sale, or the assumption and assignment of the Assumed Executory Contracts/Leases is or shall be required.

**J.** **Auction**. At or prior to the Bid Deadline, the Debtor received no additional Qualified Bids in addition to the Stalking Horse Bid. Accordingly at the scheduled Auction proceeding conducted on October 22, 2024, the Qualified Bid of the Purchaser pursuant to the Asset Purchase Agreement was declared the Prevailing Bid.

**K.** **Corporate Authority**. The Debtor: (i) has full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale of the Sale Property by the Debtor has been duly and validly authorized by all necessary corporate action of the Debtor, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by Asset Purchase Agreement , and (iii) has taken all corporate action necessary to authorize and approve the Asset Purchase Agreement and the consummation by the Debtor of the transactions contemplated thereby. No consents or approvals, other than those expressly provided for in the Asset Purchase Agreement or this Sale Approval Order are required for the Debtor to consummate such transactions.

**L.** **Opportunity to Object**. A fair and reasonable opportunity to object or be heard with respect to the Motion and the Emergency Motion and the Sale has been afforded to all interested persons and entities, including: (i) the Office of the United States Trustee for Region 11; (ii) counsel for NELI International Incorporated; (iii) counsel for the Committee; (iv) counsel for the Purchaser; and (v) all entities reasonably known by the Debtor (or its representatives and

retained professionals) to have an Interest in the Sale Property; (vii) all parties to the contracts and leases proposed to be assumed and assigned to the Purchaser; (vii) the District Director of the Internal Revenue Service for the Northern District of Illinois; (viii) the Office of the Attorney General of Illinois; (ix) all taxing authorities identified in the bankruptcy schedules filed in this proceeding; (x) all entities filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in this Bankruptcy Case; (xi) all parties receiving the Summary Sale Notice and the Assumption Notice.

**M.** **Sale in Best Interest**. Consummation of the Sale of the Sale Property to the Purchaser pursuant to the Asset Purchase Agreement is in the best interests of the Debtor, its estate, its creditors, and other parties in interest.

**N.** **Sound Business Justification**. Sound business reasons exist for the Sale. Entry into the Asset Purchase Agreement constitutes the Debtor's exercise of sound business judgment and such act is in the best interests of the Debtor, its estate, and all parties in interest. The Court finds that the Debtor has articulated good and sufficient business reasons justifying the Sale. Such business reasons include: (i) the Asset Purchase Agreement constitutes the highest and best offer for the Sale Property; (ii) the Asset Purchase Agreement and the closing thereon will present the best opportunity to realize the value of the Sale Property as a going concern and avoid the decline and devaluation of the Sale Property; and (iii) under the circumstances of this Chapter 11 Case, the Debtor is unable to propose a plan of reorganization that would be confirmable prior to the expiration of debtor in possession financing or that would meet the requirements of section 1129 of the Bankruptcy Code.

**O.** **Arm's-Length Sale**. The Asset Purchase Agreement was negotiated, proposed and entered into by the Debtor and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.

**P.** **Successful Bidder; Highest and Best Value**. After conclusion of the Auction, the Debtor determined, in accordance with its business judgment, that the Asset Purchase Agreement was (i) a Qualified Bid and (ii) the highest and best bid for the Sale Property made at the Auction. As a result, the Debtor declared the Purchaser the Prevailing Bidder for the Sale Property in accordance with the terms of the Sale Procedures Order. The Debtor conducted a fair and open Sale Process. The Sale Process, the Approved Bidding Procedures, and the Auction were non-collusive, duly noticed and provided a full, fair, and reasonable opportunity for any person to comply with the Approved Bidding Procedures and to make an offer to purchase the Sale Property. The process conducted by the Debtor pursuant to the Approved Bidding Procedures resulted in the highest or best value for the Sale Property for the Debtor and its estate, and any other transaction would not have yielded as favorable an economic result.

**Q.** **Fair Consideration**. The consideration provided by the Purchaser for the Sale Property pursuant to the Asset Purchase Agreement: (i) is fair and reasonable, (ii) is the highest and best offer for the Sale Property, (iii) will provide a greater recovery for the Debtor's creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

**R.** **Good Faith Purchaser**. The Purchaser is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code and any other applicable or similar bankruptcy and non-bankruptcy law. The Purchaser has been

and will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Asset Purchase Agreement.

**S.** **Free and Clear Sale; Purchaser's Reliance**. The Debtor may sell the Sale Property free and clear of all Interests (other than title exceptions and other Permitted Liens as defined in the Asset Purchase Agreement) because, with respect to each creditor asserting a lien, claim, encumbrance, or interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied. Those holders of Interests who did not object or withdrew objections to the Sale are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code. No holder of an Interest objected to the sale, as permitted by section 363(f) of the Bankruptcy Code. Holders of Interests who did object on other grounds would have fallen within one or more of the other subsections of section 363(f) of the Bankruptcy Code. The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby if the Sale of the Sale Property were not free and clear of all Interests (other than Permitted Liens), or if the Purchaser would, or in the future could, be liable for any such Interests (other than Permitted Liens), including, as applicable, certain liabilities related to the business of the Debtor ("Business") that will not be assumed by the Purchaser, as described in the Asset Purchase Agreement. A sale of the Sale Property other than one free and clear of all Interests (other than Permitted Liens) would adversely impact the Debtor, its estate, and its creditors, and would yield substantially less value for the Debtor's estate, with less certainty than provided under the Sale. The Purchaser can rely upon this Sale Approval Order to provide it with good and marketable title to and possession of the Sale Property free and clear of all Interests (including, without limitation, any potential derivative, vicarious, transferee, or successor liability Interests or Claims), except as set forth in the Asset Purchase Agreement.

**T.** **Transfer Free and Clear of Liabilities**. Except as provided in the Asset Purchase Agreement, the (i) transfer of the Sale Property to the Purchaser and (ii) assignment to the Purchaser of the Assumed Executory Contracts/Leases, will not subject the Purchaser to any liability whatsoever prior to the Closing Date or by reason of such transfer under the Bankruptcy Code, the laws of the United States including under applicable environmental statutes, regulations or ordinances ("Federal Environmental Laws"), the laws of any state, territory, or possession (including under applicable environmental statutes, regulations or ordinances, the "State Environmental Laws" and together with the Federal Environmental Laws, the "Environmental Laws"), or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust, successor or transferee liability.

**U.** **Assumption of Executory Contracts and Unexpired Leases**. The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assumed Executory Contracts/Leases to the Purchaser in connection with the consummation of the Sale, and the assumption and assignment of the Assumed Executory Contracts/Leases is in the best interests of the Debtor, its estate, and its creditors. The Assumed Executory Contracts/Leases being assigned to the Purchaser are an integral part of the Sale Property being purchased by the Purchaser and, accordingly, such assumption and assignment of Assumed Executory Contracts/Leases is reasonable, enhances the value of the Debtor's estate, and does not constitute unfair discrimination. The assumption and assignment of the Assumed Executory Contracts/Leases is to occur on, or substantially contemporaneously with, the closing of the transactions under the Asset Purchase Agreement (the "Closing" or the "Closing Date").

**V.** **Cure/Adequate Assurance**. Except as provided below in this paragraph V, Seller, in accordance with the Asset Purchase Agreement , has or will, either by agreement or otherwise, (i) cured, or have provided adequate assurance of cure, of any default existing prior to the Closing under any of the Assumed Executory Contracts/Leases, within the meaning of section 365(b)(l)(A) of the Bankruptcy Code (including the Cure Costs), and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Executory Contracts/Leases within the meaning of section 365(b)(l)(B) of the Bankruptcy Code. The Purchaser has provided adequate assurance of future performance of and under the Assumed Executory Contracts/Leases within the meaning of section 365(b)(l)(C) of the Bankruptcy Code. With respect to Added Contracts and Additional Contracts as defined in the Asset Purchase Agreement, Purchaser shall be solely responsible for all Cure Costs relating thereto without offset against the Cash Component (as defined under the Asset Purchase Agreement). All options to purchase any real or personal property represented by the Assumed Executory Contracts/Leases assumed and assigned to the Purchaser may be exercised by the Purchaser according to the terms of the Assumed Executory Contract/Lease at issue as though the Debtor itself were exercising such purchase option.

**W.** **Prompt Consummation**. The Sale of the Sale Property must be approved and consummated promptly in order to preserve the value of the Sale Property. Time is of the essence in consummating the Sale, and the Debtor and the Purchaser intend to close the sale as soon as possible in accordance with the Asset Purchase Agreement .

**X.** **No Intentional Fraudulent Transfer**. The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy

Code or under the laws of the United States, any state, territory, possession or the District of Columbia.

**Y.** **Purchaser Not an Insider and No Successor Liability**. Purchaser was not and is not an "insider" or "affiliate" of the Debtor, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or stockholders exists between Purchaser and the Debtor. Pursuant to the Asset Purchase Agreement, Purchaser is not purchasing all of the Debtor' assets because Purchaser is not purchasing any of the Excluded Assets, and Purchaser is not holding itself out to the public as a continuation of the Debtor. The Sale does not amount to a consolidation, merger or de facto merger of Purchaser and the Debtor and/or the Debtor's estate, there is not substantial continuity between Purchaser and the Debtor, there is no continuity of enterprise between the Debtor and the Purchaser, the Purchaser is not a mere continuation of the Debtor or the Debtor's estate, and the Purchaser does not constitute a successor to the Debtor or the Debtor's estate.

**Z.** **Legal, Valid Transfer**. Upon the payment of the purchase price under the Asset Purchase Agreement at Closing, the transfer of the Sale Property to Purchaser will be a legal, valid, and effective transfer of the Sale Property, and will vest Purchaser with all right, title, and interest of the Debtor to the Sale Property free and clear of all Interests, except as set forth in the Asset Purchase Agreement or this Sale Approval Order. The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) and all of the applicable requirements of such sections have been complied with in respect of the Sale.

**AA.** **Asset Purchase Agreement Not Modified**. The terms of the Asset Purchase Agreement , including any amendments, supplements, and modifications thereto, are fair and

reasonable in all respects, and the terms of this Sale Approval Order shall not modify the terms of the Asset Purchase Agreement unless expressly provided herein.

**BB.** **No *Sub Rosa* Plan**. The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The Sale neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates a liquidating plan of reorganization for the Debtor.

**CC.** **No Liability for Excluded Assets or Excluded Liabilities**. By consummating the Sale and the transactions contemplated by the Asset Purchase Agreement, neither the Purchaser nor any of the Sale Property will be subject to any claim, liability, or obligation arising out of, or relating to, any Excluded Asset or any Excluded Liability, including, without limitation, under the Bankruptcy Code, any environmental law, or any other laws of the United States, any state, territory, possession or the District of Columbia.

**DD.** **Legal and Factual Bases**. The legal and factual bases set forth in the Motion and at the Sale and Injunction Hearing establish just cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED EFFECTIVE IMMEDIATELY THAT**:

**General Provisions**

1. The Motion is GRANTED and APPROVED to the extent provided herein.

2. All objections to the Motion or the relief requested therein, including but not limited to the Sale Objections, that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits and denied with prejudice.

**Approval of the Sale of the Sale Property**

3. The Asset Purchase Agreement (as including any amendments, supplements and modifications thereto, and all of the terms and conditions therein, is hereby approved in all respects.

4. Pursuant to 11 U.S.C. § 363(b), the transfer of the Sale Property to the Purchaser shall be free and clear of all Interests (except those specifically permitted by the Asset Purchase Agreement ), and the transactions contemplated thereby are approved in all respects.

5. Except as otherwise specifically provided in the Asset Purchase Agreement, the Purchaser shall not be liable for any claims against the Debtor or any of its predecessors or affiliates or any other third party whatsoever, and the Purchaser shall have no successor or vicarious liabilities of any kind or character (including, without limitation, any products liability claims with respect to any Sale Property, inventory, or other assets sold, shipped or delivered prior to the Closing), whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or the Business or any obligations of, or claims against, the Debtor or any of its predecessors or affiliates or any other third party whatsoever arising at any time, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Sale Property prior to the Closing.

6. The transactions contemplated by the Asset Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein by this Sale Approval Order to consummate the Sale shall not affect the validity of the Sale to the

Purchaser. The Purchaser is a purchaser in good faith of the Sale Property, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

7. As a good faith purchaser of the Sale Property, the Purchaser has not entered into an agreement with any other bidders at the Sale, and has not colluded with any of the other bidders, potential bidders, or any other parties interested in the Sale Property, and therefore neither the Debtor nor any successor in interest to the Debtor's estate shall be entitled to bring an action against the Purchaser, and the Sale may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

**Sale and Transfer of Sale Property**

8. Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is hereby authorized to transfer the Sale Property to the Purchaser and consummate the Sale in accordance with, and subject to the terms and conditions of, the Asset Purchase Agreement and this Sale Approval Order, and to transfer and assign all right, title and interest (including common law rights) to all Sale Property, to be conveyed in accordance with, and subject to the terms and conditions of, the Asset Purchase Agreement, and is further authorized and directed to execute and deliver, and are empowered to perform under, consummate and implement, the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement , including, without limitation, any related documents, exhibits and schedules, and to take all further actions as may be reasonably requested by Purchaser for the purposes of assigning, transferring, granting, conveying and conferring to Purchaser or reducing to possession, the Sale Property, or as may be necessary or appropriate to the performance of the Debtor's obligations as contemplated by the Asset Purchase Agreement.

9. Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code and upon payment of the amounts due at Closing by the Purchaser under the Asset Purchase Agreement in accordance with this Sale Approval Order, and except in respect of the Assumed Executory Contracts/Leases, the Sale Property shall be transferred to the Purchaser upon the Closing Date free and clear of all Interests (except the Assumed Liabilities and Permitted Liens) of any kind or nature whatsoever including, but not limited to, Interests in respect of the following: (a) any labor agreements; (b) all mortgages, deeds of trust, liens and security interests; (c) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtor; (d) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) the Illinois Worker Adjustment and Retraining Notification Act, (xi) state discrimination laws, (xii) state unemployment compensation laws or any other similar state laws, or (xiii) any other state or federal benefits or claims relating to any employment with the Debtor or any of its affiliates or predecessors; (e) any bulk sales or similar law; (f) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (g) any theories of successor or products liability; and (h) any Environmental Laws. Nothing in this Sale Approval Order shall be construed to: (1) release, nullify, or enjoin a Governmental Authority

from enforcing any Environmental Laws under which a purchaser of property would otherwise be liable as a current owner or operator after the date of purchase, or (2) permit, in any circumstances, a Governmental Authority to obtain from the Purchaser penalties arising under Environmental Laws prior to the Closing Date. For purposes of clarification, and except with respect to obligations expressly assumed under the Asset Purchase Agreement and under Assumed Executory Contracts/Leases, any employee medical claims which are incurred prior to the Closing (regardless of when such claims are presented for payment) shall be claims against the bankruptcy estate of the Debtor, and not the Purchaser, and the Purchaser shall be responsible only for such claims which are incurred after the Closing. All such Interests of any kind or nature whatsoever including but not limited to the Interests of NELI shall attach (effective upon the transfer of the Sale Property to the Purchaser) to the proceeds of the Purchase Price without further act or deed or order of Court, with the same force, validity, priority and effect, if any, as the Interests formerly had against the Sale Property. Additionally, for the avoidance of doubt, Purchaser shall have no liability, obligation, or responsibility whatsoever to the Debtor, Governmental Authority or any other Person with respect to, or in connection with, any Excluded Asset or any Excluded Liability of any kind or character, whether known or unknown, as of the Closing Date, whether fixed or contingent, including, without limitation, any liability or other obligation arising under the Bankruptcy Code, any Environmental Laws, or any other laws of the United States, any state, territory, possession or the District of Columbia.

10. Subject to the Purchase Price Cap (as defined in the Asset Purchase Agreement) and the rights of the Committee but only to the extent asserted in that certain Complaint filed by the Committee on October 28, 2024 against NELI International Incorporated [Dkt. No. 83], the obligations of the Debtor under the NELI International Incorporated pre-petition revolving line of

credit and term facility (the "NELI Pre-Petition Obligations") and in respect of the post-petition secured claims of NELI, consisting of all claims arising under the Post-Petition Credit Facility [Dkt. 61], shall be paid to NELI at the closing of the Asset Purchase Agreement on a provisional basis.

11. On the Closing Date, this Sale Approval Order will be construed and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Sale Property or a bill of sale transferring good and marketable title in such Sale Property to the Purchaser, free and clear of all Interests. On the Closing Date, and subject to section 365 of the Bankruptcy Code, this Sale Approval Order also shall be construed and constitute for any and all purposes a complete and general assignment of all right, title and interest of the Debtor to the Purchaser in Assumed Executory Contracts/Leases, subject to the Asset Purchase Agreement, and shall be deemed to satisfy conclusively the Debtor's requirement to obtain the entry of an executory contract approval order as required under the Asset Purchase Agreement.

12. All entities who are presently, or on the Closing Date may be, in possession of some or all of the Sale Property are hereby directed to surrender possession of the Sale Property to the Purchaser on the Closing Date.

13. Except as expressly permitted by the Asset Purchase Agreement or this Sale Approval Order, all Persons, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade, products liability and other creditors, receiving notice of the Motion and holding Interests of any kind or nature whatsoever against or in the Debtor or the Sale Property (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated, now existing or hereinafter arising), arising under or out of, in connection with, or in any way relating to, the

Debtor, the Sale Property, or the transfer of the Sale Property to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors or assigns, its property, or the Sale Property, such persons' Interests, without further notice, act or deed. Nothing in this Order is intended to impact or diminish the rights of creditors against the Debtor or any Person who may be liable with the Debtor on a Claim.

14. On the Closing Date of the Sale, each of the Debtor's creditors is authorized to execute such documents and take all other actions as may be necessary to release its Interests in the Sale Property, if any, as such Interests may have been recorded or otherwise exist, except as to Sale Property being transferred subject to Permitted Liens.

15. Subject to the terms and conditions of this Sale Approval Order and the Asset Purchase Agreement, the transfer of the Sale Property to the Purchaser pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of the Sale Property, and shall vest the Purchaser with all right, title, and interest of the Debtor in and to the Sale Property free and clear of all Interests of any kind or nature whatsoever.

**Assumption and Assignment of Assumed Executory Contracts/Leases**

16. Pursuant to sections 105(a) and 365 of the Bankruptcy Code, as set forth in the Sale Procedures Order and subject to and conditioned upon the terms of the Asset Purchase Agreement and the Closing of the Sale, the Debtor's assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the Asset Purchase Agreement, of the Assumed Executory Contracts/Leases is hereby approved, and the requirements of section 365(b)(l) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

17. The Debtor is hereby authorized and directed in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the

Closing Date of the Sale, the Assumed Executory Contracts/Leases free and clear of all Interests of any kind or nature whatsoever (other than Permitted Liens) and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Executory Contracts/Leases to the Purchaser.

18. The Assumed Executory Contracts/Leases shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed Executory Contracts/Leases (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer. All options to purchase any real or personal property represented by the Assumed Executory Contracts/Leases assumed and assigned to the Purchaser may be exercised by the Purchaser according to the terms of the Assumed Executory Contracts/Leases at issue as though the Debtor itself were exercising such purchase option.

19. Pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability with respect to the Assumed Executory Contracts/Leases after such assignment to and assumption by the Purchaser.

20. All amounts that must be paid and obligations that must be otherwise satisfied, pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assignment and assumption of the Assumed Executory Contracts/Leases, including Cure Costs and other cure obligations that are required to be cured pursuant to the Bankruptcy Code to effect the assignment and obtain this Sale Approval Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Debtor as provided in the Asset Purchase Agreement at the Closing,

or as otherwise agreed by the Purchaser and counter-party to any such Assumed Executory Contracts/Lease.

21. Except as set forth in the Asset Purchase Agreement with respect to the assumed Cure Costs, Assumed Liabilities, and other cure obligations relating to Added Contracts and/or Additional Contracts for which the Purchaser shall be responsible, the Purchaser shall have no liability or obligation to cure executory contracts or unexpired leases defaults accruing prior to the Closing Date. The Debtor shall have no liability or obligation under the Assumed Executory Contracts/Leases accruing on or after the Closing Date. Notwithstanding any language in this paragraph to the contrary, the Purchaser shall not be responsible for any taxes and tax payments related to the Sale Property.

22. Each non-Debtor party or third-party beneficiary to any Assumed Executory Contracts/Leases is hereby forever barred, estopped, and permanently enjoined from asserting against the Debtor or the Purchaser, or the property of either of them, any default existing as of the date of the Closing Date of the Sale.

**Additional Provisions**

23. The consideration provided by the Purchaser for the Sale Property under the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia, and the Sale and the transactions consummated in connection therewith are not, and shall not be, avoidable under the Bankruptcy Code or any such laws.

24. Subject to the terms of this Sale Approval Order and the Asset Purchase Agreement, which is hereby approved in all respects by this Sale Approval Order, the Purchaser shall pay to

the Debtor at Closing the Purchase Price. Effective upon the transfer of the Sale Property to the Purchaser, all Interests of any kind or nature whatsoever (other than Permitted Liens) shall attach to the proceeds of the Purchase Price with the same force, validity, priority and effect, if any, as Interests formerly had against the Sale Property, subject to the Debtor's, the Committee's, or other party's ability to challenge the extent, validity, priority and effect of the Interests unless subject to and as otherwise provided in any other order of this Court in this Bankruptcy Case.

25. This Sale Approval Order: (a) shall be effective as a determination that, upon payment by Purchaser of the Purchase Price under the Asset Purchase Agreement in accordance herewith, all Interests of any kind or nature whatsoever existing as to the Debtor or the Sale Property prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Sale Property. Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement. The Purchaser and the Debtor shall take such further steps and execute such further documents, assignments, instruments and papers as shall be reasonably requested by the other to implement and effectuate the transactions contemplated in this paragraph. All Interests of record as of the date of this Sale

Approval Order shall be forthwith removed and stricken as against the Sale Property (other than Permitted Liens). All entities described in this paragraph are authorized and specifically directed to strike all such recorded Interests against the Sale Property from their records, official and otherwise.

26. If any entity that has filed statements or other documents or agreements evidencing Interests in any of the Sale Property does not deliver to the Debtor or the Purchaser prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all interests and other interests that the entity has or may assert with respect to any of the Sale Property, the Debtor and/or the Purchaser and their respective agents are hereby authorized to execute and file, register, or record such statements, instruments, releases and other documents on behalf of such person or entity with respect to any of the Sale Property.

27. To the extent provided by section 525 of the Bankruptcy Code, no Governmental Authority may deny, revoke, suspend or refuse to renew any permit, license, or similar grant relating to the operation of the Sale Property sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of this Bankruptcy Case or the consummation of the Sale contemplated by the Asset Purchase Agreement.

28. As specifically provided in the Asset Purchase Agreement, the Debtor will cooperate with the Purchaser and the Purchaser will cooperate with the Debtor to ensure that the transaction contemplated in the Asset Purchase Agreement is consummated, and the Debtor will make such modifications or supplements to any bill of sale or other document executed in connection with the Closing to facilitate such consummation as contemplated by the Asset

Purchase Agreement, as may be reasonably requested by the Purchaser pursuant to the terms of the Asset Purchase Agreement.

29. The Purchaser shall cooperate with any reasonable request of the Debtor or its estate, including any trustee appointed for the Debtor's estate, by providing the Debtor or any trustee appointed in the case with reasonable access to the Debtor's business records, including financial statements, reports, tax returns, invoices, e-mails, and other electronically stored information that are in the possession, custody, and control of the Debtor as of the Closing. The Debtor or trustee requesting such documents must make reasonable efforts to consolidate requests into as few as possible which may not exceed one per quarter without the written consent of the Purchaser. Nothing in this paragraph shall prohibit the Debtor or a trustee appointed in the case from issuing a document subpoena to the Purchaser, provided, however, that the Purchaser shall retain its rights to oppose any such document subpoena. The Purchaser must provide at least fourteen (14) days' written notice to the Debtor's estate, including any trustee appointed for the estate, prior to discarding or destroying any such business records.

30. The Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtor, or any third party whatsoever arising under or related to Excluded Assets, Excluded Liabilities or the Sale Property other than for the Assumed Liabilities and the Assumed Executory Contracts/Leases to the extent provided under the Asset Purchase Agreement. Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Asset Purchase Agreement, the Purchaser shall not be liable for any claims against the Debtor or any of its predecessors or affiliates or any third party whatsoever, and the Purchaser shall have no successor liabilities (including, without limitation, product liability with respect to any assets sold, shipped or delivered prior to the Closing Date) of any kind or character whether known or unknown

as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, or in connection with, or in any way relating to the operation of the Business prior to the Closing Date, and all parties are hereby forever barred, estopped and permanently enjoined from asserting any such claims against the Purchaser, its successors and assigns or against the Sale Property.

31. Except for the Assumed Liabilities and the Assumed Executory Contracts/Leases as set forth in the Asset Purchase Agreement, under no circumstances whatsoever shall the Purchaser be deemed a successor of or to the Debtor for any Interests against or in the Debtor or the Sale Property or the Excluded Assets of any kind or nature whatsoever. Except for the Assumed Liabilities and the Assumed Executory Contracts/Leases as set forth in the Asset Purchase Agreement, the sale, transfer, assignment and delivery of the Sale Property and the Assumed Executory Contracts/Leases shall not be subject to any Interests, and Interests of any kind or nature whatsoever shall remain with, and continue to be obligations of, the Debtor or such other applicable Person. All persons holding Interests against or in the Debtor or the Sale Property of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests of any kind or nature whatsoever against the Purchaser, its officers, directors, shareholders and professionals, its property, its successors and assigns, or the Sale Property with respect to any Interests of any kind or nature whatsoever (other than Permitted Liens) such person or entity had, has, or may have against or in the Debtor, its estate, officers, directors, shareholders, or the Sale Property. Following the Closing Date, no holder of an Interest in the Debtor shall interfere with the Purchaser's title to, or use and enjoyment of, the Sale Property and the Assumed Executory Contracts/Leases based on

or related to such Interest, or any actions that the Debtor or any third party may take in the Chapter 11 Cases.

32. This Court shall retain jurisdiction to enforce and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connections therewith in all respects, including to: (a) compel delivery of the Sale Property to the Purchaser free and clear of Interests (other than Permitted Liens), or compel the performance of other obligations owed by the Debtor; (b) compel delivery of the Purchase Price or performance of other obligations owed to the Debtor; (c) resolve any disputes arising under or related to the Asset Purchase Agreement, the Cure Costs, and adequate assurance of future performance of the Assumed Executory Contracts/Leases; (d) interpret, implement, and enforce the provisions of this Sale Approval Order; (e) protect the Purchaser against (i) claims made related to any of the Excluded Liabilities, (ii) any claims of successor or products liability related to the Sale Property or Assumed Executory Contracts/Leases or any of the Excluded Assets, or (iii) any claims of Interests (other than Permitted Liens) asserted in the Debtor or the Sale Property, of any kind or nature whatsoever; and (f) to require delivery of any Sale Property or proceeds thereof by the Debtor to Purchaser, or of any Excluded Assets or proceeds thereof by Purchaser to the Debtor or its designee or successor.

33. The terms and provisions of the Asset Purchase Agreement and this Sale Approval Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor and its respective affiliates, successors and assigns, its estate, and its creditors, the Purchaser, and its respective affiliates, successors and assigns, and any affected third parties, including, but not limited to, all Persons asserting Interests in the Sale Property to be sold to the Purchaser pursuant to the Asset Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s)

under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

34. The failure to specifically identify any particular provisions of the Asset Purchase Agreement in this Sale Approval Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

35. The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

36. Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d) and 7062, or any provisions of the Local Rules, this Sale Approval Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in the Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Time is of the essence and the Debtor and the Purchaser may close the Sale as soon as practicable. Any party objecting to this Sale Approval Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing, or risk its appeal being foreclosed as moot.

37. The provisions of this Sale Approval Order are nonseverable and mutually dependent.

38. To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted or otherwise modified with respect to the Debtor to the extent

necessary, without further order of the Court (a) to allow Purchaser to give the Debtor any notice provided for in the Asset Purchase Agreement, and (b) to allow Purchaser to take any and all actions permitted by the Asset Purchase Agreement. ·

39. The Sale shall not be subject to any bulk sales laws.

40. The Debtor and each other Person having duties or responsibilities under the Asset Purchase Agreement or this Sale Approval Order, and their respective agents, representatives, and attorneys, are authorized and empowered to carry out all of the provisions of the Asset Purchase Agreement, to issue, execute, deliver, file and record, as appropriate, the Asset Purchase Agreement, and any related agreements, and to take any action contemplated by the Asset Purchase Agreement or this Sale Approval Order, and to issue, execute, deliver, file and record, as appropriate, such other contracts, instruments, releases, deeds, bills of sale, assignments, or other agreements, and to perform such other acts as are consistent with, and necessary or appropriate to, implement, effectuate and consummate the Asset Purchase Agreement and this Sale Approval Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court. Without limiting the generality of the foregoing, this Sale Approval Order shall constitute all approvals and consents, if any, required by applicable business corporation, trust and other laws of applicable governmental units with respect to the implementation and consummation of the Asset Purchase Agreement and this Sale Approval Order and the transactions contemplated thereby and hereby.

41. Other than the provisional payment authorized herein to NELI. the balance of the Sale proceeds shall be held in the main operating debtor in possession bank account of the Debtor and be expended only after further Order of Court.

42. To the extent that any provision of this Sale Approval Order conflicts with the Asset Purchase Agreement, this Sale Approval Order shall control.

Dated: Chicago, Illinois
November 8, 2024

HONORABLE DAVID D. CLEARY
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 1

*Execution Version*

**FIRST AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

THIS FIRST AMENDED AND RESTATED ASSET PURCHASE AGREEMENT, dated as of October 24, 2024 (the "**Agreement**"), by and between Berkshire Investments LLC (d/b/a Chicago Extruded Metals Company), an Illinois limited liability company ("**Seller**") and X-Metals Acquisition, LLC, a Delaware limited liability company (the "**Buyer**").

**RECITALS**

WHEREAS, Seller is engaged in the business of manufacturing and selling metal alloys (collectively, the "**Business**");

WHEREAS, Seller has sought relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (as amended, the "**Bankruptcy Code**") by filing a case (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the Northern District of Illinois (the "**Bankruptcy Court**") on August 8, 2024 (the "**Petition Date**");

WHEREAS, Seller desires to sell, transfer, assign, convey and deliver to the Buyer, and the Buyer desires to purchase, acquire and accept from Seller, all of Seller's right, title, and interest in and to the Purchased Assets on the terms and conditions hereinafter set forth; and

WHEREAS, Buyer and Seller desire to amend that certain Asset Purchase Agreement dated as of September 21, 2024 by and between Buyer and Seller.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

ARTICLE 1
DEFINITIONS

SECTION 1.01 *Definitions*.

(a) The following terms, as used herein, have the following meanings:

"**Affiliate**" shall have the meaning ascribed to it under Section 101(2) of the Bankruptcy Code.

"**Ancillary Agreements**" means the Bill of Sale Assignment and Assumption Agreement, IP Assignment Agreement and each other agreement, document, or instrument (other than this Agreement) executed and delivered by the parties hereto in connection with the consummation of the transactions contemplated by this Agreement.

"**Benefit Plan**" means any material plan, program, arrangement or agreement that is a compensation, pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change in control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life, Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance, or fringe benefit plan, program, arrangement or agreement, whether written or oral, including any (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA or (ii) other employee benefit plans,

agreements, programs, policies, arrangements, or payroll practices, whether or not subject to ERISA, in each case, (x) which is sponsored, maintained, administered, or contributed to by Seller or any ERISA Affiliate and (y) under which any Business Employee or any dependent or beneficiary thereof has any present or future right to benefits, but excluding those plans, programs, arrangements, or agreements that are maintained by a Governmental Unit.

"**Business Day**" means a day on which banks are open for business in the City of Chicago, Illinois but does not include a Saturday, Sunday or a statutory holiday in the State of Illinois.

"**Business Employees**" means those individuals primarily employed in providing services to the Seller in, or otherwise necessary for, the operation of the Business.

"**Closing Date**" means the date of the Closing.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Environmental Laws**" means all Laws and orders in effect and relating to: (a) pollution or the protection of natural resources, endangered or threatened species, human health, or the environment (including ambient air, surface water, ground water, land surface or subsurface strata); (b) the presence of, or release or threatened release of, hazardous substances; (c) the generation, manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling, recycling, investigation, removal, cleanup, or remediation of hazardous substances, or documentation related to the foregoing; (d) community or worker right-to-know disclosures with respect to hazardous substances; (e) storage tanks, vessels, containers, abandoned or discarded barrels, or other closed receptacles containing hazardous substances; and (f) health and safety of employees or other persons.

"**Environmental Permit**" means any license, registration, governmental approval, and governmental authorization issued or granted pursuant to or under any Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**ERISA Affiliate**" means any trade or business that is, or was at any relevant time, treated as a single employer with Seller under Section 414 of the Code or Section 4001 of ERISA.

"**Governmental Unit**" shall have the meaning ascribed to it under Section 101(27) of the Bankruptcy Code.

"**Intellectual Property**" means, with respect to the Business or the Purchased Assets, all patents, trademarks, marks, copyrights, software, Intellectual Property Licenses, trade secrets, and confidential business information, and all rights, claims, benefits, and remedies under any Laws and throughout the world with respect to any of the foregoing and any other proprietary rights in intangible forms of property.

"**Knowledge of Seller**," "**Seller's Knowledge**," or any other similar knowledge qualification in this Agreement means the actual knowledge as of the Closing Date of Patrick Balson, Dick Jenkins, and Aaron Mercer after having conducted reasonable inquiries of all employees, consultants, and advisors of Seller who report to such individual.

"**Law**" means any law, statute, ordinance, regulation, rule, code, treaty, order, judgment, writ, injunction, act, decree, decision, ruling, award, or other requirement having the force of law of any Governmental Unit.

"**Liability**" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"**Liens**" means all options, proxies, voting trusts, voting agreements, judgments, pledges, charges, escrows, rights of first refusal or first offer, transfer restrictions, liens, claims, mortgages, security interests, indentures, equities and other encumbrances of every kind and nature whatsoever, including any arrangements or obligations to create any such encumbrance, whether arising by agreement, operation of Law or otherwise.

"**Material Adverse Effect**" means a material adverse effect on the Business, assets or financial condition of the Purchased Assets and Assumed Liabilities, taken as a whole, excluding any such effect to the extent resulting from or arising in connection with (i) the transactions contemplated hereby or the announcement thereof, (ii) changes or conditions affecting the industries generally in which Seller operates, (iii) changes in economic, regulatory or political conditions generally, or (iv) changes resulting from the Chapter 11 Case; *provided*, *however*, in the case of subsections (ii) and (iii), such changes or conditions may be taken into account in determining whether there has been or is a Material Adverse Effect to the extent such changes have a disproportionate effect on the Purchased Assets and Assumed Liabilities relative to other businesses operating in the industry in which the Business operates; *provided*, *further*, *however*, in the case of subsection (iv), such changes or conditions may be taken into account in determining whether there has been or is a Material Adverse Effect in the case it would be an expansion of the Assumed Liabilities or an increase in the Purchase Price beyond the Cap on the Purchase Price. Without any express or implied limitation of the generality of the foregoing, the following shall constitute a "Material Adverse Effect": (A) Seller's furnaces and extrusion lines have ceased operating consistent with normal pre-Petition operations, other than for routine or ordinary course maintenance, (B) a strike, work stoppage, or renegotiation of or dispute under the Union Contract, and (C) any adversary or other Proceeding that is initiated or threatened that could be reasonably likely to result in a material increase in or expand the scope of the Assumed Liabilities.

"**Permit**" means any license, permit, registration, government approval, and governmental authorization as well as industry certifications, registrations, and approvals, in each case of any kind or nature.

"**Permitted Liens**" means, with respect to the Purchased Assets, Liens for Taxes not yet due or delinquent or being contested in good faith by appropriate proceedings.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust, or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period ending on and including the Closing Date.

"**Proceeding**" means any litigation (in law or in equity), arbitration, mediation, action, lawsuit, proceeding, complaint, charge, claim, demand, hearing, inquiry, investigation or like matter, including those involving or before or by any Governmental Unit or other Person, and whether administrative, judicial, or arbitrational in nature.

"**Real Property Lease**" shall mean that certain lease dated as of March 8, 2023, between Seller and J2M-Cicero, LLC, an Illinois limited liability company, for the premises located at 1601 S. 54th Avenue, Cicero, Illinois.

"**Sale Hearing**" means the hearing conducted by the Bankruptcy Court to consider approval of the transactions contemplated by this Agreement.

"**Seller Intellectual Property**" means (i) all Intellectual Property owned or purported to be owned by Seller and (ii) to the extent transferable, any Intellectual Property that is licensed or purported to be licensed to Seller, in each case, used or held for use primarily in or otherwise necessary for the conduct of the Business, other than Intellectual Property that is an Excluded Asset.

"**Tax**" or "**Taxes**" means all federal, state, local, foreign, and other income, corporation, capital gains, excise, gross receipts, ad valorem, sales, goods and services, harmonized sales, use, employment, franchise, profits, gains, property, transfer, payroll, social security contributions, intangibles, and other taxes, fees, stamp taxes, duties, charges, levies, or assessments of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or additional amounts imposed by any Governmental Unit with respect thereto.

"**Tax Return**" means any and all returns, reports, declarations, elections, schedules, attachments, notices, forms, designations, filings, and statements (including estimated Tax Returns and reports, withholding Tax Returns and reports, information returns, and reports, and any amendments to any such documents) filed or required to be filed in respect of the determination, assessment, collection, or payment of any Taxes or in connection with the administration, implementation, or enforcement of any applicable Law relating to any Taxes.

"**Taxing Authority**" means any Governmental Unit responsible for the imposition of any Tax (domestic or foreign).

(b) Each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
|---|---|
| Agreement | Preamble |
| Allocation Statement | 2.06(b) |
| Assumed Liabilities | 2.03 |
| Avoidance Actions | 2.02(f) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bid Procedures | 6.03(c) |
| Bid Procedures Order | 6.03(c) |
| Bill of Sale Assignment and Assumption Agreement | 2.09(a)(i) |
| Business | Recitals |
| Buyer | Preamble |
| Buyer Plan | 8.01(b) |
| Chapter 11 Case | Recitals |
| Chapter 11 Contracts | 2.01(d) |
| Closing | 2.08 |
| Cure Costs | 2.05(a) |
| Designation Deadline | 2.05(e) |
| Disclosure Schedules | Article 3 |

| | |
|---|---|
| Escrow Agent | 2.07 |
| Excluded Assets | 2.02 |
| Excluded Contracts | 2.02(c) |
| Excluded Liabilities | 2.04 |
| Good Faith Deposit | 2.07 |
| IP Assignment Agreement | 2.09(a)(iii) |
| Licenses | 2.01(e) |
| Outside Date | 11.01(b) |
| Petition Date | Recitals |
| Post-Petition Contracts | 2.01(d) |
| Purchased Assets | 2.01 |
| Purchased Contracts | 2.01(d) |
| Purchase Price | 2.06 |
| Sale Order | Section 2.09(a)(v) |
| Seller | Preamble |
| Straddle Period | 7.01(c) |
| Transferred Employee | 8.01(a) |
| Transfer Taxes | 7.01(b) |


## ARTICLE 2
## PURCHASE AND SALE

SECTION 2.01 *Purchase and Sale*. Except as otherwise provided below, upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase from Seller and Seller agrees to sell, convey, transfer, assign, and deliver, or cause to be sold, conveyed, transferred, assigned, and delivered, to Buyer at the Closing, free and clear of all Liens and claims, other than Assumed Liabilities and Permitted Liens, all of Seller's right, title, and interest in, to, and under the assets, properties, and business, of every kind and description, owned, held, or used primarily in or otherwise necessary for the conduct of the Business by Seller as the same shall exist on the Closing Date (collectively, the "**Purchased Assets**"), including all right, title, and interest of Seller in, to, and under the following Purchased Assets to the extent owned, held, or used primarily in or otherwise necessary for the conduct of the Business:

(a) the real property and leases of, and other interests in, real property, in each case together with all buildings, fixtures, and improvements erected thereon, listed on Schedule 2.01(a), including the Real Property Lease;

(b) all machinery, equipment, vehicles, parts, furniture, and other tangible assets and personal property leased by or owned by Seller or that are, or may be, used in or related to the operation of the Business;

(c) all inventory, raw materials, supplies, finished goods, component parts, returned goods, contemplated products, goods in transit, packaging materials, and other consumables of Seller relating to the Business including inventory in transit from suppliers of the Business or held by suppliers of the Business;

(d) (i) all rights transferable under contracts, agreements, leases, licenses, commitments, sales, and orders, of Seller, in each case executed after the Petition Date (collectively, the "**Post-Petition Contracts**") and (ii) the transferable pre-Petition Date executory contracts that are listed on Schedule 2.01(d) (collectively, the "**Chapter 11 Contracts**", and together with Post-Petition Contracts, the "**Purchased Contracts**") to be assumed by the Seller and assigned to the Buyer pursuant to Section 365 of the Bankruptcy Code;

(e) all transferable licenses, Permits, or other governmental authorizations of Seller relating primarily to the Purchased Assets or otherwise necessary for the conduct of the Business (the "**Licenses**");

(f) all accounts, notes, and other receivables outstanding as of the Closing related to the Purchased Contracts that are for services to be performed on or after the Closing;

(g) all Seller Intellectual Property, including the items listed on Schedule 2.01(g) and all of the Seller's rights therein, and all rights to sue for and recover and retain damages for present and past infringement thereof;

(h) all hardware, software, completed products, products currently in development, and contemplated products, and all technology and Intellectual Property related thereto;

(i) all operating records, data, and other materials maintained by the Business, including all sales and sales promotional data, advertising materials, customer lists and records, emails, passwords, credit information, cost and pricing information, supplier lists and records, business plans, catalogs, price lists, correspondence, mailing lists, distribution lists, photographs, production data, service and warranty records, engineering records, manufacturing and quality control records and procedures, drawings, blueprints, records, accounting records, plans, specifications, surveys, property records, manuals, and other materials related to any of the foregoing items;

(j) all goodwill associated with the Business and the Purchased Assets;

(k) all insurance proceeds, condemnation awards, or other compensation in respect of loss or damage to any of the Purchased Assets to the extent occurring between the date hereof and the Closing Date, and all rights and claims of Seller to any such insurance proceeds, condemnation awards or other compensation not paid by the Closing, but excluding any insurance proceeds used for repair or casualty;

(l) all rights under non-disclosure or confidentiality agreements, inventions, and Intellectual Property assignment covenants executed for the benefit of Seller with current or former Business Employees, consultants, or contractors of Seller, or with third parties, in each case primarily related to the Purchased Assets or otherwise necessary for the conduct of the Business;

(m) the Agreement by and between Seller and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, on behalf of its Local 7-0717 (the "**Union Contract**"); and

(n) all security deposits, customer deposits and other deposits of any kind related to the Purchased Assets.

SECTION 2.02 *Excluded Assets*. The Buyer expressly understands and agrees that the following assets and properties of Seller (the "**Excluded Assets**") shall be excluded from the Purchased Assets:

(a) all of Seller's and its Affiliates' cash and cash equivalents on hand (including all undeposited checks) and in banks;

(b) insurance policies of Seller and its Affiliates and claims, credits, causes of action, or rights thereunder;

(c) all rights and obligations under the contracts, agreements, leases, licenses, commitments, sales and purchase orders, and other instruments of Seller and its Affiliates that are not Purchased Contracts (collectively, the "**Excluded Contracts**");

(d) all rights of Seller arising under this Agreement, the Ancillary Agreements, or the transactions contemplated hereby or thereby;

(e) any Purchased Asset sold or otherwise disposed of pursuant to Section 5.01(b) prior to the Closing Date;

(f) (i) all avoidance claims or causes of action available to Seller under Chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law (collectively, "**Avoidance Actions**") against any Person, and (ii) any proceeds of any settlement from and after the date hereof through the Closing of any claims, counterclaims, rights of offset, or other causes of action of any of Seller against any Person;

(g) all tax refunds related to any Pre-Closing Tax Period relating to the Business;

(h) all receivables, claims or causes of action that relate to any of the Excluded Assets or Excluded Liabilities;

(i) all Benefit Plans and any assets, trust agreements, insurance policies, administrative services agreements, and other contracts, files and records in respect thereof; and

(j) any asset owned by Seller that is not a Purchased Asset, including, for the avoidance of doubt, any commercial tort claims that do not relate to Purchased Assets.

SECTION 2.03 *Assumed Liabilities*. Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the time of the Closing, to assume the following Liabilities and obligations and agrees to pay, perform, and discharge, when due, in accordance with their respective terms, all of the Liabilities and obligations (of any nature or kind, and whether based in common Law or statute or arising under written contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential) of Seller with respect to, arising out of or relating to the following (the "**Assumed Liabilities**"):

(a) all Liabilities and obligations of Seller arising under Purchased Contracts and Licenses to the extent first arising on or after the Closing and excluding any and all Liabilities or obligations relating to any pre-Closing period;

(b) all authorizations of Governmental Units, including Permits, licenses, certificates, consents, variances, approvals, Environmental Permits, or authorizations of any Governmental Units relating primarily to or required in the operation of the Purchased Assets, to the extent transferable;

(c) all Liabilities and obligations assumed by, or allocated to, Buyer pursuant to Article 7 hereof; and

(d) the Assumed Liabilities listed on Schedule 2.03.

For the avoidance of doubt, nothing in this Section 2.03 or in Section 2.05 shall prevent the Buyer, after the date hereof and until the Closing, from negotiating or otherwise entering into a mutual agreement to reduce the amount of any Assumed Liability directly with the Person to which such Liability or obligation is owed;

*provided*, *however*, that Buyer shall provide Seller with reasonable advance notice of, and shall include representatives of Seller in, any such negotiation and any related communications with such Persons.

SECTION 2.04 *Excluded Liabilities*. Buyer shall not assume and shall not be responsible to pay, perform, or discharge any Liabilities of Seller, other than the Assumed Liabilities (the "**Excluded Liabilities**"). Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement is intended to require Buyer to pay, perform, or otherwise discharge any Liability included in the Excluded Liabilities. Without limiting the foregoing, the following Liabilities are Excluded Liabilities under this Agreement:

(a) all Liabilities, including but not limited to all accounts payable, accrued payroll, payroll Tax, other employee benefit Liabilities, and income or business Tax Liabilities, and other accrued expenses incurred or arising prior to the Closing Date;

(b) all Liabilities arising out of the Excluded Assets;

(c) an amount equal to all Transfer Taxes, if any;

(d) all environmental Liabilities and obligations and all other Liabilities relating to Laws or Environmental Permits in connection with any environmental, health, or safety matters based on facts arising or existing during Seller's operation of the Business prior to the Closing Date;

(e) all Liabilities arising from or relating to Benefit Plans;

(f) all Liabilities arising from or relating to any collective bargaining agreements, union contracts, including the Union Contract, and other similar agreements to the extent such Liabilities arose prior to Closing;

(g) all Liabilities relating to any claims for infringement, dilution, misappropriation or any other violation of the Intellectual Property of a third party arising from Seller's operation of the Business prior to the Closing Date;

(h) all Liabilities for any Taxes of Seller including, but not limited to, Liabilities of Seller for any Taxes arising in connection with the consummation of the transactions contemplated hereby, other than those assumed pursuant to Section 2.03;

(i) all Liabilities of Seller for Taxes of any Person under Reg. § 1.1502-6 (or any similar provision of state, local, or non-U.S. Law), as a transferee or successor, by contract or otherwise;

(j) all Liabilities for Taxes with respect to the Purchased Assets allocated under Section 7.01(c) hereof to any Pre-Closing Tax Period;

(k) all Liabilities of Seller relating to claims under the WARN Act or other similar Laws, reclamation claims, or claims under Section 503(b)(9) of the Bankruptcy Code;

(l) all Liabilities arising as a result of any action, suit, investigation, or proceeding initiated at any time, to the extent related to the Business or the Purchased Assets on or prior to the Closing Date, including, but not limited to, any equity holder suits, actions for breach of contract, or any tort actions;

(m) all Liabilities of Seller relating to costs and expenses of professionals retained under Sections 327, 363, or 1103 of the Bankruptcy Code and all fees, if any, owed to the United States Trustee

under 28 U.S.C. § 1930 or otherwise, and all costs associated with the wind down of the Business and the Chapter 11 Case; and

(n) all Liabilities incurred in the ordinary course of business existing prior to the Closing Date other than Assumed Liabilities.

SECTION 2.05 *Assignment of Contracts and Rights*.

(a) Schedule 2.01(d) sets forth with respect to each Chapter 11 Contract, Seller's good-faith estimate of the amount required to be paid with respect to each Chapter 11 Contract to cure all monetary defaults under such contract to the extent required by Section 365(b) of the Bankruptcy Code and otherwise satisfy all requirements imposed by Section 365(d) of the Bankruptcy Code (the actual amount of such costs, the "**Cure Costs**"). The Buyer may identify any Purchased Contract that the Buyer no longer desires to have assigned to it in accordance with Section 2.05(e). All contracts of Seller that are not listed on Schedule 2.01(d) shall not be considered a Purchased Contract or Purchased Asset.

(b) Prior to the Sale Hearing, Seller shall take all actions reasonably required to assume and assign the Purchased Contracts to the Buyer and otherwise take all reasonably necessary actions in order to determine the Cure Costs with respect to any Chapter 11 Contract, including the right (subject to Section 5.01) to negotiate in good faith and litigate, if necessary, with any contract counterparty the Cure Costs needed to cure all monetary defaults under such Chapter 11 Contract. If Seller, the Buyer, and the counterparty to a Chapter 11 Contract are unable to reach mutual agreement regarding any dispute with respect to Cure Costs, Seller shall seek a hearing before the Bankruptcy Court, which hearing may be the Sale Hearing, to determine Cure Costs. Notwithstanding the foregoing, if the Bankruptcy Court allows a Cure Cost in excess of the amount listed on Schedule 2.01(d), then Buyer shall be entitled, in its sole discretion, to re-designate the contract as an Excluded Contract (including, notwithstanding Section 2.05(e), if the Designation Deadline shall have passed).

(c) To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 2.05, on the Closing Date, Seller shall assume and assign to the Buyer the Chapter 11 Contracts pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to the provision of adequate assurance by the Buyer as may be required under Section 365 of the Bankruptcy Code and payment by the Buyer of the Cure Costs solely in respect of the Chapter 11 Contracts.

(d) To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 2.05, Seller shall transfer and assign all of the Purchased Contracts to the Buyer and the Buyer shall assume all of the Purchased Contracts from Seller, as of the Closing Date, pursuant to Sections 363 and 365 of the Bankruptcy Code, as applicable. Notwithstanding any other provision of this Agreement or in any Ancillary Agreement to the contrary, this Agreement shall not constitute an agreement to assign any contract or any right thereunder if an attempted assignment without the consent of a third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), would constitute a breach or in any way adversely affect the rights of the Buyer or Seller thereunder.

(e) Notwithstanding anything in this Agreement to the contrary, the Buyer may, in its sole and absolute discretion, amend or revise Schedule 2.01(d) setting forth the Purchased Contracts in order to add any contract to, or eliminate any contract from, such Schedule in each case at any time during the period commencing from the date hereof and ending on the date that is five (5) Business Days before the commencement of the Sale Hearing (the "**Designation Deadline**"). Automatically upon the addition of any contract to Schedule 2.01(d), on or prior to the Designation Deadline, such contract shall be a Purchased Contract for all purposes of this Agreement. Automatically upon the removal of any contract

from Schedule 2.01(d), on or prior to the Designation Deadline, such contract shall be an Excluded Contract for all purposes of this Agreement, and no Liabilities arising thereunder shall be assumed or borne by the Buyer unless such Liability is otherwise specifically assumed pursuant to Section 2.03. After entry of the Sale Order by the Bankruptcy Court, Seller may file one or more motions with the Bankruptcy Court seeking approval under Section 365 of the Bankruptcy Code to reject any or all Excluded Contracts.

SECTION 2.06 *Purchase Price; Allocation of Purchase Price*.

(a) In consideration of the sale of the Purchased Assets to Buyer, and upon the terms and subject to the conditions hereinafter set forth, the purchase price for the Purchased Assets (the "**Purchase Price**") shall be equal to the sum of the following amounts and payable as follows:

(i) the amount of the credit bid for outstanding indebtedness as referenced in that certain Security Agreement and UCC Filing Authorization, dated February 28, 2024, by and among Seller, Tramec, L.L.C. and Tramec Sloan LLC, and NELI International Incorporated ("**NELI**") which is equal to $1,752,339.50 as of the Petition Date; *plus*

(ii) an amount equal to the sum of (x) the obligations owed to NELI under that certain Secured Super-Priority Post-Petition Credit Agreement (as the same may be amended and modified, the "**Post-Petition Credit Agreement**") dated August 12, 2024 by and between Seller and NELI, *plus* (y) the Pre-Petition Obligations (as defined in the Post-Petition Credit Agreement) (collectively, the "**NELI Portion of the Purchase Price**"); *plus*

(iii) the amount of Cure Costs for the Real Property Lease and any other Chapter 11 Contracts assumed by Buyer within the Buyer's sole discretion (the "**Cure Portion of the Purchase Price**"); *plus*

(iv) the amount of $100,000.00 cash for the benefit of the bankruptcy estate of Seller (the "**Estate Portion of the Purchase Price**" and together with the NELI Portion of the Purchase Price and the Cure Portion of the Purchase Price, the "**Cash Portion of the Purchase Price**").

(b) The parties agree that a good faith estimate of the Purchase Price as of the date hereof and the method of calculation thereof is set forth on Schedule 2.06 (the "**Form Estimated Purchase Price Worksheet**"). The Form Estimated Purchase Price Worksheet sets forth, in each case as of the date hereof, (i) a good faith estimate of the NELI Portion of the Purchase Price, (ii) a good faith estimate of the Cure Portion of the Purchase Price, (iii) a good faith estimate of the Estate Portion of the Purchase Price, and (iv) a good faith estimate of the Cash Portion of the Purchase Price.

(c) No later than five (5) Business Days prior to the Closing Date, Seller shall deliver to Buyer, in the form of Schedule 2.06, a good faith estimate of the Purchase Price as of the Closing Date and the method of calculation thereof (the "**Closing Purchase Price Worksheet**"). The Closing Purchase Price Worksheet shall set forth, in each case as of the Closing Date, (i) a good faith estimate of the NELI Portion of the Purchase Price, (ii) a good faith estimate of the Cure Portion of the Purchase Price, (iii) a good faith estimate of the Estate Portion of the Purchase Price, and (iv) a good faith estimate of the Cash Portion of the Purchase Price.

(d) No later than ten (10) days prior to the Closing Date, the Buyer shall deliver to Seller a proposed allocation of the Purchase Price (and other amounts treated as additional consideration for U.S. federal income Tax purposes) as of the Closing Date among the Purchased Assets determined in a manner consistent with Section 1060 of the Code and the Treasury Regulations promulgated thereunder

("**Allocation Statement**"). If Seller disagrees with the Allocation Statement, Seller may, within five (5) days after delivery of the Allocation Statement, deliver a notice (the "**Seller's Allocation Notice**") to the Buyer to such effect, specifying those items as to which Seller disagrees, the basis for such disagreement, and setting forth Seller's proposed allocation of the Purchase Price (and other amounts treated as additional consideration for U.S. federal income Tax purposes) and file its Tax Returns (and Tax Returns of its Affiliates) using alternative allocations of its choosing. If Seller's Allocation Notice is duly and timely delivered, Seller and the Buyer shall cooperate in good faith to reach a mutually agreeable allocation of the Purchase Price, which allocation shall be binding on all parties. In the event the parties are unable to resolve any such dispute prior to the Closing Date, neither the Buyer nor Seller will be bound by the Allocation Statement, and each of the parties may independently determine its own allocation of the Purchase Price for income Tax purposes and file its Tax Returns (and Tax Returns of its Affiliates) using alternative allocations of its choosing.

(e) The Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that the Buyer may be required to deduct and withhold under any provision of Tax Law on account of the transactions contemplated herein. To the extent any such amount is to be so deducted and withheld by the Buyer, such amounts shall be timely paid over to, or deposited with, the relevant Governmental Unit in accordance with the applicable provisions of Tax Law. All such amounts, to the extent deducted and withheld, shall be treated for all purposes of this Agreement as having been paid to the Person from whom such amount was deducted and withheld.

SECTION 2.07 *Good Faith Deposit*. The Buyer shall deposit into escrow with an escrow agent agreed upon by the parties (the "**Escrow Agent**") an aggregate amount equal to $325,000 (such amount that has been deposited at any given time, the "**Good Faith Deposit**") by wire transfer of immediately available funds. The Good Faith Deposit shall be deposited by Buyer on the later of the date of this Agreement or the date the escrow account with the Escrow Agent is established; *provided*, that, if the foregoing occurs after 4 p.m. Eastern Time on the applicable date, Buyer shall deposit such amount on the immediately succeeding Business Day. On the date of the termination of this Agreement or the Closing Date, as applicable, and except as provided in Section 11.01(j)(ii), Buyer and Seller shall provide joint written instructions to the Escrow Agent instructing the Escrow Agent to release the Good Faith Deposit and deliver it promptly to either (x) the Buyer or (y) Seller:

(a) if the Closing shall occur, the Good Faith Deposit shall be applied toward the Purchase Price payable by the Buyer to Seller;

(b) if this Agreement is terminated by Seller pursuant to Section 11.01(f) or Section 11.01(j), the Good Faith Deposit shall be delivered to Seller; or

(c) if this Agreement is terminated by Buyer pursuant to Section 6.04(c), Section 11.01, any other provision of this Agreement that gives Buyer the express right to terminate this Agreement, or except as expressly set forth in Section 2.07(b), the Good Faith Deposit shall be returned to the Buyer.

SECTION 2.08 *Closing*. The closing (the "**Closing**") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place remotely via the exchange of documents and signatures as soon as possible after entry of the Sale Order authorizing the transactions contemplated herein, but in no event later than two (2) Business Days, after satisfaction or waiver (except for such conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver thereof at the Closing) of the conditions set forth in Article 9, or at such other time, date or place (which may be virtual) as the Buyer and Seller may mutually agree.

SECTION 2.09 *Deliveries at the Closing.*

(a) At the Closing, Seller shall deliver to the Buyer:

(i) the bill of sale, assignment, and assumption agreement transferring the Purchased Assets to the Buyer substantially in the form of Exhibit A attached hereto (the "**Bill of Sale Assignment and Assumption Agreement**"), duly executed by Seller;

(ii) an intellectual property assignment agreement transferring the Seller Intellectual Property to Buyer substantially in the form of Exhibit B attached hereto (the "**IP Assignment Agreement**"), duly executed by Seller;

(iii) an IRS Form W-9, duly executed by Seller;

(iv) copies of all of the Seller's books and records related to the Business, the Purchased Assets, and/or the Assumed Liabilities;

(v) a certified copy of the Sale Order (the "**Sale Order**") that must include, inter alia, the following:

(A) approval of the sale, transfer and assignment of the Purchased Assets to Buyer free and clear of any and all Liens, including, but not limited to, all successor liability obligations under applicable law;

(B) provision that any and all valid Liens, including Interests (as defined in the Bankruptcy Code) which includes but is not limited to liens, claims, and encumbrances, shall attach to the Cash Portion of the Purchase Price at Closing;

(C) approval of Seller's assumption and assignment to Buyer of the Chapter 11 Contracts, including the Real Property Lease, in accordance with Section 365 of the Bankruptcy Code, in which case the Sale Order shall be deemed to be the order approving the assumption and assignment of the Chapter 11 Contracts, including the Real Property Lease; and

(D) a finding that the Buyer is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code.

(vi) originals of all Purchased Contracts, and if unavailable, true and correct copies thereof;

(vii) a certified resolution of the Seller's board of directors or managers, as the case may be, authorizing the execution, delivery and performance of this Agreement;

(viii) if requested by the Buyer, notices in a form reasonably satisfactory to the Buyer executed by Seller's duly authorized representative to each customer or account debtor of the Seller advising them of the sale of the Purchased Assets and the Buyer's right to collect the applicable receivables; and

(ix) such other instruments and documents as the Buyer shall reasonably request to consummate the transactions contemplated in this Agreement or to otherwise effectuate the transfer of any and all Purchased Assets to Buyer.

(b) At the Closing, the Buyer shall deliver to Seller:

(i) an amount equal to the Cash Portion of the Purchase Price as calculated in accordance with Section 2.06(c) (including pursuant to release by the Escrow Agent of any portion of the Purchase Price from the Good Faith Deposit), by wire transfer of immediately available funds to an account or accounts designated no later than three (3) Business Days prior to Closing by Seller;

(ii) the Bill of Sale, Assignment and Assumption Agreement, duly executed by the Buyer; and

(iii) the IP Assignment Agreement, duly executed by Buyer.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as disclosed on the disclosure schedules delivered by Seller to the Buyer immediately prior to the execution of this Agreement (the "**Disclosure Schedules**"), it being understood that the scope of the representations in this Article 3 and/or any matters described in the Disclosure Schedules shall not be deemed to expand the scope of the Assumed Liabilities, Seller represents and warrants to the Buyer solely with respect to the Business and the Purchased Assets as follows:

SECTION 3.01 *Good and Marketable Title.* Seller has good and marketable title to the Purchased Assets and, upon the entry of the Sale Order, the Buyer will acquire all right, title, and interest in the Purchased Assets, free and clear of all Liens, other than any Permitted Liens.

SECTION 3.02 *Corporate Existence and Power*. Seller is duly formed, validly existing and in good standing under the Laws of its jurisdiction of formation and has all powers and all material governmental licenses, authorizations, Permits, consents, and approvals required to carry on the Business as now conducted.

SECTION 3.03 *Corporate Authorization*. Subject to the applicable provisions of the Bankruptcy Code and the Bankruptcy Court's entry of the Sale Order, the execution, delivery, and performance by Seller of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby are within Seller's powers and authorities and have been duly authorized by all necessary action on the part of Seller. On the date which the Sale Order is entered, this Agreement and the Ancillary Agreements will constitute valid and binding agreements of Seller (assuming the due authorization, execution and delivery of this Agreement and the Ancillary Agreements by the Buyer).

SECTION 3.04 *Governmental Authorization*. Except as disclosed in Schedule 3.04 of the Disclosure Schedules, the execution, delivery, and performance by Seller of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby require no action by or in respect of, or filing with, any Governmental Unit, agency or official other than (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a Material Adverse Effect.

SECTION 3.05 *Compliance with Laws and Court Orders*. To the Knowledge of Seller, Seller is not in material violation of any Law, rule, regulation, judgment, injunction, order or decree applicable to the Purchased Assets or the conduct of the Business.

SECTION 3.06 *Properties*. Schedule 3.06 of the Disclosure Schedules includes a description of all real property used or held for use primarily in or otherwise necessary for the conduct of the Business which Seller leases, operates, or subleases. Seller has good title to, or in the case of any leased personal property, have valid leasehold interests in, all Purchased Assets, subject to the entry of an order of the Bankruptcy Court authorizing the assignment and assumption of such leasehold interests to the extent they are being conveyed to Buyer under this Agreement.

SECTION 3.07 *Labor Matters*. Except for the Union Contract, Seller is not a party to or bound by any collective bargaining agreement or other labor union contract applicable to their employees, no collective bargaining agreement is currently being negotiated with respect to any of Seller's employees, and no Seller employees are represented by a labor union. To the Seller's Knowledge, there is no pending or threatened strike, work stoppage, or material labor dispute concerning the Seller's employees. Seller has made available to the Buyer the Union Contract and summaries of all material Benefit Plans covering employees, directors or consultants or former employees, directors or consultants in, or related to, the Business.

ARTICLE 4
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that:

SECTION 4.01 *Corporate Existence and Power*. Buyer is a limited liability company duly incorporated, validly existing, and in good standing under the Laws of the State of Delaware and has all corporate powers and all material governmental licenses, authorizations, Permits, consents, and approvals required to carry on its business as now conducted.

SECTION 4.02 *Corporate Authorization*. The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby are within the powers of Buyer and have been duly authorized by all necessary corporate action on the part of Buyer. Subject to Bankruptcy Court approval, this Agreement and the Ancillary Agreements constitute valid and binding agreements of Buyer (assuming the due authorization, execution, and delivery of this Agreement and the Ancillary Agreements by Seller).

SECTION 4.03 *Governmental Authorization*. The execution, delivery, and performance by Buyer of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby require no material action by or in respect of, or material filing with, any Governmental Unit, agency or official.

SECTION 4.04 *Noncontravention*. The execution, delivery, and performance by Buyer of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate the organizational documents of the Buyer, (ii) assuming compliance with the matters referred to in Section 4.03, materially violate any applicable Law, rule, regulation, judgment, injunction, order, or decree, (iii) require any consent or other action by any Person under, constitute a default under or give rise to any right of termination, cancellation, or acceleration of any right or obligation or to a loss of any benefit to which Buyer is entitled under any provision of any agreement or other instrument binding upon Buyer, or (iv) result in the creation or imposition of any material Lien on any asset of Buyer.

SECTION 4.05 *Financing*. Buyer has, or will have prior to the Closing, sufficient funds available to deliver the Purchase Price, including the timely satisfaction of the Assumed Liabilities and payment of

the Cash Portion of the Purchase Price, if any, to the Seller, and to otherwise consummate the transactions contemplated by this Agreement.

SECTION 4.06 *Litigation*. There is no action, suit, investigation or proceeding pending against, or to the knowledge of Buyer threatened against or affecting, Buyer before any court or arbitrator or any Governmental Unit, agency, or official which in any manner challenges or seeks to prevent, enjoin, alter, or materially delay the transactions contemplated by this Agreement or the Ancillary Agreements.

SECTION 4.07 *Finders' Fees*. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Buyer who might be entitled to any fee or commission from Seller or any of their Affiliates upon consummation of the transactions contemplated by this Agreement or the Ancillary Agreements.

SECTION 4.08 *Not Foreign Person*. Buyer is not a "Foreign Person" as such term is defined at 31 C.F.R § 800.224 and/or 31 C.F.R. § 802.221.

ARTICLE 5
COVENANTS OF SELLER

SECTION 5.01 *Conduct of the Business*. Except as may be required by the Bankruptcy Code and by the Bankruptcy Court in the Chapter 11 Case, from the date hereof until the Closing Date, Seller shall use commercially reasonable efforts to (a) conduct the Business in the ordinary course consistent with past practice over the last six months' time, (b) preserve intact the business organizations and material relationships with third parties, and (c) keep available the services of the present employees of the Business in the ordinary course consistent with past practice over the last six months' time. Without limiting the generality of the foregoing, from the date hereof until the Closing Date, except as disclosed on Schedule 5.01, Seller will not, with respect to the Business:

(a) acquire a material amount of assets from any other Person;

(b) sell, lease, license, or otherwise dispose of any Purchased Assets except (i) otherwise in the ordinary course of business consistent with past practices or (ii) pursuant to Sections 363 or 365 of the Bankruptcy Code;

(c) agree or commit to do any of the foregoing; or

(d) take any action that would reasonably be expected to cause the failure of the conditions contained in Section 9.02(b).

SECTION 5.02 *Access to Information*. From the date hereof until the Closing Date, Seller will, and will cause its Affiliates, as applicable, to (i) give Buyer, its counsel, financial advisors, auditors, and other authorized representatives reasonable access to the offices, properties, employees, books and records of Seller or its Affiliates relating to the Business, and (ii) furnish to Buyer, its counsel, financial advisors, auditors, and other authorized representatives such financial and operating data and other information relating to the Business as such Persons may reasonably request; *provided*, *however*, that such access shall be coordinated through persons as may be designated in writing by Seller for such purpose. Any investigation pursuant to this Section shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Seller. Notwithstanding the foregoing, Buyer shall not have the right to conduct any invasive testing (including digging, installing wells, pumping groundwater, or removing soil) with respect to the Purchased Assets, nor shall Buyer have access to personnel records of Seller relating to individual performance or evaluation records, medical histories, or other information which, in the good

faith determination of Seller, the disclosure of which would subject Seller to material risk of Liability or would violate applicable Law.

SECTION 5.03 *Notices of Certain Events*. Seller shall promptly notify Buyer of:

(a) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b) any notice or other communication from any governmental or regulatory agency or authority in connection with the transactions contemplated by this Agreement; and

(c) any action, event, facts or circumstances that would reasonably be expected to cause the failure of the conditions contained in Section 9.02(b).

ARTICLE 6

COVENANTS OF BUYER AND SELLER

SECTION 6.01 *Reasonable Efforts; Further Assurances*. Subject to the terms and conditions of this Agreement, Buyer and Seller will use their commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Laws and regulations to consummate the transactions contemplated by this Agreement and the Ancillary Agreements. Seller and Buyer agree to execute and deliver such other documents, certificates, agreements, and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement and the Ancillary Agreements and to vest in Buyer good title to the Purchased Assets, *provided*, *however*, that, except as otherwise provided in Section 6.04 of this Agreement, neither Seller nor the Buyer are obligated to incur any material cost or expense or initiate or join in any litigation in order to meet the obligations under this Section 6.01.

SECTION 6.02 *Certain Filings*. Seller and Buyer shall cooperate with one another (a) in determining whether any action by or in respect of, or filing with, any Governmental Unit is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (b) in taking such actions, making any such filings, furnishing information required in connection therewith, and seeking timely to obtain any such actions, consents, approvals, or waivers.

SECTION 6.03 *Public Announcements*. Except for filings effectuated by the Seller in connection with the Chapter 11 Case, the parties agree to consult with each other before issuing any press release or making any public statement with respect to this Agreement or the transactions contemplated hereby and, except for any press releases and public statements the making of which may be required by applicable Law (including the Bankruptcy Code) or any listing agreement with any national securities exchange, will not issue any such press release or make any such public statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed).

SECTION 6.04 *Method of Sale; Bankruptcy Court Approval*.

(a) As promptly as practicable after the Petition Date, Seller shall file a motion in the Chapter 11 Case seeking the entry of an order: (i) approving the sale process for the sale of all or substantially all of the Purchased Assets and the Bid Procedures; (ii) approving the Bid Procedures, including the Break-Up Fee and Expense Reimbursement in favor of Buyer, as defined in, and pursuant to, Section 6.04(c) (collectively, the "**Bid Procedures**"); (iii) scheduling an initial bid deadline, a qualifying

offer deadline, an auction, and a Sale Hearing, as those terms and deadlines are defined and/or described below; (iv) approving the form of the notice of the Sale Hearing and the recipients of that notice; (v) authorizing the sale of the Purchased Assets free and clear of Liens other than any Permitted Liens; and (vi) obtaining such other relief as is necessary, reasonable, and customary in connection therewith.

(b) Seller and the Buyer shall each use their commercially reasonable efforts, and shall cooperate, assist, and consult with each other, to secure the entry of the Sale Order, consistent with the terms of this Agreement and in substantially the form of Exhibit C, approving this Agreement and authorizing the transactions contemplated hereby. Seller and the Buyer shall consult with one another regarding pleadings that any of them intend to file or positions any of them intend to take with the Bankruptcy Court in connection with the Bankruptcy Court's entry of the Sale Order. Seller shall use commercially reasonable efforts to provide Buyer and its counsel with drafts of all notices and filings to be submitted by Seller to the Bankruptcy Court pertaining to this Agreement and the proposed Sale Order.

(c) Seller shall use its best efforts to obtain entry of the Sale Order by the Bankruptcy Court to approve this Agreement and authorize the transactions contemplated hereby, consistent with the Bid Procedures approved by order of the Bankruptcy Court (the "**Bid Procedures Order**"). The Bid Procedures Order must approve Bid Procedures that contain, among other customary protections and procedures relating to process, the following: if Buyer is not in material default under the terms of this Agreement and Buyer is not the successful buyer of the Purchased Assets, then Buyer shall be entitled to (i) payment of a "break-up fee" in an amount equal to $225,000.00 (the "**Break-Up Fee**"), (ii) a reimbursement of reasonable out-of-pocket expenses in an amount not to exceed $100,000.00 (the "**Expense Reimbursement**") and (iii) the return of the Good Faith Deposit.

(d) If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing, re-argument, reversal, or leave to appeal shall be filed with respect to the Sale Order or other such order), Seller and Buyer will, at the sole cost and expense of Buyer, cooperate in taking such steps to diligently defend such appeal, petition, or motion and shall seek an expedited resolution of any such appeal, petition, or motion.

SECTION 6.05 *Notices*. If at any time (a) Buyer becomes aware of any material breach by Seller of any representation, warranty, covenant, or agreement contained herein and such breach is capable of being cured by Seller, or (b) Seller becomes aware of any breach by Buyer of any representation, warranty, covenant, or agreement contained herein and such breach is capable of being cured by Buyer, the party becoming aware of such breach shall promptly notify the other parties, in accordance with Section 12.01, of such breach.

SECTION 6.06 *Communications with Customers and Suppliers*. Prior to the Closing, the Buyer shall not, and shall cause its Affiliates and representatives not to, contact, or engage in any discussions or otherwise communicate with, Seller's customers, suppliers, licensors, licensees, and other Persons with which Seller have commercial dealings without obtaining the prior written consent of Seller. Seller agrees that, subsequent to the Closing, it will refer all customer inquiries or other communications with business relationships relating to the Business to Buyer.

SECTION 6.07 *Winding Up; Dissolution; Liquidation*. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall prohibit Seller from ceasing its operations, converting the Chapter 11 Case to one under chapter 7 of the Bankruptcy Code, or seeking dismissal of the Chapter 11 Case to wind down its affairs outside of bankruptcy at any time after the Closing Date.

SECTION 6.08 *Post-Closing Payments; No Wrong Pockets*.

(a) If, for a period of nine (9) months after the Closing, Seller or any of its Affiliates receive any notices, monies, or amounts that are properly due, deliverable, or owing to the Buyer or attributable to the Purchased Assets (including funds relating to any Purchased Contracts for any post-Closing period) or Assumed Liabilities in accordance with the terms of this Agreement, Seller shall, or shall cause its applicable Affiliates to, promptly, but in any event within twenty (20) Business Days of receipt, remit, pay or deliver, or cause to be remitted, paid, or delivered, to Buyer (or its designated Affiliates) any monies or checks to the extent related to the Business that have been sent to Seller or its Affiliates after the Closing Date by customers, suppliers, or other contracting parties primarily related to or otherwise necessary for the conduct of the Business or to the extent they are or are in respect of a Purchased Asset for any period or an Assumed Liability.

(b) If, for a period of nine (9) months after the Closing, the Buyer or any of its Affiliates receives notices, monies, or amounts that are properly due, deliverable, or owing to the Seller or attributable to the Excluded Assets or Excluded Liabilities in accordance with the terms of this Agreement (or the purposes and intent of this Agreement), Buyer shall, or shall cause its applicable Affiliates to, promptly remit, pay, or deliver, or shall cause to be remitted, paid, or delivered, to Seller (or its designated Affiliates) any monies or checks that have been sent to Buyer or its Affiliates after the Closing Date solely to the extent they are in respect of an Excluded Asset or Excluded Liability.

## ARTICLE 7
## TAX MATTERS

SECTION 7.01 *Tax Cooperation; Allocation of Taxes*.

(a) The Buyer and Seller agree to use commercially reasonable efforts to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including, without limitation, access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the claim of any tax benefit under applicable Law, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit, or proceeding relating to any Tax, in each case with respect to Taxes or Tax Returns in respect of the Business or the Purchased Assets. For a period of three (3) years following the Closing Date, each party shall use commercially reasonable efforts to provide the other with at least ten (10) days' prior written notice before destroying any such books and records with respect to Taxes pertaining to the Purchased Assets with respect to any Tax period (or portion thereof) ending on or prior to the Closing Date, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records. Seller and Buyer shall use commercially reasonable efforts to cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

(b) To the extent not exempt under Section 1146(a) of the Bankruptcy Code in connection with the Chapter 11 Case, all sales, use, value added, registration stamp, recording, documentary, conveyancing, transfer, and similar Taxes, levies, charges, and fees (collectively, "**Transfer Taxes**") incurred in connection with the transactions contemplated by this Agreement shall be borne 50% by Buyer, on the one hand, and 50% by Seller, on the other. Buyer and Seller shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation; *provided*, that the parties shall reasonably cooperate in availing themselves of any available exemptions from any collection of (or otherwise reduce) any such Transfer Taxes, including any exemptions available under the Bankruptcy Code.

(c) For purposes of this Agreement, the Taxes imposed on a periodic basis with respect to the assets in respect of the Purchased Assets for any taxable period that begins on or prior to the Closing Date and ends after the Closing Date (each, a "**Straddle Period**") deemed allocable to the Pre-Closing Tax Period shall be the amount of such Taxes for the entire Straddle Period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period), multiplied by a fraction the numerator of which is the number of calendar days in the portion of such Straddle Period ending on the Closing Date and the denominator of which is the number of calendar days in the entire Straddle Period. The amount of all other Taxes for the Pre-Closing Tax Period shall be deemed allocable to the Pre-Closing Tax Period deemed equal to the amount which would be payable if the taxable year ended on the Closing Date, as determined by means of a closing of the books and records of Seller as of the end of the day on the Closing Date.

## ARTICLE 8
## EMPLOYEE MATTERS

SECTION 8.01 *Employee Matters*.

(a) Transferred Employees. The employment or engagement of each of the Business Employees and independent contractors, consultants, and service providers whom Buyer has determined are necessary for operation of the Business and the Purchased Assets after Closing, including sales personnel that maintain the customer relationships of the Business and the Purchased Assets, shall be transferred to the Buyer, and the Buyer shall accept the transfer of all such employees and independent contractors, consultants, and other service providers automatically effective as of the Closing (collectively, the "**Transferred Employees**"). For a period of one year following the Closing Date, the Buyer shall or shall cause one of its Affiliates to provide each Transferred Employee employed by Buyer or one of its Affiliates with terms and conditions of employment that are substantially similar, in the aggregate, to such Transferred Employee's terms and conditions of employment as of immediately prior to the Closing, including with respect to (i) base salary or hourly wage rate, as applicable, (ii) cash bonus opportunities and incentive opportunities (excluding equity incentive arrangements), and (iii) employee benefits (including vacation accruals, severance payments and benefits). With respect to each Transferred Employee that is an independent contractor, consultant, or other service provider, the Buyer shall assume each such individual's respective contract. Notwithstanding the foregoing, nothing herein will, after the Closing Date, impose on the Buyer any obligation to retain any Transferred Employees in its employment or engagement for any amount of time.

(b) Cooperation. In connection with the Buyer's obligations under this Article 8, prior to the Closing, and provided Buyer is the successful bidder at the auction, Seller shall reasonably cooperate with and assist the Buyer, including: (i) providing such information, to the extent not prohibited by applicable Law, reasonably requested by the Buyer of the Business Employees; and (ii) making the Business Employees available to the Buyer, without interference with the Business, with reasonable advance notice and during normal business hours, for purposes of interviewing and onboarding. Seller shall not take, cause or allow to be taken any action intended to impede, hinder, interfere, or otherwise compete with the Buyer's or its Affiliate's effort to hire any Business Employee. The Buyer shall not be responsible for any Liability, obligation, or commitment arising out of any Business Employee's employment or termination of employment with Seller or non-acceptance of the Buyer's offer of employment or failure to commence employment with the Buyer, which Liabilities, obligations and commitments shall remain those of Seller, subject in each case to Buyer's compliance with its obligations pursuant to this Article 8.

(c) Service Credit. The Buyer and its Affiliates shall treat, and shall cause each plan, program, policy, practice, and arrangement sponsored or maintained by Buyer or any of its Affiliates on or

after the Closing Date and made available to any Transferred Employee (or the spouse, domestic partner or dependent of any Transferred Employee) on or after the Closing Date (each, a "**Buyer Plan**") to treat, for all purposes (including for purposes of determining eligibility to participate, vesting, benefit accrual, and level of benefits (including vacation accruals and severance but not otherwise for purposes of benefit accruals under a defined benefit plan) and including for the purpose of calculating all service-based entitlements under applicable Law), all service with Seller and its Affiliates (and any predecessor employers to the extent Seller and its Affiliates or any corresponding Benefit Plan provides for past service credit) as service with Buyer and its subsidiaries and Affiliates; *provided, however*, that such service need not be counted to the extent it would result in duplication of benefits and such service need only be credited to the same extent and for the same purpose as such service was credited under the corresponding Benefit Plan; *provided*, *further*, that with respect to any Buyer Plan for which third party consent would be required to provide such service credit, Buyer and its Affiliates shall use their respective commercially reasonable efforts to cause the foregoing to be implemented.

(d) Welfare Benefits. The Buyer and its subsidiaries and Affiliates shall use commercially reasonable efforts to cause each Buyer Plan that is a welfare benefit plan, within the meaning of Section 3(l) of ERISA, and in which any Transferred Employee commences participation in: (i) to waive any and all eligibility waiting periods, actively-at-work requirements, evidence of insurability requirements, pre-existing conditions limitations, and other exclusions and limitations, regarding the Transferred Employees and their spouses, domestic partners, and dependents to the extent such exclusions, requirements or limitations were waived or satisfied by (or were not applicable) a Transferred Employee under the corresponding Benefit Plan, and (ii) to recognize for each Transferred Employee any deductible, copayment, and out-of-pocket expenses paid by such Transferred Employee and his or her spouse, domestic partner, and dependents under any Benefit Plan that provides welfare benefits during the plan year in which occurs the later of the Closing Date and the date on which such Transferred Employee begins participating in such Buyer Plan for purposes of satisfying the corresponding deductible, co-payment, and out-of-pocket provisions under such Buyer Plan. Except as required by applicable Law, effective as of the Closing Date, each Transferred Employee who is a participant in any Benefit Plan shall cease to accrue benefits under and be an active participant in any such Benefit Plan.

(e) Claims Incurred. Seller shall remain liable and retain responsibility for, and continue to pay in accordance with, the terms of the applicable Benefit Plan, all medical, dental, life insurance, and other welfare plan expenses and benefits for each Transferred Employee with respect to claims incurred by such Transferred Employee (or his or her spouse, domestic partner and/or dependents) which are covered by such Benefit Plan, whether incurred prior to, on or after the Closing Date, and shall remain liable for workers compensation claims (including medical, disability, permanency, and expense claims) incurred by any Transferred Employee prior to the Closing Date. The Buyer or one of its Affiliates shall be responsible for all expenses and benefits with respect to claims incurred by any Transferred Employee (or his or her spouse, domestic partner and/or dependents) on or after the Closing Date and which are covered by any Buyer Plan and shall be liable and responsible for workers compensation claims (including medical, disability, permanency and expense claims) incurred by any Transferred Employee on or after the Closing Date. For purposes of this Section 8.01(e), a claim is deemed incurred: in the case of medical or dental benefits, when the services that are subject to the claim are performed; in the case of life insurance, when the death occurs; in the case of accidental death and dismemberment or workers compensation claims, when the event giving rise to the claim occurs; and in the case of a claim that results in a hospital admission, on the date of admission.

(f) Wage Reporting. Buyer and Seller agree to utilize, or cause their respective Affiliates to utilize, the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320, with respect to wage reporting for the Transferred Employees. Notwithstanding anything to the contrary in this Agreement, Seller shall (or shall cause its Affiliates to) provide copies to Buyer of any

records relating to withholding and payment of income and unemployment Taxes (federal, state and local) and FICA and FUTA Taxes and any and all state unemployment payment reserves and/or charge history with respect to wages paid to the Transferred Employees for the calendar year in which the Closing occurs (including without limitation, Forms W-4 and Employee's Withholding Allowance Certificates).

(g) No Third-Party Beneficiaries. Nothing in this Agreement, express or implied, shall confer upon any employee, independent contractor, any beneficiary, or any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement, including any right to employment or continued employment for any specified period or continued participation in any Benefit Plan or other benefit plan, or any nature or kind whatsoever under or by reason of this Agreement. Nothing contained herein, express or implied, (i) shall be construed to establish, amend, modify, or terminate any benefit or compensation plan, program, agreement or arrangement, policy, or scheme, including any Benefit Plan, or restrict or otherwise limit the right of any party hereto to amend, terminate, or otherwise modify any such plans or arrangements, or (ii) shall be construed as a guarantee of employment for any period, or a restriction or other limitation on the right of any party hereto to terminate the employment of any individual at any time. The parties hereto agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any current or former employee or other service provider.

## ARTICLE 9
## CONDITIONS TO CLOSING

SECTION 9.01 *Conditions to Obligations of Buyer and Seller*. The obligations of Buyer and Seller to consummate the Closing are subject to the satisfaction of the following conditions:

(a) *No Orders*. No Governmental Unit shall have enacted, enforced, or entered any Law and no order shall be in effect on the Closing Date that prohibits the consummation of the Closing and no action or Proceeding shall have been initiated or threatened by a Governmental Unit that could reasonably be likely to delay or prohibit the consummation of the Closing.

(b) *Sale Order*. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect and shall not be subject to a stay pending appeal.

SECTION 9.02 *Conditions to Obligation of Buyer*. The obligation of Buyer to consummate the Closing is subject to the satisfaction of the following further conditions:

(a) *Covenants*. Seller shall have performed in all material respects all of its material obligations hereunder required to be performed by Seller on or prior to the Closing Date.

(b) *Representations and Warranties*. The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (except to the extent such representations and warranties speak as of another date, in which case such representations and warranties shall be true and correct as of such other date).

(c) *Certificate.* Seller shall have delivered to the Buyer a certificate duly executed by an executive officer of Seller certifying to the effect that the conditions set forth in Section 9.02(a) and Section 9.02(b) have been satisfied.

(d) *Deliveries*. Seller shall make or cause to be made the deliveries described in Section 2.09(a).

(e) *Material Adverse Effect*. There shall have been no Material Adverse Effect.

SECTION 9.03 *Conditions to Obligation of Seller*. The obligation of Seller to consummate the Closing is subject to the satisfaction of the following further conditions:

(a) *Covenants*. The Buyer shall have performed in all material respects all of its material obligations hereunder required to be performed by it at or prior to the Closing Date.

(b) *Representations and Warranties.* The representations and warranties of the Buyer contained in this Agreement shall be true and correct at and as of the Closing Date, as if made at and as of such date (except to the extent such representations and warranties speak as of another date, in which case such representations and warranties shall be true and correct as of such other date).

(c) *Certificate.* The Buyer shall have delivered to Seller a certificate duly executed by an executive officer of the Buyer certifying to the effect that the conditions set forth in Section 9.03(a) and Section 9.03(b) have been satisfied.

(d) *Deliveries*. The Buyer shall make or cause to be made the deliveries described in Section 2.09(b), including payment of the Purchase Price.

SECTION 9.04 *Waiver of Conditions Precedent*. Upon the occurrence of the Closing, any condition set forth in this Article 9, other than as provided in Section 9.01(b), that was not satisfied as of the Closing shall be deemed to have been waived as of and after the Closing.

ARTICLE 10
SURVIVAL

SECTION 10.01 *Survival*. The representations and warranties of each of Seller and the Buyer contained in this Agreement, in any Ancillary Agreement, or in any certificate or other writing delivered in connection herewith shall not survive the Closing. The covenants and agreements of each of Seller and the Buyer that by their terms are to be performed before Closing shall not survive the Closing, The covenants and agreements contained herein and in any Ancillary Agreement that by their terms are to be performed after Closing shall survive the Closing (a) for such period expressly set forth in this Agreement or (b) if a period is not expressly set forth, then for the applicable statute of limitations.

ARTICLE 11
TERMINATION

SECTION 11.01 *Grounds for Termination*. This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written agreement of Seller and Buyer;

(b) by Buyer if: (i) by September 11, 2024, the Bankruptcy Court shall have not entered the Bid Procedures Order consistent with the milestones set forth herein; (ii) the deadline for competing, qualified bids ("**Qualified Bids**") under the Bid Procedures Order is established later than October 15, 2024; (iii) by no later than October 22, 2024, Seller shall not have completed the auction pursuant to the approved Bid Procedures; (iv) Buyer is the successful bidder at the auction and the Bankruptcy Court shall not have conducted the Sale Hearing and entered a final order approving the Section 363 sale of the Purchased Assets contemplated herein to Buyer on or before October 30, 2024; or (v) Buyer is the successful bidder at the auction and Buyer's acquisition of the Purchased Assets shall have not closed on

or before November 22, 2024 (the "**Outside Date**"); *provided*, *however*, that if Buyer is determined to be the successful backup bidder at the auction, then pursuant to the Bid Procedures Order, Buyer's acquisition of the Purchased Assets shall have not closed on or before November 29, 2024.

(i) In addition to the foregoing deadlines in this Section 11.01(b), for purposes of this Agreement and the Bid Procedures, Seller shall obtain authority from the Bankruptcy Court in the Bid Procedures Order to define the Qualified Bids that shall have the right to participate in the auction as being bona fide, binding, and duly executed written offers to purchase the Purchased Assets with no financing contingency, and which: (A) must be no less than the Purchase Price, plus the Break-Up Fee, plus the Expense Reimbursement, plus an initial overbid of $150,000; (B) is in a form substantially similar to the form of this Agreement; (C) is irrevocable until the conclusion of the Sale Hearing or such later time as provided in the Bid Procedures Order; (D) is an all cash bid that shall be accompanied by a cashier's check or wire transfer in the amount of (1) $325,000 if it is a bid for all or substantially all of the Sale Assets, or (2) 5% of the proposed purchase price if it is a bid for less than all of the Sale Assets, as a good faith deposit to be held by the Escrow Agent; and (E) is accompanied by such evidence reasonably acceptable to the Seller demonstrating the proposed bidder's ability to close the proposed transaction.

(c) by Buyer if the Sale Order does not expressly approve Seller's assumption and assignment of the Real Property Lease to the Buyer pursuant to Section 365 of the Bankruptcy Code;

(d) by Buyer if the Purchase Price exceeds $7,470,000 (the "**Cap on the Purchase Price**");

(e) by either Seller or Buyer, if any condition set forth in Section 9.01 is not satisfied, and such condition is incapable of being satisfied by the Outside Date;

(f) by Seller, if failure to perform any covenant or agreement on the part of the Buyer set forth in this Agreement shall have occurred that would cause the conditions set forth in Section 9.03 not to be satisfied;

(g) by Buyer, if failure to perform any covenant or agreement on the part of the Seller set forth in this Agreement shall have occurred that would cause the conditions set forth in Section 9.02 not to be satisfied;

(h) by the Buyer if the Disclosure Schedules fail to be finalized in accordance with Section 12.11;

(i) upon the closing of a bid submitted by a Person other than Buyer, and provided that Buyer is not in default hereunder, then subject to the terms and conditions of the Bid Procedures Order concerning back-up bids, this Agreement shall be null and void and of no legal effect whatsoever upon Seller's return of the Good Faith Deposit to Buyer, and, other than with respect to payment of the Break-Up Fee and Expense Reimbursement to Buyer, each party hereto shall otherwise suffer their own losses, costs, expenses, or damages arising out of, or related to this Agreement; or

(j) by either of the parties hereto if the other party materially defaults under this Agreement or if the Closing shall not have occurred at or before 5:00 p.m. on the Outside Date; *provided*, *however*, that the right to terminate this Agreement under this subparagraph shall not be available to any party whose failure to fulfill any of its obligations under this Agreement has been the cause of or resulted in the failure of the Closing to occur on or prior to the aforesaid date, *provided further*, *however*, that: (i) if

Buyer is not in default hereunder and Seller fails to make the required deliveries at the Closing or materially defaults under this Agreement with no fault of Buyer, then Buyer shall have the right to: (A) terminate this Agreement and thereupon this Agreement shall be null and void and of no legal effect whatsoever upon Seller's return of the Good Faith Deposit to Buyer or (B) pursue the remedy of specific performance of this Agreement in the Bankruptcy Court, in which case, if successful, Buyer shall be entitled to offset from the Purchase Price at Closing all of its reasonable costs and expenses incurred in connection therewith (including, without limitation, reasonable attorneys' fees); and (ii) if Seller is not in default hereunder, and Buyer fails to make the required deliveries at the Closing or materially defaults under this Agreement (including the failure of conditions in Section 9.03 hereof) with no fault of Seller, including if Buyer fails to pay the balance of the Purchase Price at the Closing as set forth above, or refuses to close for any reason, then Seller, as its sole remedy, shall be entitled to retain the Good Faith Deposit as liquidated damages for Buyer's default.

(k) The party desiring to terminate this Agreement pursuant to this Section 11.01 (other than pursuant to Section 11.01(a)) shall give notice of such termination to the other party in accordance with Section 12.01.

SECTION 11.02 *Effect of Termination*.

(a) If this Agreement is terminated as permitted by Section 11.01, such termination shall be without Liability of either party (or any stockholder, director, officer, employee, agent, consultant, or representative of such party) to the other party to this Agreement except as provided in Section 2.07 and this Section 11.02.

(b) The provisions of Sections 2.07, Section 11.02, 11.03, 12.04, 12.05 and 12.06 shall survive any termination hereof pursuant to Section 11.01.

SECTION 11.03 *Expenses*. Except as otherwise expressly provided herein, whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated thereby shall be paid by the party hereto incurring such expenses.

SECTION 11.04 *Exclusive Remedies*. Except as otherwise provided in Section 11.01, in the event of any breach prior to the Closing by either party of any of such party's agreements, covenants, representations, or warranties contained herein or in the Bid Procedures, the Sale Order, including any breach that is material or willful, except as set forth in Section 12.12, the parties' sole and exclusive remedy shall be to exercise such party's rights to terminate this Agreement pursuant to Section 11.01, and, as applicable, to receive the Good Faith Deposit pursuant to Section 2.07, and such party shall not have any further cause of action for damages, specific performance or any other legal or equitable relief against the other parties hereto or any of their respective former, current or future holders of equity interests, directors, officers, Affiliates, agents or representatives with respect thereto.

## ARTICLE 12
## MISCELLANEOUS

SECTION 12.01 *Notices*. All notices, requests, claims, demands or other communications hereunder shall be deemed to have been duly given and made if in writing and (a) at the time personally delivered if served by personal delivery upon the party hereto for whom it is intended, (b) at the time received if delivered by registered or certified mail (postage prepaid, return receipt requested) or by a national courier service (delivery of which is confirmed), or (c) upon confirmation if sent by facsimile or

email; in each case to the Person at the address set forth below, or such other address as may be designated in writing hereafter, in the same manner, by such Person:

if to Buyer, to:

X-Metals Acquisition, LLC
Attn: Mark Holm and Jim Kozlowski
E mail: jkozlowski@x-metals.com and mholm@x-metals.com

with a copy to (which shall not constitute notice):

Perkins Coie LLP
110 North Wacker Drive, Suite 3400
Chicago, IL 60606
Attn: Ted Wern and Brian Audette
E-mail: twern@perkinscoie.com and baudette@perkinscoie.com

if to Seller, to:

before Closing:

Berkshire Investments, LLC
1601 South 54th Avenue
Cicero, Illinois 60804
Attn: Patrick J. Balson
Email: pbalson@cxmetals.com
Attn: Dick Jenkins
Email; jenkinsrn@aol.com

after Closing:

Berkshire Investments, LLC
c/o RD Company Agents Chicago, Inc.
180 North LaSalle Street, Suite 3300
Chicago, Illinois 60601
Attn: Patrick J. Balson
Email: patrickbalson22@gmail.com
Attn: Richard N. Jenkins
Email; jenkinsrn@aol.com
Attn: Steve Jakubowski
Email: sjakubowski@robbinsdimonte.com

with a copy to:

Robbins DiMonte, Ltd.
180 North LaSalle Street, Suite 3300
Chicago, Illinois 60601
Attn: Steve Jakubowski and Robert E. Harig
Email: sjakubowski@robbinsdimonte.com and rharig@robbinsdimonte.com

SECTION 12.02 *Amendments and Waivers*.

(a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b) No failure or delay by any party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. Subject to Section 11.04, the rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

SECTION 12.03 *Successors and Assigns*. No party shall be entitled to assign this Agreement or any rights or obligations hereunder without the prior written consent of, with respect to any assignment by Buyer, Seller, and, with respect to any assignment by Seller, Buyer, which consent may be withheld by the applicable party in its sole and absolute discretion, and any such attempted assignment without such prior written consent shall be void and of no force and effect, *provided*, *however*, that Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Affiliates or wholly-owned subsidiaries without the prior written consent of Seller so long as prior to such assignment such assignee(s) of Buyer agrees in writing in favor of Seller to be bound by the provisions of this Agreement, it being agreed that no such assignment shall relieve Buyer of any of its obligations hereunder.

SECTION 12.04 *Governing Law*. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by and construed in accordance with the Law of the State of Illinois, without regard to the conflicts of Law rules of such state.

SECTION 12.05 *Jurisdiction*. The parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court, and each of the parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in the Bankruptcy Court or that any such suit, action, or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. Process in any such suit, action, or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 12.01 shall be deemed effective service of process on such party.

SECTION 12.06 *WAIVER OF JURY TRIAL*. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 12.07 *Counterparts; Third Party Beneficiaries*. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto. No provision of this Agreement is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

SECTION 12.08 *Entire Agreement*. This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written.

SECTION 12.09 *Bulk Sales Laws*. Buyer hereby waives compliance by Seller and Seller hereby waive compliance by Buyer, with the provisions of the "bulk sales", "bulk transfer" or similar Laws other than any Laws which would exempt any of the transactions contemplated by this Agreement from any Tax Liability which would be imposed but for such compliance.

SECTION 12.10 *Captions, Headings, Interpretation*. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disbarring any party by virtue of authorship of any provisions of this Agreement.

SECTION 12.11 *Disclosure Schedules*. The parties acknowledge and agree that (i) the Disclosure Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Buyer and (ii) the disclosure by Seller of any matter in the Disclosure Schedules shall not be deemed to constitute an acknowledgment by Seller that the matter is required to be disclosed by the terms of this Agreement or that the matter is material. If any Disclosure Schedule discloses an item or information in such a way as to make its relevance to the disclosure required by another Disclosure Schedule reasonably apparent, the matter shall be deemed to have been disclosed in such other Disclosure Schedule, notwithstanding the omission of an appropriate cross-reference to such other Disclosure Schedule. The parties acknowledge that the Disclosure Schedules may not be complete as of the execution of this Agreement, and the parties hereby covenant they each will use commercially reasonable efforts to complete and deliver the Disclosure Schedules as soon as practical following the execution of this Agreement. Disclosure Schedules not included as attachments to this Agreement upon the execution and delivery hereof shall be delivered by the party responsible therefor no later than the deadline in the Bid Procedures Order for submitting Qualified Bids, and shall thereupon, if mutually acceptable to the parties, be deemed included in this Agreement as if such Disclosure Schedule was attached to this Agreement as of the execution of this Agreement.

SECTION 12.12 *Specific Performance*. The parties recognize that if the Buyer breaches this Agreement or refuses to perform under the provisions of this Agreement, monetary damages alone would not be adequate to compensate Seller for its injuries. Seller shall therefore be entitled, in addition to any other remedies that may be available, to equitable relief, including an injunction or injunctions or orders for specific performance, to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement (including, for the avoidance of doubt, the obligation of the Buyer to consummate the transactions contemplated by this Agreement), without proof of actual damages or the posting of a bond or other undertaking. If any action is brought by Seller to enforce this Agreement, the Buyer shall waive the defense that there is an adequate remedy at Law.

SECTION 12.13 *Time of the Essence*. Time shall be of the essence of this Agreement.

SECTION 12.14 **"As Is", "Where Is", and "With all Faults" Transaction**. BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN ARTICLE 3, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS. BUYER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF ALL PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS BUYER DEEMS NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION

OF THE ACQUIRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE 3, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, BUYER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS." WITH RESPECT TO ALL MATTERS AND WITHOUT RELIANCE UPON ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES OF ANY NATURE MADE BY OR ON BEHALF OF OR IMPUTED TO SELLER, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER ACKNOWLEDGES THAT SELLER DOES NOT MAKE ANY REPRESENTATION OR WARRANTY WITH RESPECT TO (I) ANY PROJECTIONS (INCLUDING WITH RESPECT TO ANY BALANCE SHEET), ESTIMATES OR BUDGETS DELIVERED TO OR MADE AVAILABLE TO BUYER OF FUTURE REVENUES, FUTURE RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), FUTURE CASH FLOWS OR FUTURE FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) OF THE BUSINESS OR THE FUTURE BUSINESS AND OPERATIONS OF THE BUSINESS OR (II) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS COUNSEL, ACCOUNTANTS OR ADVISORS WITH RESPECT TO THE BUSINESS, EXCEPT, IN EACH CASE, AS EXPRESSLY SET FORTH IN THIS AGREEMENT (AS QUALIFIED BY THE DISCLOSURE SCHEDULES) OR IN ANY ANCILLARY AGREEMENT.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BUYER**:

X-METALS ACQUISITION, LLC

By: ______________________________
Name: ______________________________
Its: Chief Executive Officer

**SELLER**:

BERKSHIRE INVESTMENTS, LLC

By: ______________________________
Name: Patrick J. Balson
Its: Chief Executive Officer

**EXHIBIT A**

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

**EXHIBIT B**

**INTELLECTUAL PROPERTY ASSIGNMENT**

# EXHIBIT C

# SALE ORDER

To be inserted.

# SCHEDULE 2.01(a)

## Real Property

1. Lease made and entered into as of March 8, 2023, by and between J2M-CICERO, LLC, an Illinois limited liability company, and BERKSHIRE INVESTMENTS LLC, an Illinois limited liability company, as amended by that certain Settlement Agreement and Mutual Release dated May 1, 2024, by and between Landlord and Tenant (the "**Lease**").

**SCHEDULE 2.01(d)**

**Chapter 11 Contracts**

| | **Contract** | **Cure Cost** |
|---|---|---|
| 1. | The Lease<br>Real property lease between J2M Cicero, LLC and Berkshire Investments, LLC dated March 8, 2023 related to the real property commonly known as 1601 South 54th Avenue, Cicero, Illinois 60804. | $515,614.13 |
| 2. | The Union Contract<br>The Union Contract in effect between the Debtor and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, on behalf of its Local 7-0717. | $146,267.04 |
| 3. | Purchase Order CX27715<br>Dated March 24, 2022, issued by Seller to Power Parts International Inc. for the Power Supply built for Melter #4 in East Bay - Unit | $66,294.00 |
| 4. | Master Lease Agreement<br>Dated as of February 2, 2016, by and between Crown Equipment Corporation (as successor to and doing business as Crown Credit Company) and Berkshire Investments LLC, and incorporating (i) that certain Lease Schedule No. 40570150, dated as of January 8, 2020 and (ii) that certain Lease Schedule No. 40678231, dated as of March 2, 2022 | $7,410.47 |
| 5. | Master Lease Agreement – Equipment<br>Dated as of June 9, 2011, by and between Atlas Toyota Material Handling, LLC and Berkshire Investments LLC, incorporating that certain Equipment Schedule No. 11 to Master Lease Agreement – Equipment, dated as of May 27, 2022 | $6,325.71 |

**SCHEDULE 2.01(g)**

**Seller Intellectual Property**

**Trademarks**

| Jurisdiction | Mark | Registration Number | Registration Date |
|---|---|---|---|
| U.S. | Biobrass | 4,017,616 | 8/30/2011 |
| Czech Republic | Biobrass | 4,017,616 | 8/30/2011 |

**Domain Names**

| Domain Name | Domain Name Registrar | Expiration Date |
|---|---|---|
| http://www.CXMetals.com | GoDaddy.com | March 6, 2025 |

**Assumed Name**

Chicago Extruded Metals Company

# SCHEDULE 2.03

## Assumed Liabilities

None.

# SCHEDULE 2.06

## Estimated Purchase Price Worksheet

*[See attached.]*

# SCHEDULE 3.04

## Governmental Authorization

None.

## SCHEDULE 3.06

**Properties**

1. Under the Lease, Seller conducts its business at a commercial facility located at 1601 South 54th Avenue, Cicero, IL 60804.

# SCHEDULE 5.01

**Conduct of Business**

None